RECORD NO. 19-4104

*In The*
# United States Court of Appeals
*For The Fourth Circuit*

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## PRECIAS K. FREEMAN,

*Defendant – Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT SPARTANBURG
_____

JOINT APPENDIX
VOLUME I OF II
(Pages 1 – 203)
_____

Hannah Rogers Metcalfe
METCALFE & ATKINSON, LLC
1395 South Church Street
Greenville, South Carolina 29605
(864) 214-2340

William J. Watkins, Jr.
OFFICE OF THE U.S. ATTORNEY
55 Beattie Place, Suite 700
Greenville, South Carolina 29601
(864) 282-2100

*Counsel for Appellant*

*Counsel for Appellee*

# TABLE OF CONTENTS
## VOLUME I OF II

**Appendix Page**

Docket Entries.................................................................1

Indictment
    filed February 14, 2017 ...................................... 11

Transcript of Change of Plea before
The Honorable Timothy M. Cain
    on June 6, 2017 ......................................... 13

Guilty Plea
    filed June 6, 2017 ........................................75

Transcript of Status Conference Hearing before
The Honorable Timothy M. Cain
    on July 9, 2018 ..........................................76

Defendant's Motion to Enter the Bridge Program,
With Exhibits,
    filed December 5, 2018 ...............................87

    Exhibits:

    1.    Diagnosis
        dated September 20, 2017 ....................94

    2.    Diagnostic Formulation
        dated September 20, 2017 ....................96

    3.    Excerpt of *Interim Report on the Bridge Drug Court Program*
        dated August 2016.................................98

    4.    Excerpt of *Interim Report on the Bridge Drug Court Program*
        dated August 2016.................................99

    5.    Copies of Prescription and Pharmacy's Recipient Report
        dated March 2015............................. 100

Transcript of Sentencing Hearing before
The Honorable Timothy M. Cain
     on December 13, 2018 ........................................................... 102

     Exam by the Court ............................................................. 104

Judgment in a Criminal Case
     filed December 13, 2018 ......................................................... 145

Defendant's Petition for Rehearing; or, in the Alternative,
Motion for Reconsideration
     filed December 24, 2018 ........................................................ 151

Defendant's Amended Petition for Rehearing; or, in the
Alternative, Amended Motion for Reconsideration,
With Exhibits,
     filed December 26, 2018 ......................................................... 167

     Exhibits:

    1.    Description of Drug Test Failure
         dated August 23, 2017 ...................................................... 183

    2.    Emails to Agent Webber
         various dates ................................................................. 184

    3.    Excerpts of *Interim Report on the Bridge Drug Court Program*
         dated August 2016 ............................................................ 186

    4.    Hillcrest Hospital Records
         various dates ................................................................. 188

    5.    Forrester Center Evaluation
         dated September 27, 2018 ................................................... 189

Government's Response to Motion for Reconsideration
     filed January 9, 2019 ........................................................... 192

Defendant's Reply to the Government's Response to
Her Motion for Reconsideration
     filed January 14, 2019 ......................................................... 196

**Text Order Denying Motion for Reconsideration**
    **filed January 30, 2019** ................................................................. 200

**Defendant's Notice of Appeal**
    **filed February 12, 2019** ................................................................. 202

## <u>TABLE OF CONTENTS</u>
## VOLUME II OF II – UNDER SEAL

<u>**Appendix Page**</u>

**Presentence Investigation Report**
     **date prepared March 16, 2018**
     **date revised July 30, 2018**...................................................................... **204**

**Government's Sentencing Memorandum,**
**With Exhibits,**
     **filed September 26, 2018** ......................................................... **224**

     <u>**Exhibits:**</u>

     **A.    South Carolina Department of Health and**
            **Environmental Control Bureau of Drug Control**
                  **dated March 3, 2015**............................................... **231**

     **B.    Report of Investigation**
                  **dated July 31, 2017**................................................ **237**

**Revised Addendum to the Presentence Report**
     **filed October 3, 2018** ................................................................ **242**

**Defendant's Objections to Revised Presentence Investigation Report**
     **filed October 15, 2018**.................................................................. **246**

APPEAL,CLOSED

# U.S. District Court
## District of South Carolina (Spartanburg)
## CRIMINAL DOCKET FOR CASE #: 7:17-cr-00079-TMC-1

Case title: USA v. Freeman
Related Case: 7:19-cv-02480-TMC

Date Filed: 02/14/2017
Date Terminated: 12/13/2018

---

Assigned to: Honorable Timothy M Cain

Appeals court case number: 19-4104 4CCA

**Defendant (1)**

**Precias K Freeman**
*TERMINATED: 12/13/2018*

represented by **David Wilson Plowden**
316 N Church Street
Walhalla, SC 29691
864-710-1577
Email: lawyer.d.plowden@gmail.com
*TERMINATED: 07/19/2017*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

**Lora Collins Blanchard**
Federal Public Defender's Office (Gvle)
Two Liberty Square
75 Beattie Place
Suite 950
Greenville, SC 29601
864-235-8714
Fax: 864-233-0188
Email: lora_blanchard@fd.org
*TERMINATED: 07/23/2018*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or
Community Defender Appointment*

**Donald L Smith**
Donald Smith Law Office
122 N Main Street
Anderson, SC 29621
864-642-9284
Fax: 864-642-9285
Email: attorneydonaldsmith@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:846, 21:841(1)(1) and 841(b)(1)(C)CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCE; 10/2014 (1) | The defendant is sentenced to 210 months imprisonment and 3 years supervised release. $100.00 special assessment. Defendant remanded to the custody of he United States Marshal. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

**Interested Party**

**Sandra Stowers**
*surety bondsman*

represented by **Sandra Stowers**
Giggies Bail Bonding
508 Laurens Rd
Greenville, SC 29607
864-271-7386
PRO SE

---

**Plaintiff**

**USA**

represented by **William J Watkins , Jr**
US Attorneys Office (Gville)
55 Beattie Place
Suite 700
Greenville, SC 29601
864-282-2100
Fax: 864-233-3158
Email: bill.watkins@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2017 | 2 | INDICTMENT (Sealed Grand Jury Ballot attached) as to Precias K Freeman (1) count(s) 1. (Attachments: # 1 GJ Ballot) (alew, ) (Entered: 02/14/2017) |
| 02/14/2017 | 5 | **ORDER FOR ISSUANCE OF Bench WARRANT as to Precias K Freeman. Signed** |

| | | by Magistrate Judge Jacquelyn D Austin on 2/14/17.(alew, ) (Main Document 5 replaced on 2/15/2017) (alew, ). Modified on 2/15/2017 to replace document per clerk (alew, ). (Entered: 02/14/2017) |
|---|---|---|
| 02/14/2017 | 7 | **Writ of Habeas Corpus ad Prosequendum Issued as to Precias K Freeman as needed. Signed by Magistrate Judge Jacquelyn D Austin on 2/14/17.(alew, )** Modified on 2/14/2017 to edit text (alew, ). (Main Document 7 replaced on 2/15/2017) (alew, ). Modified on 2/15/2017 to replace document per clerk (alew, ). (Entered: 02/14/2017) |
| 02/14/2017 | 8 | NOTICE OF HEARING as to Precias K Freeman Arraignment set for 2/24/2017 10:00 AM in Greenville #1, Clement F Haynsworth Fed Bldg, 300 E Washington St, Greenville before Magistrate Judge Jacquelyn D Austin. (alew, ) (Entered: 02/14/2017) |
| 02/24/2017 | 9 | Arrest of Precias K Freeman. Clerk notified by: USM. (ncha, ) (Entered: 02/24/2017) |
| 02/24/2017 | 10 | **ORAL ORDER APPOINTING FEDERAL PUBLIC DEFENDER David Wilson Plowden for Precias K Freeman entered by Magistrate Judge Jacquelyn D Austin on 2/24/2017.(ncha, )** (Entered: 02/24/2017) |
| 02/24/2017 | 11 | **Minute Entry for proceedings held before Magistrate Judge Jacquelyn D Austin: Arraignment as to Precias K Freeman (1) Count 1 held on 2/24/2017. Defendant present in custody with Attorney David Plowden. Federal Public Defender's Office appointed to represent Defendant. Defendant waived reading of indictment and penalties. Plea of not guilty entered by the Court. Bond set at $25,000 secured. Will reconvene for conditions if bond is posted. May readdress if state bond is no longer an issue. Court Reporter Debra Bull. (ncha, )** (Entered: 02/24/2017) |
| 02/24/2017 | 12 | **ORAL ORDER Setting Bond at $25,000 secured as to Precias Freeman entered by Magistrate Judge Jacquelyn D Austin on 2/24/17. Will reconvene for conditions if bond is posted. (ncha, )** (Entered: 02/24/2017) |
| 02/27/2017 | 14 | Warrant Returned Executed on 02/24/2017 in case as to Precias K Freeman. (bwalters-USMS, ) (Entered: 02/27/2017) |
| 03/01/2017 | 15 | CJA 23 Financial Affidavit (Restricted Access) by Precias K Freeman (mpridmore-USPO, ) (Entered: 03/01/2017) |
| 03/01/2017 | 16 | Case Reassigned as to Precias K Freeman to Judge Honorable Timothy M Cain. Judge Unassigned - CRI no longer assigned to the case. (pcas, ) (Entered: 03/01/2017) |
| 03/03/2017 | 17 | NOTICE OF HEARING as to Precias K Freeman: Bond Conditions Hearing set for 3/6/2017 10:00 AM in Greenville #4, Clement F Haynsworth Fed Bldg, 300 E Washington St., Greenville before Magistrate Judge Kevin McDonald. (awil, ) (Entered: 03/03/2017) |
| 03/06/2017 | 18 | **Minute Entry for proceedings held before Magistrate Judge Kevin McDonald: Bond Hearing as to Precias K Freeman held on 3/6/2017. Defendant present in custody with counsel. Bond is $25,000 secured. Bondsman has signed. Special conditions as follows: home confinement with GPS monitoring; drug testing as directed by US Probation Office; defendant must comply with state bonds; defendant must reside at parent's residence. Pretrial to verify residence prior to defendant's release. Tape #CourtSmart 4. (awil, )** (Entered: 03/06/2017) |
| 03/06/2017 | 19 | **ORDER Setting Conditions of Release as to Precias K Freeman (1). Bond is $25,000 secured. Special conditions as follows: home confinement with GPS monitoring; drug testing as directed by US Probation Office; defendant must comply with state bonds; defendant must reside at parents' residence. Pretrial to verify residence prior to defendant's release. Signed by Magistrate Judge Kevin McDonald on 3/6/17.(awil, )** (Entered: 03/06/2017) |

| | | |
|---|---|---|
| 03/06/2017 | 20 | SECURED Bond Entered as to Precias K Freeman in amount of $ 25,000. Defendant is ready to be released from USM custody. (Attachments: # 1 Power of Attorney)(awil, ) (Entered: 03/06/2017) |
| 03/14/2017 | 23 | SCHEDULING NOTICE as to Precias K Freeman:Motions due by 3/22/2017. Pretrial Conference and/or Change of Plea set for 4/10/2017 02:00 PM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Honorable Timothy M Cain. (Attachments: # 1 Judge Cain Criminal Standing Order)(pbri, ) (Entered: 03/14/2017) |
| 03/14/2017 | 24 | ***DOCUMENT MAILED as to Precias K Freeman re 23 Scheduling Notice, placed in U.S. Mail to Surety (pbri, ) (Entered: 03/14/2017) |
| 04/07/2017 | 25 | MOTION to Continue by Precias K Freeman. No proposed order(Plowden, David) (Entered: 04/07/2017) |
| 04/07/2017 | 26 | **TEXT ORDER granting 25 Motion to Continue as to Precias K Freeman (1). Ordered by Honorable Timothy M Cain on 4/7/17.(pbri, )** (Entered: 04/07/2017) |
| 04/07/2017 | 27 | NOTICE OF CANCELLATION OF HEARING: 4/10/17 Pretrial as to Precias K Freeman (pbri, ) (Entered: 04/07/2017) |
| 04/26/2017 | 28 | SCHEDULING NOTICE as to Precias K Freeman: Motions due by 5/18/2017. Pretrial Conference and/or Change of Plea set for 6/6/2017 09:30 AM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Honorable Timothy M Cain. (Attachments: # 1 Judge Cain Criminal Standing Order)(pbri, ) (Entered: 04/26/2017) |
| 04/27/2017 | 29 | ***DOCUMENT MAILED as to Precias K Freeman re 28 Scheduling Notice, placed in U.S. Mail to Surety (pbri, ) (Entered: 04/27/2017) |
| 06/06/2017 | 30 | **Minute Entry for proceedings held before Honorable Timothy M Cain: Pretrial Conference as to Precias K Freeman held on 6/6/2017. Defendant present with counsel and to enter a guilty plea. Court Reporter Karen Martin. (pbri, )** (Entered: 06/06/2017) |
| 06/06/2017 | 31 | **Minute Entry for proceedings held before Honorable Timothy M Cain: Change of Plea Hearing as to Precias K Freeman held on 6/6/2017. Precias K Freeman (1) Guilty Count 1. Court Reporter Karen Martin. (pbri, )** (Entered: 06/06/2017) |
| 06/06/2017 | 32 | Guilty PLEA ENTERED as to Precias K Freeman (pbri, ) (Entered: 06/06/2017) |
| 06/06/2017 | 33 | ORAL MOTION to modify conditions of bond as to Precias K Freeman. (pbri, ) (Entered: 06/06/2017) |
| 06/06/2017 | 34 | **TEXT ORDER removing electronic monitoring and house arrest, granting 33 Oral Motion to Modify Conditions of Bond as to Precias K Freeman (1). The defendant must comply with all remaining terms and conditions including substance abuse treatment at the Forrester Center. Ordered by Honorable Timothy M Cain on 6/6/17.(pbri, )** (Entered: 06/06/2017) |
| 06/06/2017 | 35 | **Minute Entry for proceedings held before Honorable Timothy M Cain: Hearing to Modify the conditions of bond as to Precias K Freeman held on 6/6/2017. The court grants the unopposed motion to remove electronic monitoring and house arrest. Court Reporter Karen Martin. (pbri, )** (Entered: 06/06/2017) |
| 07/19/2017 | 37 | **TEXT ORDER APPOINTING FEDERAL PUBLIC DEFENDER Lora Collins Blanchard for Precias K Freeman. Ordered by Honorable Timothy M Cain on 7/19/17.(pbri, )** (Entered: 07/19/2017) |
| 09/07/2017 | 39 | **ORDER modifying conditions of release as to Precias K Freeman. Signed by** |

-4-

| | | |
|---|---|---|
| | | **Honorable Timothy M Cain on 9/7/17.**(pbri, ) (Entered: 09/07/2017) |
| 09/15/2017 | 41 | MOTION to Revoke Bond as to Precias K Freeman. (pbri, ) (Entered: 09/15/2017) |
| 09/15/2017 | 42 | **ORDER granting 41 Motion for Bond Revocation Warrant as to Precias K Freeman (1). Signed by Honorable Timothy M Cain on 9/15/17.**(pbri, ) Modified on 5/22/2018 to correct text on entry (pbri, ). (Entered: 09/15/2017) |
| 05/18/2018 | 48 | NOTICE OF HEARING as to Precias K Freeman: Sentencing set for 7/9/2018 02:00 PM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Honorable Timothy M Cain. (pbri, ) (Entered: 05/18/2018) |
| 06/29/2018 | 49 | **Writ of Habeas Corpus ad Prosequendum Issued as to Precias K Freeman for as needed from Cleveland County Jail, NC. Signed by Magistrate Judge Jacquelyn D Austin on 6/29/18.**(jtho, ) (Entered: 06/29/2018) |
| 06/29/2018 | 50 | NOTICE OF HEARING as to Precias K Freeman: Bond Revocation Hearing set for 7/6/2018 10:00 AM in Greenville #4, Clement F Haynsworth Fed Bldg, 300 E Washington St., Greenville before Magistrate Judge Kevin McDonald. (awil, ) (Entered: 06/29/2018) |
| 07/06/2018 | 53 | **Minute Entry for proceedings held before Magistrate Judge Kevin McDonald: Bond Revocation Hearing as to Precias K Freeman held on 7/6/2018. The defendant is present in custody with AFPD Lora Blanchard. The defendant's bond is revoked. Court Reporter Karen Martin. (jtho, )** (Entered: 07/06/2018) |
| 07/06/2018 | 54 | **ORAL ORDER revoking bond as to Precias K Freeman. Signed by Magistrate Judge Kevin McDonald on 7/6/18.**(jtho, ) (Entered: 07/06/2018) |
| 07/06/2018 | 55 | Arrest of Precias K Freeman. Clerk notified by: USM. (jtho, ) (Entered: 07/06/2018) |
| 07/06/2018 | 56 | Warrant Returned Executed on 07/05/2018 in case as to Precias K Freeman. (bwalters-USMS, ) (Entered: 07/06/2018) |
| 07/09/2018 | 57 | **Minute Entry for proceedings held before Honorable Timothy M Cain: Status Conference as to Precias K Freeman held on 7/9/2018. Defendant requests time to hire counsel and objects to drug weight. Drug weight will be recalculated and defendant's fugitive status will be examined in regards to her guilty plea proffer. Court Reporter Debra Bull. (pbri, )** (Entered: 07/09/2018) |
| 07/20/2018 | 59 | NOTICE OF ATTORNEY APPEARANCE: Donald L Smith appearing for Precias K Freeman (Smith, Donald) (Entered: 07/20/2018) |
| 07/23/2018 | 60 | **TEXT CJA 7 as to Precias K Freeman - Order Terminating Appointment of Counsel Lora Collins Blanchard. Signed by Magistrate Judge Kevin McDonald on 7/23/18.**(jtho, ) (Entered: 07/23/2018) |
| 08/10/2018 | 61 | First MOTION for Extension of Time by Precias K Freeman. No proposed order(Smith, Donald) (Entered: 08/10/2018) |
| 08/13/2018 | 62 | **TEXT ORDER granting 61 Motion for Extension of Time to File objections to the amended presentence report until September 20, 2018 as to Precias K Freeman (1). Ordered by Honorable Timothy M Cain on 8/13/18.**(pbri, ) (Entered: 08/13/2018) |
| 09/26/2018 | 63 | MOTION to Seal Document by USA as to Precias K Freeman. Proposed order is being emailed to chambers with copy to opposing counsel(Watkins, William) (Entered: 09/26/2018) |
| 09/26/2018 | 64 | **ORDER granting 63 Motion to Seal Document as to Precias K Freeman (1). Sealing pursuant to this order may be challenged by any person at any time. Any motions** |

| | | |
|---|---|---|
| | | **seeking to unseal documents shall address the factors governing sealing reflected in controlling case law.Signed by Honorable Timothy M Cain on 9/26/18.(pbri, )** (Entered: 09/26/2018) |
| 09/26/2018 | 65 | Sealed Document (Attachments: # 1 Exhibit A - DHEC Report, # 2 Exhibit B - DEA 6) (Watkins, William) (Entered: 09/26/2018) |
| 10/29/2018 | 69 | NOTICE OF HEARING as to Precias K Freeman: Sentencing set for 12/13/2018 02:00 PM in G Ross Anderson Jr Court House, 315 S McDuffie St, Anderson before Honorable Timothy M Cain. (pbri, ) (Entered: 10/29/2018) |
| 12/05/2018 | 70 | SENTENCING MEMORANDUM by Precias K Freeman (Attachments: # 1 Exhibit Diagnosis, # 2 Exhibit Diagnostic Formulation, # 3 Exhibit Expansion of Candidates for Program, # 4 Exhibit No Lost Causes, # 5 Exhibit Promotion of Addiction)(Smith, Donald) (Attachment 3 replaced on 12/7/2018 as provided by filer to correct entry) (pbri, ). (Entered: 12/05/2018) |
| 12/13/2018 | 71 | **Minute Entry for proceedings held before Honorable Timothy M Cain: Sentencing held on 12/13/2018 as to Precias K Freeman. Court Reporter Debra Bull. (pbri, )** (Entered: 12/13/2018) |
| 12/13/2018 | 72 | **JUDGMENT as to Precias K Freeman (1), Count(s) 1. The defendant is sentenced to 210 months imprisonment and 3 years supervised release. $100.00 special assessment. Defendant remanded to the custody of he United States Marshal. Signed by Honorable Timothy M Cain on 12/13/18.(pbri, )** (Entered: 12/13/2018) |
| 12/24/2018 | 75 | MOTION for Reconsideration by Precias K Freeman. No proposed order(Smith, Donald) (Entered: 12/25/2018) |
| 12/26/2018 | 76 | Amended MOTION for Reconsideration re 72 Judgment, by Precias K Freeman. No proposed order (Attachments: # 1 Exhibit Description of drug test failure, # 2 Exhibit Emails to Agent Webber, # 3 Exhibit Comments by Judge Hendricks, # 4 Exhibit Hillcrest Hospital Records, # 5 Exhibit Forrester Center Evaluation)(Smith, Donald) (Entered: 12/26/2018) |
| 01/09/2019 | 79 | RESPONSE in Opposition by USA as to Precias K Freeman re 76 Amended MOTION for Reconsideration re 72 Judgment, (Watkins, William) (Entered: 01/09/2019) |
| 01/14/2019 | 80 | REPLY TO RESPONSE to Motion by Precias K Freeman re 76 Amended MOTION for Reconsideration re 72 Judgment, (Smith, Donald) (Entered: 01/14/2019) |
| 01/30/2019 | 81 | **TEXT ORDER denying 76 Motion for Reconsideration as to Precias K Freeman (1): Defendant filed a motion for rehearing or, in the alternative, an amended motion for reconsideration of this courts sentence and judgment order of December 13, 2018. (ECF No. 76). The Government filed a response. (ECF No. 79). Defendant filed a Reply. (ECF No. 80).Defendant pleaded guilty to violations of 21 U.S.C. 841(a)(1), (b)(1)(C) and 846. (ECF No. 32). A sentencing hearing was held on December 13, 2018. At the hearing, Defendant withdrew her objections to the Presentence Report. Defendant was sentenced to 210 months imprisonment to be followed by three years of supervised release. (ECF No. 72).Defendants motion essentially attempts to rehash arguments contained in the objections to the Presentence Report, all of which were withdrawn, or to reargue her motion to enter a drug court program. (ECF No. 70). Defendants motion states it is filed pursuant to Federal Rule of Civil Procedure 59(e). However, Rule 59(e) does not apply to criminal proceedings. United States v. McKelvey, 34 Fed. Appx 959, 959 (4th Cir. 2002). The courts authority to modify a sentence is extremely narrow. A district court is only authorized to modify or reduce a sentence after imposition where (1) the Bureau of Prisons moves for a reduction, (2) the Sentencing Commission amends the applicable Guidelines range, or (3)** |

another statute (including Rule 35 of the Federal Rules of Criminal Procedure) expressly permits the court to do so. United States v. Blackshear, 450 Fed. Appx 241, 242 (4th Cir. 2011) (citing 18 U.S.C. § 3582(c) (Section 3582)). Neither the first nor third condition is present here. Therefore, the only relevant issue is whether modification is allowed by statute or Rule 35. Under Rule 35, there are also only three possible situations allowing the court to modify a sentence: (a) upon remand after appeal; (b) upon motion of the Government; and (c) within fourteen days after sentencing if there was an arithmetical, technical, or other clear error. See Fed.R.Crim.P. 35(a)-(c). As there has not been a remand after an appeal, the Government has not filed any motion for a sentence reduction, and there is no arithmetical, technical or other clear error in the judgment, Rule 35 does not provide Defendant any relief. It appears that Defendant simply would like a re-do of her sentencing. However, the court finds that it lacks authority to modify Defendants sentence.Assuming the court did have the authority to alter or amend the sentence, it would not do so. The court carefully considered the Defendants motion for entry into the Bridge Program and determined, based upon the facts and circumstances presented, as well as an analysis of the factors set forth in 18 U.S.C. §3553, that the motion should be denied. The Defendant has a troubling criminal record. She was a prolific dealer of hydrocodone and oxycodone through forging and filling fraudulent prescriptions over an extended period, filling up to 21 such prescriptions per day. (ECF No. 68, 10). The Defendant received a low end advisory guideline sentence, with a recommendation, based on her assertions that she had a drug problem, that she be allowed to participate in any drug treatment programs available within the Bureau of Prisons. The court remains of the opinion that the sentenced imposed is reasonable given the facts and circumstances of the case and sufficient but not greater than necessary to achieve the purposes of sentencing.Finally, in her Reply, Defendant makes a vague reference to the First Step Act and requests an opportunity to be a subject case under the Act without identifying any specific provisions which would entitle her to relief. (ECF No. 80). Unlike filings filed by pro se parties, the court is not required to liberally construe motions filed by a party who is represented by counsel. Aikens v. Ingram, 652 F.3d 496, 504 (4th Cir. 2011). Nor are courts required to conjure up questions never squarely presented to them. Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1274, 1278). Based on the foregoing, Defendants motion (ECF No. 76) is DENIED.This order shall be without prejudice to the Defendants right to pursue, by proper petition or motion in accordance with applicable law, any relief to which she may be entitled under the First Step Act of 2018, Pub. L. No. 115-391, § 404, 132 Stat.__(2018). Ordered by Honorable Timothy M Cain on 1/30/19.(pbri, ) (Entered: 01/30/2019)

| 02/12/2019 | 82 | NOTICE OF APPEAL OF FINAL JUDGMENT Precias K Freeman re 72 Judgment. The Docketing Statement form, Transcript Order form, and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov. If applicable, the original CJA 24 form must be sent to the clerk's office upon filing of the Transcript Order form. (pbri, ) (Entered: 02/13/2019) |
| 02/13/2019 | 83 | Transmittal Sheet for Notice of Appeal to USCA as to Precias K Freeman to US Court of Appeals re 82 Notice of Appeal - Final Judgment. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (pbri, ) (Entered: 02/13/2019) |
| 02/19/2019 | 85 | USCA Case Number as to Precias K Freeman 19-4104 for 82 Notice of Appeal - Final Judgment, filed by Precias K Freeman. (pbri, ) (Entered: 02/19/2019) |
| 03/13/2019 | 86 | ORDER of USCA appointing Hannah Rogers Metcalfe as to Precias K Freeman re 82 Notice of Appeal - Final Judgment. (jtho, ) (Entered: 03/13/2019) |

| | | |
|---|---|---|
| 04/08/2019 | 88 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Bond Conditions Hearing for dates of March 6, 2017 before Judge Kevin F. McDonald, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Beth A. Krupa, RPR, CRR, Telephone number/E-Mail beth_krupa@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 4/29/2019. Redacted Transcript Deadline set for 5/9/2019. Release of Transcript Restriction set for 7/8/2019. (bkru, ) (Entered: 04/08/2019) |
| 04/24/2019 | 89 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Status Conference for dates of February 24, 2017 before Judge Timothy M. Cain, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber D Bull, Telephone number/E-Mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 5/15/2019. Redacted Transcript Deadline set for 5/28/2019. Release of Transcript Restriction set for 7/23/2019. (dbull, ) (Entered: 04/24/2019) |
| 04/24/2019 | 90 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Status Conference for dates of July 9, 2018 before Judge Timothy M. Cain, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber D Bull, Telephone number/E-Mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 5/15/2019. Redacted Transcript Deadline set for 5/28/2019. Release of Transcript Restriction set for 7/23/2019. (dbull, ) (Entered: 04/24/2019) |
| 04/24/2019 | 91 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Sentencing for dates of December 13, 2018 before Judge Timothy M. Cain, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber D Bull, Telephone number/E-Mail debra_bull@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 5/15/2019. Redacted Transcript Deadline set for 5/28/2019. Release of Transcript Restriction set for 7/23/2019. (dbull, ) (Entered: 04/24/2019) |
| 05/02/2019 | 92 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Pretrial Conference and Bond Hearing for date of 6/6/17 before Judge Timothy M. Cain, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Karen E. Martin, Telephone number/E-Mail Karen_E_Martin@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that |

| | | |
|---|---|---|
| | | date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 5/23/2019. Redacted Transcript Deadline set for 6/3/2019. Release of Transcript Restriction set for 7/31/2019. (kmartin, ) (Entered: 05/02/2019) |
| 05/02/2019 | 93 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Change of Plea for date of 6/6/17 before Judge Timothy M. Cain, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Karen E. Martin, Telephone number/E-Mail Karen_E_Martin@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? N***<br><br>Redaction Request due 5/23/2019. Redacted Transcript Deadline set for 6/3/2019. Release of Transcript Restriction set for 7/31/2019. (kmartin, ) (Entered: 05/02/2019) |
| 05/02/2019 | 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Precias K Freeman. Bond Revocation Hearing for date of 7/6/18 before Judge Kevin F. McDonald, re 82 Notice of Appeal - Final Judgment, Court Reporter/Transcriber Karen E. Martin, Telephone number/E-Mail Karen_E_Martin@scd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Parties have 7 calendar days from the filing of the transcript to file with the court a Notice of Intent to Request Redaction. ***Does this satisfy all appellate orders for this reporter? Y***<br><br>Redaction Request due 5/23/2019. Redacted Transcript Deadline set for 6/3/2019. Release of Transcript Restriction set for 7/31/2019. (kmartin, ) (Entered: 05/02/2019) |
| 07/16/2019 | 96 | ASSEMBLED INITIAL ELECTRONIC RECORD TRANSMITTED TO FOURTH CIRCUIT COURT OF APPEALS as to Precias K Freeman re 82 Notice of Appeal - Final Judgment. Electronic record successfully transmitted. (pbri, ) (Entered: 07/16/2019) |
| 07/25/2019 | 97 | Appeal Remark as to Precias K Freeman re 82 Notice of Appeal - Final Judgment, filed by Precias K Freeman, USA : 4CCA screen shot. (pbri, ) (Entered: 07/25/2019) |
| 08/30/2019 | 99 | MOTION to Vacate under 28 U.S.C. § 2255 by Precias K Freeman. Document delivered to the clerk's office unsigned. Signature page returned to defendant at Iredell County Detention Center, 221 East Water Street, Statesville, NC 28687, Prisoner number 311557, for signature.No proposed order (Attachments: # 1 Exhibit attorney documentation)(pbri, )<br>Civil case 7:19-cv-02480-TMC opened. (Entered: 09/03/2019) |
| 09/03/2019 | 100 | **TEXT ORDER as to Precias K Freeman: dismissing Motion to Vacate under 28 U.S.C. § 2255 99 without prejudice. On September 3, 2019, Defendant filed a Motion to Vacate under 28 U.S.C. § 2255 (ECF No. 99). However, as Defendant acknowledges in her current motion, id. at 2, Defendant's direct appeal remains pending before the Fourth Circuit Court of Appeals. While the fact that an appeal is pending does not divest the district court of jurisdiction to hear a § 2255 motion, such motion is "generally not heard where a direct appeal is pending except in 'exceptional circumstances.'" United States 'v. Williams, 110 F.3d 62, at \*1 (4th Cir. 1997); see also Bowen v. Johnson, 306 U.S. 19, 27 (1939). Defendant has failed to set** |

| | | |
|---|---|---|
| | | forth any exceptional circumstances in this case that warrant deviation from this rule. Additionally, it is possible that the appeal could resolve some issues raised in the § 2255 motion. Accordingly, Defendant's motion to vacate is premature. See *Walker v. Connor*, 72 Fed. Appx 3, 4 (4th Cir. 2003) (stating that a § 2255 petition was premature when the direct criminal appeal was still pending). Accordingly, the court dismisses Defendant's Motion to Vacate under 28 U.S.C. § 2255 (ECF No. 99) without prejudice. In making this ruling, the court expresses no opinion as to the ultimate merits of Defendant's claims. Furthermore, this is order is without prejudice to the Defendant's right to pursue, by proper petition or motion in accordance with the applicable law, any relief to which she may be entitled under the First Step Act of 2018, Pub. L. No. 115-391, § 404 (2018). Ordered by Honorable Timothy M Cain on 9/3/19.(pbri, ) <br> Civil Case 7:19-cv-02480-TMC closed. (Entered: 09/03/2019) |
| 09/03/2019 | 101 | JUDGMENT on 28:2255 PETITION as to Precias K Freeman re: 100 Order on Motion to Vacate 2255 (pbri, ) (Main Document 101 replaced on 9/3/2019 to correct division) (pbri, ). (Entered: 09/03/2019) |
| 09/03/2019 | 102 | ***DOCUMENT MAILED as to Precias K Freeman re 101 28:2255 Judgment, 100 Order on Motion to Vacate 2255 placed in U.S. Mail from Greenville Clerks Office to Precias Freeman #311557 Iredell County Detention Center, 221 East Water Street, Statesville, NC 28687. (pbri, ) (Entered: 09/03/2019) |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 04/21/2020 14:44:11 | | |
| PACER Login: | HRMetcalfe:5400853:0 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 7:17-cr-00079-TMC |
| Billable Pages: | 9 | Cost: | 0.90 |

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 7:17cr00079 |
| | ) | 21 U.S.C. § 846 |
| | ) | 21 U.S.C. § 841(a)(1) |
| vs. | ) | 21 U.S.C. § 841(b)(1)(C) |
| | ) | |
| | ) | |
| PRECIAS K. FREEMAN | ) | INDICTMENT |

THE GRAND JURY CHARGES:

That beginning at a dae unknown, but beginning at least in or around October 2014, and continuing thereafter, up to and including the date of this Indictment, in the District of South Carolina and elsewhere, the defendant, PRECIAS K. FREEMAN, together with persons whose identities are both known and unknown to the grand jury, knowingly and intentionally did combine, conspire, agree and have tacit understanding with each other to knowingly, intentionally, and unlawfully possess with intent to distribute and distribute Hydrocodone and Oxycodone, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), and 841(b)(1)(C);

All in violation of Title 21, United States Code, Section 846.

A True Bill

REDACTED
FOREPERSON

BETH DRAKE   (WJW/jl)
UNITED STATES ATTORNEY

RECEIVED
USDC CLERK GREENVILLE, SC
2017 FEB 14  PM 12: 42

RECORD OF GRAND JURY BALLOT

C/

THE UNITED STATES OF AMERICA v. PRECIAS K. FREEMAN

(SEALED UNTIL FURTHER ORDER OF THE COURT)

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
                   ANDERSON/GREENWOOD DIVISION


UNITED STATES OF AMERICA,      )     June 6, 2017
                               )
        -versus-               )     Anderson, SC
                               )
MARCUS DEVANTE HORNE,          )     7:17-103-1
BRENDA PEREZ-DIAZ,             )     6:16-361-4
PRECIAS K. FREEMAN,            )     7:17-79-1
TRAVIS LEE NIXON,              )     6:17-208-1
MIGUEL URIETA-JAMES,           )     8:16-296-1
             Defendants.       )


                TRANSCRIPT OF CHANGE OF PLEA

         BEFORE THE HONORABLE TIMOTHY M. CAIN
          UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Government:            ANDREW B. MOORMAN, AUSA
                              WILLIAM J. WATKINS, JR, AUSA
                              D. JOSEV BREWER, AUSA
                              JENNIFER E. WELLS, AUSA
                              US Attorney's Office
                              55 Beattie Place, Ste. 700
                              Greenville, SC 29601

For Defendant Horne:          RYAN L. BEASLEY, ESQ.
                              650 E. Washington St.
                              Greenville, SC 29601

For Defendant Perez-Diaz:     HANNAH R. METCALFE, ESQ.
                              9 Toy Street
                              Greenville, SC 29601

For Defendant Freeman:        DAVID W. PLOWDEN, ESQ.
                              Federal Public Defender
                              75 Beattie Place, Ste. 950
                              Greenville, SC 29601

For Defendant Nixon:          JAMES B. LOGGINS, ESQ.
                              Federal Public Defender
                              75 Beattie Place, Ste. 950
                              Greenville, SC 29601
```

```
For Defendant Urieta-James:    JAMES B. LOGGINS, ESQ.
                               Federal Public Defender
                               75 Beattie Place, Ste. 950
                               Greenville, SC 29601

Court Reporter:                KAREN E. MARTIN, RMR, CRR
                               300 E. Washington Street
                               Room 304
                               Greenville, SC 29601


The proceedings were taken by mechanical stenography and
the transcript produced by computer.
```

3

1              Tuesday, June 6, 2017

2              THE COURT:  I would ask that you line up in the

3    order as directed by the Clerk.

4              THE CLERK:  Marcus Horne, and then Brenda

5    Perez-Diaz, Precias Freeman, Travis Nixon, and Miguel

6    Urieta-James.

7              THE COURT:  All right.  At this time I'm going

8    to ask the clerk to place the defendants under oath.  And

9    when you respond, I need you to do so one at a time

10   beginning with Mr. Horne.

11             THE CLERK:  Raise your right hand, please.

12        (WHEREUPON, the defendants were sworn.)

13             MR. HORNE:  Yes, ma'am.

14             MS. PEREZ-DIAZ:  Yes, ma'am.

15             MS. FREEMAN:  Yes.

16             MR. NIXON:  Yes, ma'am.

17             MR. URIETA-JAMES:  Yes, ma'am.

18             THE CLERK:  Thank you.

19             THE COURT:  Let the record reflect all the

20   defendants are now under oath.

21             As I understand it, we have Mr. Horne who is

22   represented by Mr. Beasley, Ms. Perez-Diaz represented by

23   Ms. Metcalfe, Ms. Freeman who is represented by

24   Mr. Plowden, Mr. Nixon who is represented by Mr. Loggins,

25   and Mr. Urieta-James represented by Mr. Loggins.  Thank

4

```
1    you.
2              Let me first ask the attorneys if there is any
3    objection to proceeding with these folks as a group?  We
4    can do it as a group or take them individually.  It
5    matters not to me because I have to be here all day
6    anyway.  Glad to do it.  But it saves time for everyone
7    when we're able to proceed in this fashion.  So let me
8    just ask, beginning with Mr. Beasley, if there's any
9    objection to proceeding with this group of five?
10             MR. BEASLEY:  I'll do the group, Judge.
11             MS. METCALFE:  No objection, Your Honor.
12             MR. PLOWDEN:  No objection.
13             MR. LOGGINS:  No objection, Your Honor.
14             THE COURT:  Thank you.  Let me also ask the
15   attorneys, with respect to your client, have you had a
16   sufficient amount of time to confer with your client to
17   discuss these matters?
18             MR. BEASLEY:  Yes, Your Honor.
19             MS. METCALFE:  Yes, sir.
20             MR. PLOWDEN:  Yes, Your Honor.
21             MR. LOGGINS:  I have, Your Honor.
22             THE COURT:  Have you advised your clients of
23   your client's constitutional rights and explained the
24   court process?
25             MR. BEASLEY:  I have, Your Honor.
```

5

1          **MS. METCALFE:**  Yes, Your Honor.

2          **MR. PLOWDEN:**  Yes, sir.

3          **MR. LOGGINS:**  I have, Your Honor.

4          **THE COURT:**  Do you feel your client understands

5    what the client's doing today?

6          **MR. BEASLEY:**  Yes, Your Honor.

7          **MS. METCALFE:**  Yes, Your Honor.

8          **MR. PLOWDEN:**  Yes, sir.

9          **MR. LOGGINS:**  I believe they both do, Your

10   Honor.

11         **THE COURT:**  And Mr. Loggins, I'll take it unless

12   you tell me otherwise, you're responding as to both

13   clients.

14         **MR. LOGGINS:**  Very good, sir.

15         **THE COURT:**  Now I want to ask the defendants

16   some questions about your decision to plead guilty today.

17   When you answer, I need for you to speak up so that we can

18   hear you and so the court reporter can make a record of

19   what is said.  We don't have a microphone for each one of

20   you, so it's vitally important that you speak up so that

21   everyone can hear you.

22         Now, the prosecutor handling your particular

23   case on behalf of the Government and your attorney tell me

24   that you wish to change the plea you have previously

25   entered in your case from a plea of not guilty to a plea

6

```
1   of guilty.  Is that correct?
2             MR. HORNE:  Yes, sir.
3             MS. PEREZ-DIAZ:  Yes, sir.
4             MS. FREEMAN:  Yes, sir.
5             MR. NIXON:  Yes, sir.
6             MR. URIETA-JAMES:  Yes, sir.
7             THE COURT:  And I do need for you to respond one
8   at a time beginning with Mr. Horne.  And make sure your
9   neighbor is finished with his or her answer before you
10  start your answer so that we don't have more than one
11  person trying to talk at the same time.  Also don't rely
12  upon the answer your neighbor gives.  Your answer must be
13  your own response based on your particular case and set of
14  circumstances.
15            Now, Mr. Loggins, with respect to
16  Mr. Urieta-James, have you had sufficient assistance from
17  a qualified interpreter in communicating with your client?
18            MR. LOGGINS:  I have, Your Honor, we met
19  multiple times over the course of representation.
20            THE COURT:  Mr. Urieta-James, do you agree with
21  that?
22            MR. URIETA-JAMES:  Yes, sir.
23            THE COURT:  Thank you.
24            All right.  Ladies and gentlemen, before I can
25  accept your plea of guilty, it is necessary for me to make
```

1    sure that you're pleading guilty freely, voluntarily, and

2    knowingly.  By pleading guilty, you are giving up certain

3    important rights and possible legal defenses you may have

4    under the law.  I need to ask you some questions about

5    this.  And it is very important that you listen carefully

6    to my questions and to everything else that is said during

7    this hearing.

8        If I give you information which is different

9    from what others, including your lawyer, has told you, you

10   must rely upon what I say.  Do you understand?

11       **MR. HORNE:**  Yes, sir.

12       **MS. PEREZ-DIAZ:**  Yes, sir.

13       **MS. FREEMAN:**  Yes, sir.

14       **MR. NIXON:**  Yes, sir.

15       **MR. URIETA-JAMES:**  Yes, sir.

16       **THE COURT:**  If I ask a question that you do not

17   understand or use a word or phrase that you do not

18   understand, you should tell me so that I can explain these

19   to you.  Otherwise, I will presume that you understand

20   these questions and everything that is said today.  During

21   this questioning, if you feel it is necessary, you may ask

22   for an opportunity to speak with your lawyer privately and

23   I will allow you to do so.  Do you understand?

24       **MR. HORNE:**  Yes, sir.

25       **MS. PEREZ-DIAZ:**  Yes, sir.

8

1          MS. FREEMAN:  Yes.

2          MR. NIXON:  Yes, sir.

3          MR. URIETA-JAMES:  Yes, sir.

4          THE COURT:  Do you understand that you are now

5     under oath.  And that if you answer any of my questions

6     falsely, your answers may later be used against you in

7     another proceeding to include a criminal prosecution for

8     perjury or for making a false statement?  Do you

9     understand this?

10         MR. HORNE:  Yes, sir.

11         MS. PEREZ-DIAZ:  Yes, sir.

12         MS. FREEMAN:  Yes.

13         MR. NIXON:  Yes, sir.

14         MR. URIETA-JAMES:  Yes, sir.

15         THE COURT:  Please state your full name.

16         MR. HORNE:  Marcus Devante Horne.

17         MS. PEREZ-DIAZ:  Brenda Perez-Diaz.

18         MS. FREEMAN:  Precias Kowanna Freeman.

19         THE COURT:  What's your middle name?

20         MS. FREEMAN:  Kowanna.

21         MR. NIXON:  Travis Lee Nixon.

22         MR. URIETA-JAMES:  Miguel Urieta-James.

23         THE COURT:  How old are you?

24         MR. HORNE:  20.

25         MS. PEREZ-DIAZ:  28.

1          MS. FREEMAN:  34.

2          THE COURT:  How old?

3          MS. FREEMAN:  34.

4          MR. NIXON:  26.

5          MR. URIETA-JAMES:  41.

6          THE COURT:  How far did you go in school?  In

7    other words, what is your educational level?

8          MR. HORNE:  Some college.

9          MS. PEREZ-DIAZ:  10th grade.

10          MS. FREEMAN:  Two years college.

11          THE COURT:  Two years?

12          MS. PEREZ-DIAZ:  (Nodded head.)

13          MR. NIXON:  10th grade.

14          THE COURT:  What grade?

15          MR. NIXON:  10th.

16          MR. URIETA-JAMES:  9.

17          THE COURT:  Where were you born?

18          MR. HORNE:  Gaffney, South Carolina.

19          MS. PEREZ-DIAZ:  Spartanburg, South Carolina.

20          MS. FREEMAN:  Shelby, North Carolina.

21          MR. NIXON:  Greenville, South Carolina.

22          MR. URIETA-JAMES:  Mexico.

23          THE COURT:  These next series of questions are

24    questions that I ask every defendant, so please do not be

25    offended by my asking you.  Have you used any alcohol or

```
 1   drug within the last 24 hours?
 2             MR. HORNE:  No, sir.
 3             MS. PEREZ-DIAZ:  No, sir.
 4             MS. FREEMAN:  No, sir.
 5             MR. NIXON:  No, sir.
 6             MR. URIETA-JAMES:  No, sir.
 7             THE COURT:  Are you under the influence of any
 8   alcohol, drug, medicine, or any other substance or mental
 9   or physical condition which would keep you from
10   understanding what you are doing today?
11             MR. HORNE:  No, sir.
12             MS. PEREZ-DIAZ:  No, sir.
13             MS. FREEMAN:  No, sir.
14             MR. NIXON:  No, sir.
15             MR. URIETA-JAMES:  No, sir.
16             THE COURT:  I did not believe that any of you
17   were.
18             Are there any medications that have been
19   prescribed for you by a doctor or medical provider that
20   you are supposed to be taking today that you are not
21   taking as directed?
22             MR. HORNE:  No, sir.
23             MS. PEREZ-DIAZ:  No, sir.
24             MS. FREEMAN:  No, sir.
25             MR. NIXON:  No, sir.
```

1          MR. URIETA-JAMES:  No, sir.

2          THE COURT:  Have you ever been treated for

3    mental illness or addiction to narcotic drugs?

4          MR. HORNE:  No, sir.

5          MS. PEREZ-DIAZ:  No, sir.

6          MS. FREEMAN:  I'm in treatment now.

7          THE COURT:  You're in treatment now?

8          MS. FREEMAN:  Yes.

9          THE COURT:  Step forward a little bit closer to

10   the microphone and tell me about that.  Did Pretrial

11   Services put you in treatment?

12          MS. FREEMAN:  I asked to go.  I go to Forester

13   Center in Spartanburg.

14          THE COURT:  The what center?

15          MS. FREEMAN:  Forester.  It used to be SADAC but

16   now it's the Forester Center.

17          THE COURT:  Okay.  And how often do you go

18   there?

19          MS. FREEMAN:  I go three days a week.

20          THE COURT:  You go for counseling?

21          MS. FREEMAN:  Counseling and drug testing.

22          THE COURT:  Counseling and drug testing?

23          MS. FREEMAN:  Yes, sir.

24          THE COURT:  And are you passing your drug tests?

25          MS. FREEMAN:  I am.

12

1          THE COURT:  About how long have you been going

2     there?

3          MS. FREEMAN:  Um, I would say about a month now.

4          THE COURT:  What was the drug or drugs that

5     caused you to ask for that?

6          MS. FREEMAN:  Norco.

7          THE COURT:  Okay.  So do you feel like that is

8     helping you?

9          MS. FREEMAN:  Oh, yeah.

10          THE COURT:  And do you understand what's going

11     on today?

12          MS. FREEMAN:  I do.

13          THE COURT:  Thank you.

14          Did you want to say something, Mr. Plowden?

15          MR. PLOWDEN:  No, sir.

16          THE COURT:  Okay.

17          All right.  Again, the question is have you ever

18     been treated for mental illness or addiction to narcotic

19     drugs?

20          MR. NIXON:  I completed a Phoenix Center class

21     last year.  I don't know if that counts.

22          THE COURT:  I heard Phoenix Center, but can you

23     speak up and tell me that again?

24          MR. NIXON:  I completed.

25          THE COURT:  You completed the Phoenix Center?

13

```
 1              MR. NIXON:  Last year.
 2              THE COURT:  Last year.  So were you there for a
 3    drug issue?
 4              MR. NIXON:  Yeah, DSS.
 5              THE COURT:  DSS sent you to the Phoenix Center?
 6              MR. NIXON:  Yes, sir.
 7              THE COURT:  Did you successfully complete that
 8    program?
 9              MR. NIXON:  Yes, sir.
10              THE COURT:  Okay.  How long have you been in
11    custody?
12              MR. NIXON:  Like, going on five months.
13              THE COURT:  Okay.
14              Again, the question is have you ever been
15    treated for mental illness or addiction to narcotic drugs?
16              MR. URIETA-JAMES:  Yes, I've had treatment
17    before.
18              THE COURT:  Tell me about that.  Approximately
19    when was the treatment and what was it for?
20              MR. URIETA-JAMES:  About alcohol and drugs and
21    it was about five years ago.
22              THE COURT:  Did you successfully complete the
23    treatment?
24              MR. URIETA-JAMES:  Yes.
25              THE COURT:  And you're in custody at this time.
```

14

1  How long -- approximately how long have you been in

2  custody?

3          MR. URIETA-JAMES:  19 months.

4          THE COURT:  Okay.  Thank you.

5          Other than the information you may have just

6  given me in response to the last question, have you

7  recently been treated by a doctor, psychiatrist,

8  psychologist, or mental health professional?

9          MR. HORNE:  No, sir.

10          MS. PEREZ-DIAZ:  No, sir.

11          MS. FREEMAN:  No, sir.

12          MR. NIXON:  No, sir.

13          MR. URIETA-JAMES:  No, sir.

14          THE COURT:  Do you understand what is happening

15  today?

16          MR. HORNE:  Yes, sir.

17          MS. PEREZ-DIAZ:  Yes, sir.

18          MS. FREEMAN:  Yes, sir.

19          MR. NIXON:  Yes, sir.

20          MR. URIETA-JAMES:  Yes, sir.

21          THE COURT:  Are you satisfied with the services

22  of your attorney?

23          MR. HORNE:  Yes, sir.

24          MS. PEREZ-DIAZ:  Yes, sir.

25          MS. FREEMAN:  Yes, sir.

15

```
1              MR. NIXON:  Yes, sir.

2              MR. URIETA-JAMES:  Yes, sir.

3              THE COURT:  Have you had enough time to meet

4     with your lawyer and discuss your case?

5              MR. HORNE:  Yes, sir.

6              MS. PEREZ-DIAZ:  Yes, sir.

7              MS. FREEMAN:  Yes, sir.

8              MR. NIXON:  Yes, sir.

9              MR. URIETA-JAMES:  Yes, sir.

10             THE COURT:  Has your attorney advised you of

11    your rights and explained the court process to you?

12             MR. HORNE:  Yes, sir.

13             MS. PEREZ-DIAZ:  Yes, sir.

14             MS. FREEMAN:  Yes, sir.

15             MR. NIXON:  Yes, sir.

16             MR. URIETA-JAMES:  Yes, sir.

17             THE COURT:  Has your attorney explained the

18    possible consequences that may take place as a result of

19    this proceeding?

20             MR. HORNE:  Yes, sir.

21             MS. PEREZ-DIAZ:  Yes, sir.

22             MS. FREEMAN:  Yes, sir.

23             MR. NIXON:  Yes, sir.

24             MR. URIETA-JAMES:  Yes, sir.

25             THE COURT:  Have you told your attorney
```

16

```
1    everything that you want to tell him or her?

2              MR. HORNE:  Yes, sir.

3              MS. PEREZ-DIAZ:  Yes, sir.

4              MS. FREEMAN:  Yes, sir.

5              MR. NIXON:  Yes, sir.

6              MR. URIETA-JAMES:  Yes, sir.

7              THE COURT:  Has your attorney done everything

8    that you've asked your attorney to do for you?

9              MR. HORNE:  Yes, sir.

10             MS. PEREZ-DIAZ:  Yes, sir.

11             MS. FREEMAN:  Yes, sir.

12             MR. NIXON:  Yes, sir.

13             MR. URIETA-JAMES:  Yes, sir.

14             THE COURT:  Is there anything that you would

15   like for your attorney to do for you at this time before

16   we proceed any further with your case?

17             MR. HORNE:  No, sir.

18             MS. PEREZ-DIAZ:  No, sir.

19             MS. FREEMAN:  No, sir.

20             MR. NIXON:  No, sir.

21             MR. URIETA-JAMES:  No, sir.

22             THE COURT:  Do you authorize your attorney to

23   speak on your behalf today?

24             MR. HORNE:  Yes, sir.

25             MS. PEREZ-DIAZ:  Yes, sir.
```

1          **MS. FREEMAN:**  Yes, sir.

2          **MR. NIXON:**  Yes, sir.

3          **MR. URIETA-JAMES:**  Yes, sir.

4          **THE COURT:**  Let me ask the attorneys, taking

5    into consideration everything that you know about your

6    client and your client's case, do you agree with your

7    client's decision to plead guilty?

8          **MR. BEASLEY:**  I do, Your Honor.

9          **MS. METCALFE:**  Yes, Your Honor.

10          **MR. PLOWDEN:**  Yes, Your Honor.

11          **MR. LOGGINS:**  I do, Your Honor.

12          **THE COURT:**  And again to the attorneys, do you

13    have any concerns about your client's competence to make

14    this decision?

15          **MR. BEASLEY:**  No, Your Honor.

16          **MS. METCALFE:**  None whatsoever.

17          **MR. PLOWDEN:**  No, sir.

18          **MR. LOGGINS:**  No, sir.

19          **THE COURT:**  Any issues of competency or other

20    questions requested from any of the attorneys or the

21    Government?

22          **MR. MOORMAN:**  None as to Ms. Perez-Diaz.

23          **MS. WELLS:**  Not as to Mr. Horne, Your Honor.

24          **MR. BREWER:**  Not as to Mr. Urieta-James or

25    Mr. Nixon.

18

1      **MR. WATKINS:**  No, sir.

2      **THE COURT:**  Accordingly, with respect to each

3  defendant, I find that each defendant is competent to

4  plead guilty and I so find for purposes of the record.  As

5  I indicated earlier, by pleading guilty you are giving up

6  certain important rights and possible legal defenses you

7  may have under the law.  Do you understand that under the

8  constitution and laws of the United States you have a

9  right to plead not guilty; and if you plead not guilty,

10  you are entitled to a public and speedy trial by a jury on

11  the charges contained in the indictment?

12      **MR. HORNE:**  Yes, sir.

13      **MS. PEREZ-DIAZ:**  Yes, sir.

14      **MS. FREEMAN:**  Yes, sir.

15      **MR. NIXON:**  Yes, sir.

16      **MR. URIETA-JAMES:**  Yes, sir.

17      **THE COURT:**  It matters not to me whether you

18  plead guilty or not.  If you decided to plead not guilty

19  and request a trial by jury, you would also be entitled to

20  a number of procedural rights as a defendant in a criminal

21  case.  I want to list these rights for you so that you

22  will have a clear understanding of what you will give up

23  if you plead guilty.  If a trial was held, you would have

24  a right to the assistance of counsel for your defense at

25  every stage of your case including the trial.  If you

19

1  could not afford an attorney, one would be appointed for

2  you without cost to you. And of course, you are all being

3  represented by highly competent legal counsel at this

4  time.

5          There is no burden of proof upon you whatsoever.

6  I will mention that to you several times. You are

7  presumed innocent of any charges contained in the

8  indictment unless the Government proves you guilty of each

9  and every element of each offense beyond a reasonable

10  doubt. You would be presumed innocent and the Government

11  would be required to prove you guilty by competent

12  evidence and beyond a reasonable doubt before you could be

13  found guilty. And you would not have to prove that you

14  were innocent if a trial was held.

15          If a trial was held, the witnesses for the

16  Government would have to come to Court and testify in your

17  presence. They would do so from the witness box to my

18  right, right where Mr. Watkins is standing. Your attorney

19  could cross-examine the Government's witnesses and ask

20  them questions. Your attorney could also object to

21  evidence offered by the Government. And although there is

22  no burden of proof upon you, your attorney could offer

23  evidence on your behalf.

24          While there is no burden of proof upon you, if a

25  trial was held, you would have the right to testify if you

20

1    chose to do so.  However, you also would have the right

2    not to testify.  And if you decided not to testify, I

3    would inform and instruct the jury that no inference or

4    suggestion of guilt could be drawn from the fact that you

5    did not testify.

6           If a trial was held, you would have a right to

7    the issuance of subpoenas to compel the attendance of

8    witnesses to testify in your defense and to compel the

9    production of other evidence.  In other words, although

10   there is no burden of proof upon you, if a trial was held

11   and you had witnesses that you wanted to come to court to

12   testify, the Court would assist you and your attorney in

13   having those witnesses brought to court if necessary.

14          If a trial was held, in order for you to be

15   found guilty, the jury would have to reach a unanimous

16   verdict by all 12 of the jury members.  Do you understand

17   all of these important rights I have outlined for you?

18          **MR. HORNE:**  Yes, sir.

19          **MS. PEREZ-DIAZ:**  Yes, sir.

20          **MS. FREEMAN:**  Yes, sir.

21          **MR. NIXON:**  Yes, sir.

22          **MR. URIETA-JAMES:**  Yes, sir.

23          **THE COURT:**  If you plead guilty and I accept

24   your plea, you will give up your right to a jury trial and

25   the other rights I have just listed for you.  And there

21

1    will be no trial.  And I will enter a judgment of guilt

2    and sentence you on the basis of your guilty plea.  Do you

3    understand?

4              MR. HORNE:  Yes, sir.

5              MS. PEREZ-DIAZ:  Yes, sir.

6              MS. FREEMAN:  Yes, sir.

7              MR. NIXON:  Yes, sir.

8              MR. URIETA-JAMES:  Yes, sir.

9              THE COURT:  If you plead guilty you will also

10   have to give up your right not to incriminate yourself

11   since I will ask you questions about what you did in order

12   to satisfy myself that you are guilty as charged.  And you

13   will have to acknowledge and admit to your guilt.  Do you

14   understand that?

15             MR. HORNE:  Yes, sir.

16             MS. PEREZ-DIAZ:  Yes, sir.

17             MS. FREEMAN:  Yes, sir.

18             MR. NIXON:  Yes, sir.

19             MR. URIETA-JAMES:  Yes, sir.

20             THE COURT:  If restitution is an issue in your

21   case, and if you plead guilty and I accept your plea, you

22   may be required to make restitution to the victim or

23   victims of your acts either by payment of money or in

24   personal services as may be directed by the Court.  If

25   restitution is ordered, failure to comply may be the basis

22

1    for revoking any period of supervised release that may be
2    imposed as a part of your sentence.  Do you understand?
3            MR. HORNE:  Yes, sir.
4            MS. PEREZ-DIAZ:  Yes, sir.
5            MS. FREEMAN:  Yes, sir.
6            MR. NIXON:  Yes, sir.
7            MR. URIETA-JAMES:  Yes, sir.
8            THE COURT:  The offenses to which you're
9    pleading guilty are felony offenses.  If your plea is
10   accepted, you may be deprived of valuable civil rights
11   such as the right to vote, hold public office, serve on a
12   jury, and possess any kind of firearm.  It may also affect
13   your ability to receive certain government benefits.  Do
14   you understand?
15           MR. HORNE:  Yes, sir.
16           MS. PEREZ-DIAZ:  Yes, sir.
17           MS. FREEMAN:  Yes, sir.
18           MR. NIXON:  Yes, sir.
19           MR. URIETA-JAMES:  Yes, sir.
20           THE COURT:  Are you a citizen of the United
21   States?
22           MR. HORNE:  Yes, sir.
23           MS. PEREZ-DIAZ:  Yes, sir.
24           MS. FREEMAN:  Yes, sir.
25           MR. NIXON:  Yes, sir.

23

1              MR. URIETA-JAMES:  No, sir.

2              THE COURT:  Mr. Urieta-James, you are a citizen

3    of what country?

4              MR. URIETA-JAMES:  Mexico.

5              THE COURT:  Do you understand that by pleading

6    guilty you may also be removed from and/or deported from

7    this country, denied citizenship, and denied admission to

8    the United States, and be subject to other immigration

9    consequences?  In fact, it would be my understanding that

10   if you plead guilty or are convicted, you would be subject

11   to deportation as well as these other possible

12   consequences I have mentioned, as well as possible

13   consequences that may be unforeseen at this time.  Do you

14   understand that?

15             MR. URIETA-JAMES:  Yes, sir.

16             THE COURT:  If you plead guilty and forfeiture

17   of property or money is an issue in your case, I can order

18   you to forfeit certain property to the Government.  Do you

19   understand?

20             MR. HORNE:  Yes, sir.

21             MS. PEREZ-DIAZ:  Yes, sir.

22             MS. FREEMAN:  Yes, sir.

23             MR. NIXON:  Yes, sir.

24             MR. URIETA-JAMES:  Yes, sir.

25             THE COURT:  If you plead guilty, the Court is

24

```
1    obligated to impose a mandatory special assessment fee for
2    each count of the indictment that you admit to that is
3    payable immediately upon sentencing.  Do you understand?
4              MR. HORNE:  Yes, sir.
5              MS. PEREZ-DIAZ:  Yes, sir.
6              MS. FREEMAN:  Yes, sir.
7              MR. NIXON:  Yes, sir.
8              MR. URIETA-JAMES:  Yes, sir.
9              THE COURT:  If you plead guilty today and at
10   some point in the future you plead guilty or no contest to
11   or you are convicted of a criminal offense in a state or
12   federal court, this plea today may be used to give you an
13   enhanced or greater sentence in that case.  Do you
14   understand?
15             MR. HORNE:  Yes, sir.
16             MS. PEREZ-DIAZ:  Yes, sir.
17             MS. FREEMAN:  Yes, sir.
18             MR. NIXON:  Yes, sir.
19             MR. URIETA-JAMES:  Yes, sir.
20             THE COURT:  At this time I want us to go over
21   the charge or charges in each case as well as the
22   essential elements of those charges the Government would
23   have to prove beyond a reasonable doubt if the case goes
24   to trial and also the maximum possible penalty associated
25   with each defendant and each case.  And I'm going to ask
```

25

1   the prosecutor handling the case on behalf of the

2   Government to go over that.  And I want the defendants to

3   listen carefully.

4         Let me first ask, have you received a copy of

5   the indictment; that is, the charging document in your

6   case, and had sufficient opportunity to go over that

7   document as well as your case in general with your

8   attorney?

9         **MR. HORNE**:  Yes, sir.

10         **MS. PEREZ-DIAZ**:  Yes, sir.

11         **MS. FREEMAN**:  Yes, sir.

12         **MR. NIXON**:  Yes, sir.

13         **MR. URIETA-JAMES**:  Yes, sir.

14         **THE COURT**:  Thank you.

15         All right.

16         **MS. WELLS**:  May it please the Court, Your Honor?

17   As to Mr. Horne, Mr. Horne is charged in a three-count

18   indictment.  Count 1 of that indictment alleges that on or

19   about September 1st, 2016, here in the District of South

20   Carolina, that Mr. Horne, having been convicted of a crime

21   punishable by imprisonment for a term exceeding one year

22   did knowingly possess in and affecting commerce a firearm,

23   that being a .40 caliber handgun, which had been shipped

24   and transported in interstate commerce.  Your Honor,

25   that's in violation of Title 18 United States Code

26

1   Sections 922(g)(1), 924(a)(2), and 924(e).

2        Your Honor, the elements the Government would

3   have to prove at trial in this case is that the

4   defendant -- beg the Court's indulgence for one moment to

5   get to the right page.  The defendant had been convicted

6   in some court -- in some court of a crime punishable by

7   imprisonment for a term exceeding one year.  That the

8   defendant possessed or shipped or transported in

9   interstate commerce a firearm.  That the firearm had

10   traveled in interstate or foreign commerce at some point

11   during its existence.  And that the defendant did so

12   knowingly, that is the defendant must know that the

13   firearm was a firearm and the possession must be voluntary

14   and intentional.

15        Your Honor, the penalty without the prior

16   enhancing conviction in this case is not more than ten

17   years, a fine of not more than $250,000, supervised

18   release for up to three years, and a special assessment of

19   $100.

20        I do not believe that Mr. Horne is an armed

21   career criminal, but I can advise him of that if the Court

22   pleases?

23        **THE COURT**:  Go ahead.

24        **MS. WELLS**:  Okay.  Your Honor, if he were to be

25   determined to be ACC, that imprisonment would then become

1    15 years up to life, a fine of up to $250,000, supervised

2    release up to five years, and a $100 special assessment.

3              Your Honor, Count 2 of the indictment alleges

4    that on or about September 1st, 2016, in the District of

5    South Carolina, that Mr. Horne did knowingly obstruct,

6    delay, and affect commerce as that term is defined in

7    Title 18 United States Code Section 1951(b)(3).  And the

8    movement of articles and commodities in such commerce by

9    robbery as that term is defined in the statute in that the

10   defendant did unlawfully take property consisting of money

11   belonging to Zippy's, which, Your Honor, is located at 901

12   West Floyd Baker Boulevard in Gaffney, South Carolina, and

13   was at the time a commercial business engaged in

14   interstate commerce, that Mr. Horne did take from the

15   person and presence of an employee of the store against

16   his will by means of actual and threatened force,

17   violence, and fear of injury immediate and future to his

18   person, in that the defendant did rob an employee of the

19   store at gunpoint of money.  Your Honor, that's in

20   violation of Title 18 United States Code Sections 1951(a).

21             Your Honor, the elements the Government would

22   have to prove at trial in this case is that the defendant

23   did commit an unlawful taking or obtaining of personal

24   property from a person or in the presence of another

25   against his will by means of actual or threatened force or

1  violence or fear of injury immediate or future to his

2  person or property, or property in his custody or

3  possession; that this robbery obstructed, delayed, or

4  affected commerce or the movement of any article or

5  commodity in commerce.

6          Your Honor, the penalty in that is imprisonment

7  up to 20 years, a fine of up to $250,000, supervised

8  release of up to three years, and a $100 special

9  assessment.

10         Your Honor, finally, as to Count 3, Mr. Horne --

11  the grand jury charged in that count that Mr. Horne did on

12  or about September 1st, 2016, here in the District of

13  South Carolina, knowingly possess a firearm in furtherance

14  of a crime of violence discharged in Count 2 of the

15  indictment which is prosecutable in a court of the United

16  States.  And that's in violation of Title 18 United States

17  Code Section 924(c).

18         Your Honor, the elements the Government would

19  have to prove in that as to the 924(c) is, first, the

20  defendant possessed a firearm.  Second, the defendant did

21  so in furtherance of a crime of violence which may be

22  prosecuted in federal court.  And did so knowingly, Your

23  Honor.

24         The penalty in that case is at least five years

25  up to life, that is consecutive to any other term of

1   imprisonment imposed; a fine of up to $250,000; supervised

2   release for up to five years; and a $100 special

3   assessment.

4            **THE COURT**:  Thank you.

5            Mr. Moorman?

6            **MR. MOORMAN**:  May it please the Court, Your

7   Honor?  Ms. Brenda Perez-Diaz has offered to plead guilty

8   to Count 1 of the superseding indictment in her case.  By

9   way of summary, Count 1 alleges that beginning at a time

10  unknown to the grand jury, but beginning at least in 2014

11  and continuing thereafter up to and including the date of

12  the superseding indictment, in the District of South

13  Carolina and elsewhere, Ms. Perez-Diaz did conspire

14  unlawfully and intentionally or agree with unlawfully and

15  intentionally with others to possess with the intent to

16  distribute and to distribute 500-grams or more of a

17  mixture or substance containing a detectable amount of

18  methamphetamine in violation of Title 21 United States

19  Code Sections 841(a)(1), (b)(1)(A), and 846.

20           Your Honor, the elements of the offense

21  contained in Count 1 are as follows.  First, that's

22  conspiracy described in the superseding indictment was

23  willfully formed and was existing at or on about the

24  alleged time.  And two, this defendant, Ms. Perez-Diaz,

25  willfully became a member of the conspiracy.

1        Your Honor, the statutory penalties that are

2   applicable as a result of Ms. Perez-Diaz's guilty plea are

3   as follows.  A minimum term of imprisonment of ten years,

4   and a maximum of life imprisonment, there is no

5   opportunity for probation or parole, she is subject to a

6   fine of up to $10 million, and a term of supervised

7   release of at least five years, as well as a special

8   assessment of $100.

9        **THE COURT**:  Thank you.

10       Mr. Watkins?

11       **MR. WATKINS**:  Your Honor, as to Ms. Freeman,

12   she's offering to plead guilty to her indictment which

13   contains a single count.  It charges that beginning in or

14   about October 2014 and up and to the date of the

15   indictment that she, along with other individuals both

16   known and unknown to the grand jury, conspired to

17   unlawfully possess with intent to distribute Hydrocodone

18   and Oxycodone, Your Honor.

19       Your Honor, under the indictment, the Government

20   would have to prove the following elements at trial.  One,

21   a conspiracy to distribute controlled substances as

22   described in the indictment was willfully formed and was

23   existing at or about the alleged time.  And two, the

24   accused willfully became a member of the conspiracy.

25       Your Honor, the maximum penalty she could face

1    would be a fine of a million dollars, and/or 20 years

2    imprisonment, supervised release of three years, and a

3    special assessment fee of $100.

4            **THE COURT:**  Thank you.

5            Mr. Brewer?

6            **MR. BREWER:**  Your Honor, may it please the

7    Court?  Mr. Travis Lee Nixon is pleading to a single-count

8    indictment for possession of a firearm.  That indictment

9    reads that on or about February 16, 2017, in the District

10   of South Carolina, Mr. Travis Lee Nixon, having been

11   convicted of a crime punishable for a term exceeding one

12   year, did possess in and affecting commerce a firearm;

13   that is, a GSG .22 caliber semi-automatic firearm which

14   had traveled in interstate commerce in violation of 18 USC

15   Section 922(g)(1), 924(a)(2), and 924(e).

16           Your Honor, in a trial of this case the

17   Government would be -- have to prove beyond a reasonable

18   doubt the following elements.  That Mr. Nixon had in fact

19   been convicted of a crime punishable in some court of more

20   than a term of -- of a term exceeding a year, that he

21   subsequently possessed the firearm, that that firearm had

22   traveled in interstate commerce at some time during its

23   existence, and that he did so knowingly; that is, that he

24   meant to possess it and that he knew it was a firearm.

25           Your Honor, the maximum sentence that Mr. Nixon

32

1    faces up to ten years imprisonment, a fine of $250,000, up

2    to three years supervised release, and a special

3    assessment of a hundred dollars.

4            Your Honor, with respect to Mr. Miguel

5    Urieta-James, he is named in a nine-count indictment.

6    He's specifically identified in Counts 1, 4 and 5.  He is

7    pleading to Counts 4 and 5.  At the sentencing in this

8    matter, Your Honor, the Government would be moving to

9    dismiss Count 1 against him.

10            Your Honor, Count 4 of the indictment indicates

11   that on or about November 8th, 2015, in the District of

12   South Carolina, the defendant, Miguel Angel Urieta-James,

13   a/k/a Raul Sanchez, knowingly, intentionally, and

14   unlawfully did possess with intent to distribute 50-grams

15   or more of a mixture or substance containing a detectable

16   amount of methamphetamine and a quantity of cocaine, both

17   Schedule II controlled substances, and a quantity of

18   marijuana, a Schedule I controlled substance, in violation

19   of Title 21 United States Code Sections 841(a)(1),

20   841(b)(1)(B), 841(b)(1)(C), and 841(b)(1)(D).

21            Your Honor, the -- at a trial of this case the

22   Government would have to prove beyond a reasonable doubt

23   that the defendant knowingly and intentionally possessed

24   the quantities of controlled substances identified and

25   described in the indictment.  At the time of such

33

1    possession, the defendant knew the substances were

2    controlled substances.  And the defendant possessed the

3    controlled substances with the intent to distribute.

4            The maximum penalties, Your Honor, of the

5    controlled substances identified in the indictment are

6    specifically the 50-grams or more of a mixture of a

7    substance containing a detectable amount of

8    methamphetamine, that would be up to 40 years in prison, a

9    minimum of five years, a fine of $5 million, supervised

10   release of at least four years, and a special assessment

11   of a hundred dollars.

12           Your Honor, he's also pleading guilty to Count 5

13   of the indictment, which indicates that on or about

14   November 8th, 2015, in the District of South Carolina, the

15   defendant, Miguel Angel Urieta-James, a/k/a Raul Sanchez,

16   knowingly did possess a firearm in furtherance of a drug

17   trafficking crime, which is prosecutable in a court of the

18   United States, in violation of Title 18 United States Code

19   Section 924(c)(1)(A).

20           Your Honor, the Government at a trial in this

21   case would have to demonstrate the defendant committed a

22   crime -- a drug trafficking crime.  And the defendant

23   knowingly used or carried a firearm during and in relation

24   to or possessed a firearm in furtherance of that drug

25   trafficking crime.

34

```
 1              The maximum penalty, Your Honor, is life
 2     imprisonment, minimum is five years consecutive to any
 3     other term of imprisonment, $250,000 fine, five years
 4     supervised release, and a hundred dollar special
 5     assessment.
 6              THE COURT:  Thank you.
 7              Let me ask each defendant, did you listen
 8     carefully as the prosecutor summarized the charge or
 9     charges against you as well as the essential elements the
10     Government would have to prove beyond a reasonable doubt
11     if your case went to trial, and also the penalties
12     associated with each offense?  Did you listen carefully?
13              MR. HORNE:  Yes, sir.
14              MS. PEREZ-DIAZ:  Yes, sir.
15              MS. FREEMAN:  Yes, sir.
16              MR. NIXON:  Yes, sir.
17              MR. URIETA-JAMES:  Yes, sir.
18              THE COURT:  Do you understand the charge or
19     charges against you?
20              MR. HORNE:  Yes, sir.
21              MS. PEREZ-DIAZ:  Yes, sir.
22              MS. FREEMAN:  Yes, sir.
23              MR. NIXON:  Yes, sir.
24              MR. URIETA-JAMES:  Yes, sir.
25              THE COURT:  Do you understand the essential
```

35

```
1    elements the Government would have to prove beyond a
2    reasonable doubt if your case goes to trial?
3              MR. HORNE:  Yes, sir.
4              MS. PEREZ-DIAZ:  Yes, sir.
5              MS. FREEMAN:  Yes, sir.
6              MR. NIXON:  Yes, sir.
7              MR. URIETA-JAMES:  Yes, sir.
8              THE COURT:  Do you understand the possible
9    penalty you face, including the maximum possible penalty,
10   as well as the required minimum sentence, if applicable,
11   to your case that you face?
12             MR. HORNE:  Yes, sir.
13             MS. PEREZ-DIAZ:  Yes, sir.
14             MS. FREEMAN:  Yes, sir.
15             MR. NIXON:  Yes, sir.
16             MR. URIETA-JAMES:  Yes, sir.
17             THE COURT:  Do the attorneys have any questions
18   for their clients about the client's decision to plead
19   guilty at this stage of the proceedings?
20             MR. BEASLEY:  No, Your Honor.
21             MS. METCALFE:  No, Your Honor.
22             MR. PLOWDEN:  No, sir.
23             MR. LOGGINS:  I do not, sir.
24             THE COURT:  Let me ask the defendants, do you
25   need any additional time to discuss these matters with
```

36

```
1   your attorney?
2           MR. HORNE:  No, sir.
3           MS. PEREZ-DIAZ:  No, sir.
4           MS. FREEMAN:  No, sir.
5           MR. NIXON:  No, sir.
6           MR. URIETA-JAMES:  No, sir.
7           THE COURT:  Do you still want to plead guilty?
8           MR. HORNE:  Yes, sir.
9           MS. PEREZ-DIAZ:  Yes, sir.
10          MS. FREEMAN:  Yes, sir.
11          MR. NIXON:  Yes, sir.
12          MR. URIETA-JAMES:  Yes, sir.
13          THE COURT:  I find that with respect to each
14  defendant, each defendant fully comprehends and
15  understands the charge against him or her or charges
16  against him or her and generally what elements the
17  Government would have to prove if a trial is held.  And
18  each defendant understands the penalties associated with
19  each offense.
20          If you plead guilty or if you are convicted by a
21  jury, then I will have to determine the appropriate
22  sentence to be imposed.  In determining the appropriate
23  sentence, I'm required to consider the statutory
24  sentencing factors set out in Section 3553(a) of Title 18
25  of the United States Code and also the advisory sentencing
```

1    guidelines issued by the United States Sentencing

2    Guidelines Commission.

3           The guidelines are used as a starting point in

4    determining the sentence.  The Court is obligated to

5    calculate the applicable guideline range and to consider

6    that range, possible departures under the sentencing

7    guidelines, and other factors under 18 USC Section

8    3553(a).

9           The Court will also consider the purposes of

10   sentencing, which include punishment, deterrence,

11   incapacitation, and rehabilitation in making its

12   determination.  Do you understand?

13          **MR. HORNE:**  Yes, sir.

14          **MS. PEREZ-DIAZ:**  Yes, sir.

15          **MS. FREEMAN:**  Yes, sir.

16          **MR. NIXON:**  Yes, sir.

17          **MR. URIETA-JAMES:**  Yes, sir.

18          **THE COURT:**  Have you and your attorney talked

19   about how the statutory factors and the advisory

20   guidelines may affect your sentence?

21          **MR. HORNE:**  Yes, sir.

22          **MS. PEREZ-DIAZ:**  Yes, sir.

23          **MS. FREEMAN:**  Yes, sir.

24          **MR. NIXON:**  Yes, sir.

25          **MR. URIETA-JAMES:**  Yes, sir.

38

1          THE COURT:  Do you understand that the Court

2     will not be able to determine the guideline range for your

3     case until after the Presentence Report has been completed

4     and you and the Government have had an opportunity to

5     challenge the reported facts and the application of the

6     guidelines recommended by the probation officer who

7     prepares the report?  Do you understand?

8               MR. HORNE:  Yes, sir.

9               MS. PEREZ-DIAZ:  Yes, sir.

10              MS. FREEMAN:  Yes, sir.

11              MR. NIXON:  Yes, sir.

12              MR. URIETA-JAMES:  Yes, sir.

13              THE COURT:  Do you understand that the

14     guidelines are advisory.  And that after it has been

15     determined what guidelines apply to your case, the Court

16     has the authority to impose a sentence more severe or less

17     severe than the sentence called for by the guidelines?

18              MR. HORNE:  Yes, sir.

19              MS. PEREZ-DIAZ:  Yes, sir.

20              MS. FREEMAN:  Yes, sir.

21              MR. NIXON:  Yes, sir.

22              MR. URIETA-JAMES:  Yes, sir.

23              THE COURT:  In calculating the range of sentence

24     under the advisory guidelines and determining an

25     appropriate sentence, the Court will take into account all

39

1    conduct, circumstances, and injuries associated with your

2    criminal conduct, whether or not this conduct is formally

3    charged by the Government.  The Court will consider all

4    relevant conduct at the time of sentencing even though in

5    your particular case you might be pleading guilty to fewer

6    than all counts in the indictment.  But the Court, in

7    essence, will be able to consider all relevant conduct at

8    the time of sentencing.  Do you understand that?

9              MR. HORNE:  Yes, sir.

10             MS. PEREZ-DIAZ:  Yes, sir.

11             MS. FREEMAN:  Yes, sir.

12             MR. NIXON:  Yes, sir.

13             MR. URIETA-JAMES:  Yes, sir.

14             THE COURT:  Also, there is no limitation placed

15   on the information the Court can consider at the time of

16   sentencing concerning your background, character, and

17   conduct so long as the information is reliable.  The Court

18   will take all these factors into consideration in

19   determining an appropriate sentence.  Do you understand?

20             MR. HORNE:  Yes, sir.

21             MS. PEREZ-DIAZ:  Yes, sir.

22             MS. FREEMAN:  Yes, sir.

23             MR. NIXON:  Yes, sir.

24             MR. URIETA-JAMES:  Yes, sir.

25             THE COURT:  Do you understand that any sentence

40

```
1   that may be imposed may be different from and possibly
2   greater than any estimate your attorney may have given
3   you?
4           MR. HORNE:  Yes, sir.
5           MS. PEREZ-DIAZ:  Yes, sir.
6           MS. FREEMAN:  Yes, sir.
7           MR. NIXON:  Yes, sir.
8           MR. URIETA-JAMES:  Yes, sir.
9           THE COURT:  Are you currently on probation or
10  parole with any court?
11          MR. HORNE:  Yes, sir.
12          THE COURT:  Tell me about that, Mr. Horne, or
13  let your lawyer tell me.
14          MR. BEASLEY:  He's on a YOA from Gaffney, Your
15  Honor.  It was a suspended YOA.
16          THE COURT:  Mr. Horne, do you understand that by
17  pleading guilty today, whatever probationary or suspended
18  sentence that you have may be revoked and you may be
19  required to serve a sentence as a result of that
20  revocation in addition to any sentence imposed upon you in
21  this case?
22          MR. HORNE:  Yes, sir.
23          THE COURT:  Okay.
24          Again, the question is are you currently on
25  probation or parole with any court?
```

41

```
1            MS. PEREZ-DIAZ:  No, sir.

2            MS. FREEMAN:  No, sir.

3            MR. NIXON:  No, sir.

4            MR. URIETA-JAMES:  No, sir.

5            THE COURT:  Do you realize that if you plead

6    guilty and I accept your plea, the law provides that upon

7    release from incarceration you'll be subject to a term of

8    supervised release.  And if you are placed on supervised

9    release, you'll be under a court order that prescribes

10   rules for your behavior while on supervised release?

11           MR. HORNE:  Yes, sir.

12           MS. PEREZ-DIAZ:  Yes, sir.

13           MS. FREEMAN:  Yes, sir.

14           MR. NIXON:  Yes, sir.

15           MR. URIETA-JAMES:  Yes, sir.

16           THE COURT:  Do you understand that if you

17   violate any term or condition of supervised release, you

18   can be given additional time in prison?

19           MR. HORNE:  Yes, sir.

20           MS. PEREZ-DIAZ:  Yes, sir.

21           MS. FREEMAN:  Yes, sir.

22           MR. NIXON:  Yes, sir.

23           MR. URIETA-JAMES:  Yes, sir.

24           THE COURT:  Do any of these folks have plea

25   agreements?
```

42

```
 1              MR. MOORMAN:  Your Honor, I don't believe so.
 2              MR. BREWER:  Neither of mine does, Your Honor.
 3              MR. WATKINS:  No, sir.
 4              MS. WELLS:  No, sir, Your Honor.
 5              THE COURT:  Okay.
 6              Do you understand that under some circumstances
 7    you or the Government may have the right to appeal any
 8    sentence I may impose?
 9              MR. HORNE:  Yes, sir.
10              MS. PEREZ-DIAZ:  Yes, sir.
11              MS. FREEMAN:  Yes, sir.
12              MR. NIXON:  Yes, sir.
13              MR. URIETA-JAMES:  Yes, sir.
14              THE COURT:  Do you understand that parole has
15    been abolished; and that if you are sentenced to prison,
16    you will not be released early on parole?
17              MR. HORNE:  Yes, sir.
18              MS. PEREZ-DIAZ:  Yes, sir.
19              MS. FREEMAN:  Yes, sir.
20              MR. NIXON:  Yes, sir.
21              MR. URIETA-JAMES:  Yes, sir.
22              THE COURT:  Has anyone forced you or threatened
23    you or pressured you in any way to get you to plead
24    guilty?
25              MR. HORNE:  No, sir.
```

43

```
 1              MS. PEREZ-DIAZ:  No, sir.

 2              MS. FREEMAN:  No, sir.

 3              MR. NIXON:  No, sir.

 4              MR. URIETA-JAMES:  No, sir.

 5              THE COURT:  Are you pleading guilty of your own

 6    free will because you are guilty?

 7              MR. HORNE:  Yes, sir.

 8              MS. PEREZ-DIAZ:  Yes, sir.

 9              MS. FREEMAN:  Yes, sir.

10              MR. NIXON:  Yes, sir.

11              MR. URIETA-JAMES:  Yes, sir.

12              THE COURT:  Has anyone made any prediction,

13    prophesy, or promise as to what your sentence will be?

14              MR. HORNE:  No, sir.

15              MS. PEREZ-DIAZ:  No, sir.

16              MS. FREEMAN:  No, sir.

17              MR. NIXON:  No, sir.

18              MR. URIETA-JAMES:  No, sir.

19              THE COURT:  Has anyone promised you anything in

20    order to get you to plead guilty?

21              MR. HORNE:  No, sir.

22              MS. PEREZ-DIAZ:  No, sir.

23              MS. FREEMAN:  No, sir.

24              MR. NIXON:  No, sir.

25              MR. URIETA-JAMES:  No, sir.
```

44

1    **THE COURT:** All right. At this time with

2    respect to each defendant in each case I'll be glad to

3    hear from the Government as to the facts the Government

4    would be prepared to prove at trial so as to establish an

5    independent factual basis for the offense and the plea. I

6    will ask the defendants to listen carefully as the

7    prosecutors summarize the facts of the case and what you

8    did because I will ask you some questions about that when

9    that process is finished.

10   **MS. WELLS:** May it please the Court, Your Honor?

11   As to Mr. Horne, on September the 1st, 2016, officers with

12   the Gaffney Police Department responded to 901 West Floyd

13   Baker Boulevard in Gaffney to a call of an armed robbery

14   in progress. This location is known as Zippy's, which is

15   a convenience store which sells items that have been

16   shipped in interstate commerce. Officers arrived and were

17   told by witnesses on the scene that the perpetrator had

18   fled on foot with a black backpack towards a decent-sized

19   construction site that existed very close by the

20   convenience store.

21   Officers were then able to locate the defendant

22   in this case, Mr. Horne, just on the other side of the

23   site at an abandoned house located at 609 Marion Avenue

24   and at that time placed him in investigative detention.

25   Mr. Horne was wearing a red T-shirt and shorts. Witnesses

45

1    described that the suspect was tall wearing all black

2    clothing to include a mask.  At least one witness from the

3    construction site saw an individual wearing all black, a

4    ski mask, and carrying a backpack running across the site.

5         The Cherokee County Sheriff's Office brought out

6    their tracking unit.  The canine from that unit tracked

7    from the store to the location where officers were with

8    Mr. Horne.  And that happened twice.

9         Under the house where Mr. Horne was apprehended,

10   officers located a black pack that contained a black ski

11   mask, a black jacket, a black pair of pants, a pair of

12   black gloves, a black hat, and a Glock Model 23 that was

13   loaded.  These items of the backpack were taken into

14   evidence.

15        Video that was recovered from Zippy's showed a

16   male in all black run into the store, point a handgun at

17   customers and staff, and then run around the corner and

18   grab money from the cash register.

19        **THE COURT:**  If you could just slow down a little

20   bit.

21        **MS. WELLS:**  Yes, sir, Your Honor.

22        And grabbed money from the cash register.  This

23   individual fled from the store.  A red shirt can be

24   observed on the video underneath the black jacket.  The

25   firearm and ammunition both traveled in interstate

1    commerce to reach the district.  And Mr. Horne is a felon

2    whose rights to possess a firearm have not been restored.

3         Those are some of the facts the Government would

4    rely upon at a trial in this case.

5         **THE COURT**:  Thank you.

6         Proceed with the next defendant.

7         **MR. MOORMAN**:  Your Honor, may it please the

8    Court?  The facts as they relate to Ms. Brenda Perez-Diaz.

9    Your Honor, the investigation in this case revealed that a

10   number of individuals formed an agreement beginning in

11   2014 in the District of South Carolina and elsewhere to

12   possess with intent to distribute and to distribute

13   500-grams or more of a mixture or substance containing a

14   detectable amount of methamphetamine.  The evidence also

15   showed that this defendant joined that agreement for the

16   purpose, again, of distributing in excess of 500-grams of

17   methamphetamine.

18        Your Honor, the investigation has revealed that

19   this defendant, Brenda Perez-Diaz, was either married to

20   or at a minimum romantically involved with the

21   co-defendant Alejandro Peneral.  And during the course of

22   the conspiracy, she worked with Co-defendant Peneral,

23   Co-defendant Braulio Reyes-Reyes, and others for the

24   purpose of accomplishing the distribution of 500-grams or

25   more of methamphetamine.

47

1          Information law enforcement received during the

2     investigation suggests that this defendant would travel to

3     Atlanta, Georgia, with Co-defendant Braulio Reyes-Reyes

4     and other co-conspirators for the purpose of retrieving

5     kilogram quantities of methamphetamine.  She would then

6     return to the upstate of South Carolina where she and her

7     co-defendants and co-conspirators would distribute this

8     methamphetamine.

9          Also during the course of the investigation, law

10    enforcement utilized a confidential source for the purpose

11    of communicating with this defendant for the purpose of

12    accomplishing the distribution of methamphetamine.  And

13    numerous text messages between the confidential source and

14    this defendant suggests that, again, she formed the

15    agreement for the purpose of distributing methamphetamine.

16          **THE COURT**:  Thank you.

17          **MR. WATKINS**:  May it please the Court, Your

18    Honor?  As to Ms. Freeman, Your Honor, this is a drug

19    conspiracy case.  Ms. Freeman is a member of the

20    conspiracy as well as members of a motorcycle gang who

21    have yet to be fully identified.  This is based on her own

22    statement.

23          Your Honor, essentially, what Ms. Freeman would

24    do was to create fraudulent prescriptions for primarily

25    Hydrocodone, though we have recovered a couple of

48

| | |
|---|---|
| 1 | Oxycodone prescriptions.  And then she would pass these at |
| 2 | local pharmacies throughout the upstate of South Carolina. |
| 3 | Your Honor, Ms. Freeman was arrested by law |
| 4 | enforcement and was interviewed.  She cooperated.  She was |
| 5 | read her rights.  And she admitted to filling fraudulent |
| 6 | prescriptions for Hydrocodone and stated that the |
| 7 | prescriptions that she received were sold and passed on to |
| 8 | members of the motorcycle gang for their use and |
| 9 | distribution.  Your Honor, she said she usually tried to |
| 10 | fill approximately three prescriptions per week.  And |
| 11 | sometimes she could get one per day if she was having a |
| 12 | good streak of luck. |
| 13 | Your Honor, again, this occurred beginning in or |
| 14 | around October 2014 and continuing up until the date of |
| 15 | this indictment. |
| 16 | **THE COURT:**  Thank you. |
| 17 | Give me just a moment. |
| 18 | **MR. WATKINS:**  Yes, sir. |
| 19 | **THE COURT:**  (Pause)  All right.  Thank you. |
| 20 | **MR. BREWER:**  May it please the Court, Your |
| 21 | Honor?  With respect to Mr. Travis Lee Nixon, Mr. Travis |
| 22 | Lee Nixon and a Hannah Fooshang were involved in a |
| 23 | domestic dispute in January of this year.  Subsequently, |
| 24 | on February 5th, 2017, Ms. Hannah Fooshang went to her |
| 25 | mother's house in Greenville, South Carolina, with her son |

49

1    that she shares in common with Mr. Nixon.  Mr. Nixon

2    subsequently came to the house at approximately 4 a.m. the

3    following morning, February 6th, 2017, to visit with their

4    son.

5           The evidence indicates that Mr. Nixon and

6    Ms. Fooshang became involved in a verbal altercation at

7    which point Mr. Nixon brandished a black firearm, made

8    some threats as against Ms. Fooshang.  Mr. Nixon went in

9    to visit with his son, eventually fell asleep.

10          Ms. Fooshang left the residence and called the

11   police.  The Greenville Police Department arrived at the

12   residence and knocked on the door.  Eventually Ms. Regina

13   Fooshang, Ms. Hannah Fooshang's mother, appeared at the

14   door and indicated that Mr. Nixon had also leveled threats

15   against her and had a gun inside the residence.

16          Law enforcement called for Mr. Nixon to come

17   out.  Mr. Nixon eventually left the residence, was taken

18   into custody.  A search of the house eventually produced

19   the GSG .22 caliber semi-automatic pistol alleged in the

20   indictment.  It was unloaded at the time.  The pistol was

21   found to be physically and visually consistent with the

22   firearm described by Ms. Regina Fooshang.  Subsequent

23   jailhouse calls involving Mr. Nixon also indicated that he

24   was aware that the police had found his pistol in the

25   residence.

50

1          Mr. Nixon has been previously convicted of

2     crimes punishable by imprisonment of a term exceeding one

3     year.  And the firearm in question in this case, the

4     .22 caliber semi-automatic pistol, was manufactured

5     outside the State of South Carolina and, necessarily,

6     traveled in interstate commerce.

7          **THE COURT REPORTER:**  Please spell that name for

8     me.

9          **MR. BREWER:**  Fooshang?  F-O-O-S-H-A-N-G.

10          **THE COURT REPORTER:**  Thank you.

11          **MR. BREWER:**  Your Honor, if I may --

12          **THE COURT:**  Yes.

13          **MR. BREWER:**  -- with respect to

14     Mr. Urieta-James?

15          **THE COURT:**  Yes.

16          **MR. BREWER:**  Your Honor, a cooperating informant

17     in this case on about November 8th, 2015, indicated to law

18     enforcement that he had been coordinating and receiving

19     supplies of methamphetamine out of Georgia from

20     Mr. Urieta-James.  And that he was expecting approximately

21     a one-kilogram delivery that same day to the informant's

22     house.

23          At approximately 4 p.m. on that same day,

24     Anderson County Sheriff's Office, who were patrolling

25     Highway 24 in Anderson, observed a vehicle that was

51

1  consistent with the description given by the cooperating

2  informant.  A traffic stop was eventually initiated for

3  the driver's failure to maintain his lane.

4          The driver was identified as the defendant,

5  Mr. Urieta-James, out of Atlanta, Georgia.  He did not

6  have a driver's license or registration.  The vehicle was

7  registered to one of his aliases and was consistent with

8  information given by the cooperating informant.

9          A search of his vehicle indicated or produced

10  472-grams of crystal methamphetamine, 26-grams of cocaine,

11  14-grams of marijuana, a black digital scale, a Browning

12  9x19 millimeter handgun, several rounds for that same

13  firearm, and approximately $4,600 in US currency, Your

14  Honor.

15          **THE COURT:**  Thank you.

16          All right.  Let me ask each defendant, did you

17  listen carefully to the prosecutor's summary of what you

18  did?

19          **MR. HORNE:**  Yes, sir.

20          **MS. PEREZ-DIAZ:**  Yes, sir.

21          **MS. FREEMAN:**  Yes, sir.

22          **MR. NIXON:**  Yes, sir.

23          **MR. URIETA-JAMES:**  Yes, sir.

24          **THE COURT:**  Do you agree with the prosecutor's

25  summary of the facts of your case and what you did?

1          **MR. HORNE:**  Yes, sir.

2          **MS. METCALFE:**  Your Honor, we don't agree with

3    some of the specific facts as recited by Mr. Moorman.  I

4    believe there was some confusion and would like to address

5    a couple of the facts that were contained in his

6    recitation.

7          He listed some facts with regard to driving back

8    and forth to Atlanta.  My client does not agree with those

9    facts as stated by the Government.

10          She does agree that she was involved in a

11    conspiracy to possess and distribute methamphetamine.

12    She, as the Government stated, was in a romantic

13    relationship with the lead defendant who is the father of

14    her two youngest children.  And she agrees that she was

15    involved in this conspiracy and there was -- it was

16    foreseeable that 500-grams of methamphetamine were going

17    to be distributed.  But she does not agree with the

18    specific facts with regard to the alleged trips to

19    Atlanta.

20          **MR. MOORMAN:**  Your Honor, and that information

21    came from a cooperating witness.  For the purpose of the

22    guilty plea, Your Honor, I believe that Ms. Metcalfe's

23    representation to the Court that she acknowledges that she

24    was -- formed an agreement with others to distribute

25    methamphetamine and at a minimum it was foreseeable that

53

1    the agreement involved 500-grams or more, I think that

2    that is a sufficient factual basis, Your Honor.

3            THE COURT:  All right.

4            Ms. Perez-Diaz, did you listen carefully to what

5    your lawyer and the prosecutor just said?

6            MS. PEREZ-DIAZ:  Yes, sir.

7            THE COURT:  Do you understand what they said?

8            MS. PEREZ-DIAZ:  Yes, sir.

9            THE COURT:  Do you agree with what they said?

10           MS. PEREZ-DIAZ:  Yes, sir.

11           THE COURT:  And so as I understand it, the

12   disagreement you would have would be regarding trips to

13   Atlanta.  But otherwise, you agreed with the other

14   allegations of the Government about your involvement in

15   the conspiracy?

16           MS. PEREZ-DIAZ:  Yes, sir.

17           THE COURT:  You still want to plead guilty?

18           MS. PEREZ-DIAZ:  Yes, I do.

19           THE COURT:  Okay.

20           And again, the question is -- well, do you want

21   to ask her any other questions, Ms. Metcalfe?

22           MS. METCALFE:  No, Your Honor.

23           THE COURT:  Mr. Moorman, do you want to ask her

24   any other questions?

25           MR. MOORMAN:  No, Your Honor.

54

1          **THE COURT:**  Okay.

2          Again, the question is did you listen carefully

3    to the prosecutor's summary of the facts of the case and

4    what you did and do you agree with it?

5          **MS. FREEMAN:**  Yes, sir.

6          **MR. LOGGINS:**  Your Honor, Mr. Nixon agrees with

7    all the facts related to him possessing the firearm, with

8    knowingly possessing it.  He has pending state charges

9    around some of the other activities in the house that

10   night.  He does not want to comment on those.  But he

11   fully admits to the elements to support the charge.

12         **THE COURT:**  Sir, do you understand what your

13   lawyer said?

14         **MR. NIXON:**  Yes, sir.

15         **THE COURT:**  Do you agree with what he said?

16         **MR. NIXON:**  Yes, sir.

17         **THE COURT:**  All right.

18         And again, do you agree with the prosecutor's

19   summary of the facts of the case and what you did?

20         **MR. URIETA-JAMES:**  Yes, sir.

21         **THE COURT:**  Now, some of these folks are going

22   to be subject to mandatory minimum sentences.  And I think

23   we've been over it.  I don't want to hold folks up.  But I

24   want to make sure that those who are affected do

25   understand and that there's no confusion about that.

1          Mr. Horne is pleading guilty to Counts 1, 2, and

2    3.  And he's been advised of the mandatory minimum term of

3    imprisonment of 15 years, maximum of life, fine of

4    $250,000, term of supervised release of not more than five

5    years in addition to any term of imprisonment, plus a

6    special assessment of $100 if he has the prior -- if he's

7    considered an armed career criminal or subject to an

8    enhanced sentence.  We don't think that applies to him.

9          **MR. BEASLEY:**  It does not apply to him, Your

10   Honor, but he has been advised of that.

11         **THE COURT:**  And with respect to Count 3, as I

12   understand it, as to Count 3 he is subject to imprisonment

13   of not less than seven years, not more than life, a fine

14   of not more than $250,000, supervised release of not more

15   than five years, and a special assessment of $100.

16         Do you understand that, Mr. Horne?

17         **MR. HORNE:**  Yes, sir.

18         **THE COURT:**  Okay.  You've been over that with

19   him, I know.

20         **MR. BEASLEY:**  Yes, Your Honor.

21         **MS. WELLS:**  Your Honor, he is not charged in the

22   indictment with the brandishing.  So I advised him of the

23   five -- mandatory five.

24         **THE COURT:**  Okay.  So brandishing --

25         **MS. WELLS:**  Your Honor, I will tell the Court I

56

1   realized when I stood up here that it looks like I

2   submitted elements -- I mistakenly -- I submitted a draft

3   version of the elements to the Court which I will correct

4   after court today.  But he has been properly advised in

5   court today of the five.

6          **MR. BEASLEY:**  That's correct.

7          **MS. WELLS:**  The consecutive five on Count 3.

8          **MR. BEASLEY:**  That's correct.

9          **THE COURT:**  Okay.

10         Do you understand that, Mr. Horne?

11         **MR. HORNE:**  Yes, sir.

12         **THE COURT:**  Okay.

13         Thank you for that clarification.

14         **MS. WELLS:**  Thank you, Your Honor.

15         **THE COURT:**  I just want everybody to know and

16  understand everything that happens in this hearing.  So I

17  appreciate your indulgence.

18         Now, with respect to Ms. Brenda Perez-Diaz, I

19  understand she is subject to a mandatory minimum of ten

20  years.

21         **MS. METCALFE:**  That's correct, Your Honor, and

22  she has been advised of that.

23         **THE COURT:**  Ms. Perez-Diaz, as I understand it,

24  based on the charge to which you are pleading guilty, and

25  we've been over this but I just want to make sure you're

57

```
1   clear, you're facing a minimum term of imprisonment of ten
2   years, maximum term of life, no probation, no parole, fine
3   of up to $10 million, and a term of supervised release of
4   at least five years in addition to any term of
5   imprisonment, plus a special assessment of $100.  Do you
6   understand that?
7              MS. PEREZ-DIAZ:  Yes, sir.
8              THE COURT:  Okay.
9              And with respect to Mr. Miguel Urieta-James,
10  he's pleading guilty to Counts 4 and 5 and he's also
11  facing a minimum term of imprisonment.
12             MR. LOGGINS:  He's been informed multiple times
13  that he's facing a mandatory five years consecutive on
14  that charge, Your Honor, both prior to court today and
15  multiple times in court today.
16             MR. BREWER:  And, Your Honor, it's technically
17  two mandatory minimums.  So with respect to Count 4, he's
18  facing five years for possession with intent to
19  distribute.  And then as Mr. Loggins just indicated,
20  another five years consecutive to any other term of
21  imprisonment with respect to Count 5, the 924(c) count.
22             THE COURT:  And with respect to Count 4, as I
23  understand, it's a minimum term of five years, maximum
24  term of 40?
25             MR. BREWER:  That's correct, Your Honor.
```

58

1           THE COURT:  And as to Count 5, minimum term of

2    five years consecutive to any other term of imprisonment

3    and maximum of life.

4           MR. LOGGINS:  That's correct.

5           MR. BREWER:  That's correct.

6           THE COURT:  Okay.

7           Sir, do you understand that?

8           MR. URIETA-JAMES:  Yes, sir.

9           THE COURT:  Thank you.

10          Anything else on behalf of any of the

11   defendants?

12          MR. BREWER:  Your Honor, may it please the

13   Court?  I believe Mr. Urieta-James needs one second

14   with --

15          THE COURT:  Okay.  I'm sorry.

16          Does he need to speak with you?

17          MR. LOGGINS:  He did, Your Honor.  He had one

18   question.  We've answered it.

19          THE COURT:  Okay.  Thank you.

20          Anything else on behalf of any of the

21   defendants?

22          MR. BEASLEY:  No, Your Honor, as to Mr. Horne.

23          MS. METCALFE:  No, Your Honor.

24          MR. PLOWDEN:  No, sir.

25          MR. LOGGINS:  No, Your Honor.

59

1          THE COURT:  Anything from the Government on any

2     of these cases?

3          MS. WELLS:  Not as to Mr. Horne, Your Honor.

4          MR. MOORMAN:  Nothing as to Ms. Perez-Diaz.

5          MR. BREWER:  Nothing, Your Honor.

6          MR. WATKINS:  No, sir.

7          THE COURT:  All right.

8          In just a moment, I'm going to make a finding

9     about your guilty plea and accept your plea.  But at this

10    time I'm going to give each of the defendants an

11    opportunity to tell me anything they want to tell me about

12    their case.

13         I think I forget to ask one question I normally

14    ask, so let me just ask this.  You've heard the

15    prosecutor's summary of the facts of the case and what you

16    did.

17         Mr. Horne, do you disagree with anything the

18    prosecutor said about what you did?

19         MR. HORNE:  No, sir.

20         THE COURT:  Ms. Perez-Diaz, other than the --

21    what we discussed about the trips to Atlanta, do you

22    disagree with anything the prosecutor said about what you

23    did?

24         MS. PEREZ-DIAZ:  No, sir.

25         THE COURT:  Ms. Freeman, do you disagree with

60

1    the prosecutor's summary, anything about what he said

2    about what you did?

3              **MS. FREEMAN:**  No, sir.

4              **THE COURT:**  Mr. Nixon, do you disagree with

5    anything the prosecutor's said about what you did with

6    respect to having the gun, possession of the gun?

7              **MR. NIXON:**  No, sir.

8              **THE COURT:**  And Mr. Urieta-James, do you

9    disagree with anything the prosecutor said about what you

10   did?

11             **MR. URIETA-JAMES:**  No, sir.

12             **THE COURT:**  I'm going to give each defendant an

13   opportunity to tell me anything you want me to know or

14   anything you want to say at this time.  You'll be

15   returning to court at some point in the future after a

16   Presentence Report has been completed and you and your

17   attorney have had a full and complete opportunity to

18   review that report, study it, make any objections or

19   comments about it.  And at that sentencing hearing, you'll

20   be allowed to say anything you want to say and tell me

21   anything you want me to know about your case.  But I also

22   give everyone an opportunity to say anything they want to

23   say at the conclusion of a guilty plea hearing.

24             So you can tell me what you want me to know

25   today.  And you can tell me what you want me to know at

61

 1    the sentencing hearing.  Or you can wait until the time of

 2    your sentencing hearing.

 3              You've admitted guilt.  You've listened to the

 4    summary of the facts of the case and indicated that you

 5    want to plead guilty.  So that is sufficient in my view

 6    for today.  Whether or not you want to say anything else

 7    is a decision for you to make in close consultation with

 8    your attorney.

 9              So at this time let me ask each defendant, is

10    there anything else you want to say?

11              MR. HORNE:  No, sir.

12              MS. PEREZ-DIAZ:  I want to apologize for being

13    late today.

14              THE COURT:  Thank you.

15              MS. FREEMAN:  No, sir.

16              MR. NIXON:  No, sir.

17              MR. URIETA-JAMES:  No, sir.

18              THE COURT:  All right.  If there's nothing

19    further, with respect to each defendant, based upon the

20    information presented, I find there is a factual basis for

21    the guilty plea as to each offense.  I further find that

22    each defendant's plea of guilty is made freely,

23    voluntarily, and knowingly with the advice and assistance

24    of competent legal counsel and supported by an independent

25    basis in fact containing each of the essential elements of

62

1    each offense.  Each defendant's plea of guilty is

2    therefore accepted.  And each defendant is hereby adjudged

3    guilty of the offense or offenses charged.

4         I'll request that the probation office commence

5    preparation of a Presentence Investigation Report for

6    these folks whereupon those matters will be returned to

7    court for a final disposition.

8         Thank you and good luck to you.

9         **MR. BREWER:**  Thank you, Your Honor.

10        **MR. MOORMAN:**  Thank you, Your Honor.

11        **MR. PLOWDEN:**  Your Honor, can I take up a bond

12   issue for Ms. Freeman?

13        **THE COURT:**  Yes.  We'll let those other folks

14   get signed up and then we'll take it up.

15       (WHEREUPON, the defendants signed their plea.)

16                              * * *

17   I certify that the foregoing is a correct transcript from

18   the record of proceedings in the above-entitled matter.

19

20      s/Karen E. Martin                10/19/2017

21   _____        _____
     Karen E. Martin, RMR, CRR           Date

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

**UNITED STATES OF AMERICA**

           **VS**                            **CR NO.  7:17-79**

Precias K Freeman

      The defendant, having withdrawn his or her plea of Not Guilty, pleads **GUILTY** to

Count(s)_____ of the Indictment/ Superseding Indictment/Information.

                                       (Signed) Defendant

Anderson, South Carolina

1

```
  1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF SOUTH CAROLINA
  2                     SPARTANBURG DIVISION

  3    UNITED STATES OF AMERICA,  )    CR. NO. 7:17-CR-79
                                  )    ANDERSON, SC
  4                               )    JULY 9, 2018
                                  )
  5         VERSUS                )
                                  )
  6    PRECIAS K. FREEMAN,        )
                                  )
  7                 DEFENDANT.    )
       _____)
  8
                BEFORE THE HONORABLE TIMOTHY M. CAIN
  9            UNITED STATES DISTRICT COURT JUDGE
                   STATUS CONFERENCE HEARING
 10
       APPEARANCES:
 11
       FOR THE GOVERNMENT:      WILLIAM WATKINS, AUSA
 12                             UNITED STATES ATTORNEY'S OFFICE
                                55 BEATTIE PLACE
 13                             SUITE 700
                                GREENVILLE, SC  29601
 14
       FOR THE DEFENDANT:       LORA C. BLANCHARD, AFPD
 15                             FEDERAL PUBLIC DEFENDER'S
                                  OFFICE
 16                             TWO LIBERTY SQUARE
                                75 BEATTIE PLACE
 17                             SUITE 950
                                GREENVILLE, SC  29601
 18
       COURT REPORTER:          DEBRA R. BULL, RPR, CRR
 19                             UNITED STATES COURT REPORTER
                                315 SOUTH MCDUFFIE STREET
 20                             ANDERSON, SC  29624

 21

 22          STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
                    *** *** *** *** ***
 23

 24

 25
```

```
 1          (Whereupon, the hearing commenced at 3:35 p.m.)
 2          MR. WATKINS:  Judge,  our next case is 7:17-79,
 3    United States versus Freeman, she is represented by
 4    Ms. Blanchard.
 5          THE CLERK:  Raise your right hand,  please.
 6           PRECIAS K. FREEMAN, having been first duly
 7    sworn, testified as follows:
 8          MS. BLANCHARD:  Your Honor,  if I may, in just
 9    briefly talking to Ms. Freeman, she has informed me that
10    there are some objections that she now has to the
11    Presentence Report.  I know one of them is with regard
12    to the determination as to the drug amounts.  I don't
13    know how Your Honor would like to address that.
14          THE COURT:  Well,  my report says that there were
15    no objections to the presentence report, that is at ECF
16    52-1.
17          MS. BLANCHARD:  That is correct,  Your Honor.  I
18    did go meet with Ms. Freeman up in North Carolina, and
19    we did discuss the Presentence Report, and we had
20    several corrections as to family history and that type
21    of thing.  And I just learned this afternoon that she
22    was concerned about the drug weights.
23          THE COURT:  Well,  specifically,  what is the
24    objection?
25          THE DEFENDANT:  Actually it is more than just
```

1  that issue.

2        THE COURT:  Wait one second.  Did we administer

3  the oath?

4        THE CLERK:  Yes.

5        THE COURT:  Go ahead, ma'am.

6        THE DEFENDANT:  Ms. Blanchard did come see me

7  last week and bring me my presentencing report (sic).

8  But at that time, we sat down and talked, that was my

9  first time even seeing the report.  She told me --

10        THE COURT:  That is fine.  You can make your

11  objection today.

12        THE DEFENDANT:  Okay.

13        THE COURT:  I just want to make sure I understand

14  what it is.

15        THE DEFENDANT:  Okay.  Well, first, with

16  regards to the weight, I am just trying to figure out

17  how they came to that conclusion or how they came to

18  that calculation because the way I read it --

19        THE COURT:  Are you talking about paragraph 11?

20        THE DEFENDANT:  Yes, sir.  Yes, sir.  Basically

21  saying that I tried to fill three prescriptions a day

22  and a minimum of one prescription a day, to me an

23  attempt is not necessarily admitting that that is what

24  it is.  I mean, if I am saying it right, I don't know

25  if I am saying it right.  But it says I attempted to

4

1   fill three,  21 per week,  a minimum of one per day.

2   Admitting I tried is not the same as saying that I

3   actually did it.

4        MR. WATKINS:  Judge, she is not being held

5   accountable for three per day.  She said -- my notes

6   from her interview with inspector Richmond with DHEC was

7   that she usually tried to fill three prescriptions per

8   day,  which would have been 21 per week,  but she only

9   had success typically with about one per day, which

10  would have been seven per week.

11       MS. BLANCHARD:  So, that is an average of one per

12  day.  Since you admitted that you tried to get three per

13  day, her minimum was an average of one per day.  So,

14  they are using an average of one per day.  So, 365 days,

15  time 120 pills for two years.  That is in --

16       MR. WATKINS:  So, Judge,  we took the lower number

17  to try to be fair with her based on the interview rather

18  than three or two,  the lowest,  seven, maybe she got

19  one a day,  though she tried three.  I am sure some days

20  she probably had success and got two or three,  but we

21  didn't use the higher number,  we used the lower number,

22  one.

23       THE COURT:  Okay.  Ms. Stewart, did you want to

24  say anything about it?

25       PROBATION OFFICER:  I am going to agree with

1    Mr. Watkins, that is how we calculated was use the low

2    end because in her statement it says she tried to do

3    more than three -- three, and the minimum was one, and

4    that is where we calculated the drug weight was on one a

5    day.

6          THE COURT:    Okay.

7    By THE COURT:

8    Q.       Ms. Freeman, do you understand?

9    A.       I understand what they are saying, I do.   But I

10   guess the way it is worded --

11          THE COURT:   Well, is there anything else that

12   anyone wants to say about that?

13          MS. BLANCHARD:  Your Honor, I would just say that

14   is how we got the number of pills, use the drug

15   equivalent found in section 2D1.1 and that would be the

16   6,700 grams, 876 grams of hydrocodone, multiplied by

17   6,700 grams of marijuana to get the equivalency to find

18   that on the drug table.

19          THE COURT:    Say that one more time.

20          MS. BLANCHARD:  So, Your Honor, one gram of

21   hydrocodone is the same as 6,700 grams of marijuana.

22          THE COURT:    Correct.

23          MS. BLANCHARD:  So, they multiplied the 6,700

24   grams times 876 grams of hydrocodone to come up with the

25   5,869.2 kilograms of marijuana which corresponds to a

1    base offense level of 32.

2        THE COURT:   This gentleman in the blue shirt

3    needs to leave the courtroom.   He is making gestures,

4    shaking his head.   Thank you.

5        I see how they came up with it, and I think I

6    understand the math,  but I am just trying to determine

7    if there is an objection to it or does she understand

8    now and agrees or disagrees that that is a reasonable

9    way to do it?

10       THE DEFENDANT:   I mean, I understand how they did

11   it,  but I still disagree,  me, personally, with the

12   fact that they are saying I did one a day.

13       THE COURT:   Well, did you indicate to the agent

14   that you tried to fill three prescriptions a day?  That

15   that is what you tried to do?

16       THE DEFENDANT:  Are we referring to when I was

17   interviewed initially when I got arrested?

18       MS. BLANCHARD:  At any time you breached your

19   proffer anything you said was fair game.

20       THE DEFENDANT:  I mean, I am not sure which

21   conversation we are referring to.

22       MR. WATKINS:  Judge,  I was referring to when she

23   was first arrested back in October 2016, and shortly

24   thereafter she spoke with Rachel McCoy was -- at the

25   time McCoy,  she is now Richmond,  she is married,  she

1    is with DHEC, she was read her Miranda rights, and
2    admitted to filling fraudulent prescriptions for
3    hydrocodone.  She stated that the drugs she received
4    from the prescriptions were sold to members of a gang.
5    And, again, she stated that she usually tried to fill
6    three prescriptions per day, 21 a week, but at least
7    one per day, seven prescriptions a week.  And research
8    from Ms. Richmond showed that Ms. Freeman's
9    prescriptions were almost exclusively for 120 tablets of
10   ten milligram hydrocodone per prescription.  So I don't
11   know if that is the interview?  Judge, to be honest with
12   you, Ms. Blanchard has said candidly that she spoke
13   again with Adam Roberson here from DEA diversion under
14   proffer, but she -- her proffer has blown-up because
15   she took off, ran.  And one reason Ms. Blanchard could
16   only speak with her a week or so ago is because she has
17   been on the run, guess what? Doing more fraudulent
18   prescriptions, and was caught with drugs up in Shelby
19   and State charges filed against her there.  So, if we
20   need to go back and recalculate the drug weight,
21   Ms. Stewart has not included the additional information
22   from the proffer, which under the terms as long as she
23   complied with her bond and obeyed the law, that wasn't
24   going to be included in the guidelines.  We could
25   certainly do a recalculation with that information, you

1    know,  it might not be a level 32 anymore,  but that is

2    up to, obviously, the Court and how Ms. Freeman wants to

3    proceed.

4          THE DEFENDANT:   When I first got arraigned,  I

5    had Mr. Plowden as an attorney, and then he retired.

6    Then I was given Ms. Blanchard.

7          THE COURT:   Well,  do you want the Government to

8    go back?

9          THE DEFENDANT:   That is not what I am saying.

10   At this point, me and Ms. Blanchard aren't seeing eye to

11   eye.   I don't really feel like I am being represented

12   correctly,  I really don't.   I am fighting for my life

13   here, and I feel like my attorney should be on my side

14   and try to fight for me, and she is not.   And I know I

15   have been in custody in North Carolina since March 1st,

16   but several of my State attorneys tried to get in touch

17   with Ms. Blanchard,  my family has tried to get in touch

18   with her,  nothing.   There has been nothing until last

19   week; am I incorrect?

20         THE COURT:   Well,  ma'am,  you don't get to ask

21   her or anyone else questions here today.

22             So,  other than the concerns you have about the

23   drug weight -- maybe that is what needs to happen, the

24   Government needs to just go back, revisit this, it might

25   result in a higher number, it might result in a lower

1  number. It is what it is at that point.  So, do you

2  want me to ask the Government to go back and look at the

3  other information you provided to the Government, as

4  well as what the investigation will be able to build to

5  get a more accurate drug weight?

6          THE DEFENDANT:   No, sir, I am just asking for

7  another attorney.

8          THE COURT:   You are asking for another attorney?

9          THE DEFENDANT:   Yes, sir.  My family has been

10 looking to another attorney.

11         THE COURT:   Your family what?

12         THE DEFENDANT:   Has been looking at another

13 attorney and are ready to hire another attorney because

14 I really do not  -- I mean,  I don't think  -- I am

15 literally fighting for my life here,  I really am.  And

16 I -- all I am asking is a chance,  I would really like

17 another attorney.

18         THE COURT:   So you want some time so your family

19 can hire another lawyer,  is that what you are telling

20 me?

21         THE DEFENDANT:   Yes, sir.  It wouldn't take --

22 they actually saw an attorney today, and they are ready

23 to hire an attorney as soon as possible.

24         THE COURT:   Well,  it sounds like she is wanting

25 a continuance to hire a lawyer.

1          MR. WATKINS:  Yes, sir.   Judge,  if that is what

2     she wants to do, I just want to put the Court and

3     Ms. Freeman on notice that,  frankly, with the drug

4     weight, not trying to run up the score on her,  I had

5     kind of overlooked the busted proffer and didn't want to

6     hang any more on her.   I would ask Ms. Stewart to get

7     with to get with Mr. Roberson and go over the numbers

8     and additional information from that proffer and see if

9     that changes the drug weight one way or the other, and

10    we can do this again if the Court is inclined.

11         THE COURT:   Well,  did your agent have to come a

12    long way?

13         MR. WATKINS:  Where did you come from this morning

14    Agent Roberson.

15         THE AGENT:  Columbia,  sir.   That is fine.   I

16    will come back another time.

17         THE COURT:   Okay.   Thank you.

18         Ms. Freeman, where are you housed right now?

19         THE DEFENDANT:   Today in Anderson.   Anderson

20    City.

21         THE COURT:   Well,  I will continue this hearing

22    for a short period of time to allow Ms. Freeman and her

23    family to hire a lawyer if that is what they want to do.

24    And then it is up to the Government if the Government

25    wants to revisit the calculations set forth in paragraph

1    11, and if that results in an updated report then that

2    would just need to be provided to everyone.

3           MR. WATKINS:  Yes, sir.

4           THE COURT:   Thank you.

5           MR. WATKINS:  Thank you, Judge.

6       (Whereupon, the hearing concluded at 3:49 p.m.)

7           *** END OF REQUESTED TRANSCRIPT ***

8       * * * * * * * * * * * * * * * * * * * * * * * * *

9                CERTIFICATE OF REPORTER

10       I certify that the foregoing is a correct

11   transcript from my stenographic notes in the

12   above-entitled matter.

13

14

15

16

17     S/Debra R. Bull, RPR, CRR      April 11, 2019

18                                 Date

19

20

21

22

23

24

25

# UNITED STATES DISTRICT COURT
### for the
### District of South Carolina

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )    **MOTION TO ENTER** |
| v. | )    **BRIDGE PROGRAM** |
| | ) |
| PRECIAS K. FREEMAN | )    **C.A. No.: 7:17-CR-79** |
| _____ | ) |

### DEFENDANT'S MOTION TO ENTER
### THE BRIDGE PROGRAM

### Introduction

COMES NOW DEFENDANT Precias Freeman, by and through undersigned counsel, and hereby moves this Court to enter into the BRIDGE program. Defendant brings with her an addiction to opioids that has ruined her life; and, more importantly, who she is. What seemed like an ordinary prescription to recover for injuries sustained in an automobile accident in 2000, turned out to be the end of life as Precias Freeman knew it. She began her long and arduous Opioid journey which has brought her to this point.

Her incarceration for the last eight (8) months has provided her with the opportunity to work on being drug free for the longest period of time in this millennium. Although the Defendant entered a rehabilitation program in Spartanburg when she was released in April of 2017, she was unable to participate in the MAT program because of her pregnancy. The MAT program utilizes medicinal therapy as well as counseling to foster and facilitate recovery. The inability to enter a program that offered a physical element to her arsenal to fight this dreaded disease ensured her failure.

Precias Freeman has been opioid free since her incarceration. It has reminded her of the woman who was free of the gripping addiction of the opioids which have literally wreaked havoc

on her, South Carolina and the United States as a whole. Defendant will always be the drug addict that she has become. Her fight will be a daily struggle in which the only chance that she has is with the rigors of something such as the Bridge Program which requires the candidate to immerse oneself in a pledge to defeat a most severe opioid addiction; and, get to a place where she can raise her children and live a life that is not consumed by her quest to get the next pill.

Therefore, counsel respectfully requests, in part for the reason found below, Defendant be considered for the BRIDGE program.

### Discussion

Precias Freeman was admitted into the Intensive Outpatient Program in Spartanburg at the Forester Center. As part of the indoctrination, the depth of her addiction was examined in order to find the best way in which to treat her. The findings were extreme and explain how significant the aforementioned addiction that she possesses is.

She was diagnosed with a severe opioid disorder, an unspecified depressive disorder and an unspecified anxiety disorder. (Exhibit 1-Diagnosis Made). The diagnostic formulation which arrived at the diagnoses could not have been more apropos. She had a severe intoxication/ withdrawal risk. She had a very severe mental, cognitive or behavioral impairment in need of confinement. Her counselor recognized that her treatment readiness was essentially non-existent. In fact, based on her lack of knowledge relating to addiction; and, her unwillingness to explore the possibilities, her recovery's chances for failure were very severe. Her lack of skills to manage the symptoms of her disease, to prevent ongoing use or relapse, was considered severe. Her lack of a supportive network and environment was also considered severe in the scope of recovery. (Exhibit 2-Diagnostic Formation).

The astute counselors predicted failure for her before they even started. That prediction was made *before* she learned of her pregnancy and the inability to use the necessary medicinal therapy to supplement the counseling that was offered. Precias Freeman had developed a dependence so severe that it is difficult to fathom how she is alive. She was consuming in her darkest hours sixty (60) to eighty (80) 10 mg Norco pills *a day*. She would crush six pills at a time for consumption. Very severe would probably be considered an understatement with regard to her addiction.

The numbers are staggering. It is the epitome of addiction. The body builds up tolerance to medication. She was a walking opioid. The counselors assessed her perfectly. Based on the medicinal therapy weapon not being available to her, she had no chance to make any significant advances in her war.

The Forester Center, with the input of the government, mischaracterized certain aspects of her treatment. The notes state that she was discharged from the MAT program due to a failure to appear is taken out of context. Ms. Freeman was told by her OB/GYN that he would not approve her taking anything relating to opioid treatment, such as methadone or suboxone.

She was in Steven Prince's group in May and the first half of June in 2017. However, he told the class that Ms. Freeman's failure to come to class dealt with the fact that she had been taken to jail. He then proceeded to offer the other members of the group private information related to her record and her addiction. Upon learning of this breach of her trust, she was taken out of his class. She went to another individual's class, but they wanted her to start with a new group to be on the same level as her fellow group members. Hence, she was out of class until September. It should be noted that on September 6, 2017, which was her last in the program, she passed her drug test on that occasion and participated in the group session. She was to begin

anew with an IOP group on September 11, 2018.  Unfortunately, Ms. Freeman withdrew from it to have her baby.

Ms. Freeman is capable of successful treatment.  Undeniably, she needs all of the possible tools to succeed to be available to her.  Her criminal history is 2.  Of course, they are both charges dealing with prescriptions.

> As the Program experienced success with these participants, it expanded its eligibility criteria to accept non-violent drug offenders who were dealing drugs to support addiction. The Bridge Program not only found that it could effectively treat such offenders, but that in doing so, there was a substantial opportunity to save resources and improve the lives of the participants, their families, and the community.

*Interim Report on the Bridge Drug Court Program,* p. 6, August 2016.

Because of her innovation, she was able to secure thousands and thousands of pills.  Her success has left her looking up at a sentence of 210 to 240 months, as suggested by the government.  She would be released from prison following her youngest child's graduation from high school.  Due to the significant sentence in front of her, it is thought that the BRIDGE Program should not be presented to her.  However, she did not use violence to get her medication; she did not steal from her neighbor to allow her to acquire the pills; and, she did not become wealthy as a result of her acquisition and subsequent distribution of Norcos, just to name a few things.

In Judge Hendricks' Interim Report in 2016, she used an article from the Huntington Post to illustrate how there can be no quit in the Court's attempt to reform individuals.  A gentleman who was so addicted to heroin that it was "the consensus among several of the professionals who work with the Program was that Shaun was the worst heroin addict they had ever seen." *Interim Report on the Bridge Drug Court Program,* p. 23, August 2016.  Precias can be the same individual only with a different addiction.

Ms. Freeman was surviving the only way that she knew. Ingest the Norco narcotic; or, cease to exist. The Norcos were her dictator. She existed to create and have prescriptions filled. She knew that if she failed to maintain her constant drug induced state, she would cease to exist.

That is the only explanation. She was certainly not doing it take money. In fact, her family, which included her pregnant self, was being evicted for failure to pain the rent. She wasn't robbing or using violence. Her twisted sense of reality combined with her intelligence enabled her to figure out security measures used to control the dispensing of the medication.

On the other hand, all of the players in this epidemic were dispensing pills at an astronomical rate. Someone with her addictive personality didn't stand a chance. Florida recently sued Walgreens and CVS for their proliferation of the pills. This was not foreign to Precious. She had a prescription for 120 pills. The pharmacy filled it with 180 pills. (Exhibit 5-

A successful reformation of Precias Freeman could pay incredible dividends. She would be able to help raise her children. She could be the mentor needed for so many people who suffer from what she suffers. She would be invaluable as a speaker to spread the word of how she able to overcome the opioid monster with prayers and dedication. Everyone wins when someone completes drug court, whether be in the State or Federal Court.

Precias Freeman is facing upwards of twenty (20) years in prison for what the American Medical Association termed a disease in 1987. While others say these addicts, and their criminal acts are because of the addiction from which they suffer, Ms. Freeman can point to the fact that her crimes have all been for prescriptions. It is because she can't stop. Her cancer is her addiction to the opioids that man has made to stem pain. Instead, it has caused monumental pain in our society.

On October 26, 2017, President Trump announced that his Administration was declaring the opioid crisis a national Public Health Emergency under federal law, effective immediately. "I am directing all executive agencies to use every appropriate emergency authority to fight the opioid crisis," the President said. "Defeating this epidemic will require the commitment of every state, local, and Federal agency. Failure is not an option. Addiction is not our future," the President told New Hampshire. "And we pledge to honor the memory of those you lost with action and determination and resolve." First Lady Melania Trump said, "I learned that to help babies succeed, we must help their parents succeed." www.Whitehouse.gov

### Conclusion

Precias Freeman, like many Americans, is addicted to opioids that were created to treat injuries like those she suffered in a car wreck. That was nearly two decades ago. She has struggled to maintain, to survive, to live. She is a drug addict that simply needs help. To this point in her addiction, she has not had the tools to win. The BRIDGE Program can offer her those tools. She is the consummate candidate. She was highly addicted, with unparalleled consumption. She has non-violent crimes that are directly related to her addiction. In fact, her crimes are for the sole purpose of feeding her disease, we call addiction.

It is difficult for those of us who have not dealt with addiction to understand why addicts, just can't "say no". The disease that Ms. Freeman has seemingly will not let her go. However, if we don't quit on her, she has great potential to succeed. "The good news is that even the most severe, chronic form of the disorder can be manageable and reversible, usually with long term treatment and continued monitoring and support for recovery." Center on Addiction, December 3, 2018. Please give her one chance to choose her path. If she wants to succeed, she will. If not, she can do that as well.

7

Respectfully submitted,

s/**Donald L. Smith**_____
Donald L. Smith, (Fed Id.#06626)
Attorney for Defendant Precias Freeman
122 N. Main Street
Anderson SC 29621
Telephone:  (864) 642-9284
Facsimile:  (864) 642-9285
attorneydonaldsmith@gmail.com

December 4, 2018.

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

Priority #: | 3

# TEDS/NOMS Verification

| | |
|---|---|
| Client Program: | Programs marked with (*) are not yet active. They will become active once the Client is admitted. |
| | Intensive Outpatient (IOP) (04/20/2017 - 09/20/2017) |
| Days Waiting to Enter Treatment: | 7 |
| Record Type: | Discharge |
| Education: | 2 Years of College/University |
| Employment Status: | Unemployed |
| Living Status: | Adult or Independent Youth Living Independently |
| Arrests in 30 days prior (to A/T/D): | ● Unknown |
| Non-DUI Arrests in 30 days prior (to A/T/D): | ● Unknown |
| DUI Arrests in 30 days prior (to A/T/D): | ● Unknown |

## Quality of Life Survey

(Optional Participation)

| | |
|---|---|
| Did the client leave before quality of life questions could be completed? | ● Yes |
| | ○ No |

## Client DSM Diagnosis as of 9/20/2017 10:44 AM

| | |
|---|---|
| Client: | Freeman, Precias (592280) 9/2/1982 |
| Effective Date/Time: | 9/20/2017 10:44 AM |
| External Diagnosis: | No |
| Diagnosed By: | Keeney, Melissa (546494) |
| Comments: | |

## Diagnosis

| DSM-5          Severity/Specifier | ICD-10 | Comments |
|---|---|---|
| F11.20 - Severe opioid use disorder | F11.20 - Opioid dependence, uncomplicated | Federal Probation for Conspiracy to Possess with Intent to Distribute and Distribute Hydrocodone and Oxycodone, Schedule II Controlled Substances (October 2014 and indicted February 12th, 2017). Cl said that she requested to come for AOD tx due to px with opiate use with last use was last week (Norcos 10mg-1 pill/ others) with report of heavier use in the past year. |
| F12.10 - Mild cannabis use disorder | F12.10 - Cannabis abuse, uncomplicated | Cl reported last use was 2 1/2 weeks ago which she usually smokes 5-6 hits off a joint on weekends. |
| F32.9 - Unspecified Major Depressive Disorder | F32.9 - Major depressive disorder, single episode, unspecified | Dx by Dr. Martin (psychiatrist) while in jail which he prescribed her Lexapro and Seroquel in December 2016 which she took until February 2017 (cl took herself off of it) which cl said that it was making her blood pressure go up. Cl denied any |

Freeman, Precias (592280)                    2 of 4                    Date Printed: 9/27/2018 10:14 AM

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

| | | counseling hx. |
|---|---|---|
| F41.9 - Unspecified Anxiety Disorder | F41.9 - Anxiety disorder, unspecified | Per cl report. |

The Diagnoses above display in priority order.

## Psychosocial and Contextual Factors

| ICD-10 Code - Description | Comments |
|---|---|
| Z65.8 - Other Problem Related to Psychosocial Circumstances | Taking care of her parents, px with kids (i.e. teenage daughter) |
| Z59.9 - Unspecified Housing or Economic Problem | Financial stress |
| Z65.3 - Problems Related to Other Legal Circumstances | Legal px involving Federal Probation with Conspiracy (possession with intent to distribute opiates) |

## Diagnostic Formulation

See psychoactive substance use hx.

## ASAM PTC-Third ed.

**Dimension 1. Intoxication/WD:** Intoxication/Withdrawal or Potential Signs or Symptoms

○ 0 - None  ○ 2 - Moderate  ○ 4 - Very Severe
○ 1 - Mild  ● 3 - Severe

Severe - Severe intoxication or WD risk, but manageable.

**Notes:** Client hx of AOD use and self-report of continued use poses high risk for intoxication and withdrawal.

**Dimension 2. Medical Issues:** Biomedical Symptoms or their Complications to Tx

○ 0 - None  ○ 2 - Moderate  ○ 4 - Very Severe
○ 1 - Mild  ● 3 - Severe

Severe - Severe but stable medical problems or inability to cope with them.

**Notes:** Lupus (dx with 2003) and residuals from fall in 2000 involving her tail bone. Cl takes Prednisone when having flare-ups with Lupus but not on any meds now and does not have a physician (hers was on North Carolina). Cl does not have a physician in SC. Client is pregnant and reported continued AOD use. Client stated she is due to give birth 01/01/18.

**Dimension 3. Emotional/ Behavioral:** Emotional, Behavioral, or Cognitive functioning

○ 0 - None  ○ 2 - Moderate  ● 4 - Very Severe
○ 1 - Mild  ○ 3 - Severe

Very Severe - Severe mental, cognitive or behavioral impairment in need of confinement.

**Notes:** Cl has px coping with stressors/anxiety/depressive sx w/o AOD such as px with setting boundaries with others and having to take care of her parents along with legal charges. Client reported she and her family are being evicted from their home. Client stated she does not want to go to a shelter. Client reported prior homeless episode when she, her husband and two children lived in their SUV. Client stated that was a "fun" time.

**Dimension 4. Tx Acceptance:** Treatment Readiness

○ 0 - None  ○ 1 - Mild  ○ 2 - Moderate

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

| | counseling hx. |
|---|---|
| F41.9 - Unspecified Anxiety Disorder | F41.9 - Anxiety disorder, unspecified — Per cl report. |

The Diagnoses above display in priority order.

## Psychosocial and Contextual Factors

| ICD-10 Code - Description | Comments |
|---|---|
| Z65.8 - Other Problem Related to Psychosocial Circumstances | Taking care of her parents, px with kids (i.e. teenage daughter) |
| Z59.9 - Unspecified Housing or Economic Problem | Financial stress |
| Z65.3 - Problems Related to Other Legal Circumstances | Legal px involving Federal Probation with Conspiracy (possession with intent to distribute opiates) |

## Diagnostic Formulation

See psychoactive substance use hx.

## ASAM PTC-Third ed.

**Dimension 1. Intoxication/WD:** Intoxication/Withdrawal or Potential Signs or Symptoms
○ 0 - None    ○ 2 - Moderate    ○ 4 - Very Severe
○ 1 - Mild    ◉ 3 - Severe

Severe - Severe intoxication or WD risk, but manageable.

**Notes:** Client hx of AOD use and self-report of continued use poses high risk for intoxication and withdrawal.

**Dimension 2. Medical Issues:** Biomedical Symptoms or their Complications to Tx
○ 0 - None    ○ 2 - Moderate    ○ 4 - Very Severe
○ 1 - Mild    ◉ 3 - Severe

Severe - Severe but stable medical problems or inability to cope with them.

**Notes:** Lupus (dx with 2003) and residuals from fall in 2000 involving her tail bone. Cl takes Prednisone when having flare-ups with Lupus but not on any meds now and does not have a physician (hers was on North Carolina). Cl does not have a physician in SC. Client is pregnant and reported continued AOD use. Client stated she is due to give birth 01/01/18.

**Dimension 3. Emotional/ Behavioral:** Emotional, Behavioral, or Cognitive functioning
○ 0 - None    ○ 2 - Moderate    ◉ 4 - Very Severe
○ 1 - Mild    ○ 3 - Severe

Very Severe - Severe mental, cognitive or behavioral impairment in need of confinement.

**Notes:** Cl has px coping with stressors/anxiety/depressive sx w/o AOD such as px with setting boundaries with others and having to take care of her parents along with legal charges. Client reported she and her family are being evicted from their home. Client stated she does not want to go to a shelter. Client reported prior homeless episode when she, her husband and two children lived in their SUV. Client stated that was a "fun" time.

**Dimension 4. Tx Acceptance:** Treatment Readiness
○ 0 - None    ○ 1 - Mild    ○ 2 - Moderate

Freeman, Precias (592280)                    3 of 4                    Date Printed: 9/27/2018 10:14 AM

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

|  |  |
|---|---|
|  | ○ 3 - Severe        ◉ 4 - Very Severe |
|  | Very Severe - Knows little about addiction, and not willing to explore. |
| Notes: | Client stated if she does not attend treatment she will be arrested.<br>Client has not returned to services. Client has not responded to attempts for reconnection with services.<br>Client appeared ambivalent regarding negative impact of AOD on her life, her unborn child, her family and her need for positive change. |

| Dimension 5. Relapse/<br>Ongoing Use Potential: | Skills to manage symptoms of disease |
|---|---|
|  | ○ 0 - None        ○ 2 - Moderate        ○ 4 - Very Severe |
|  | ○ 1 - Mild        ◉ 3 - Severe |
|  | Severe - Little understanding or coping skills for managing substance abuse symptoms. |
| Notes: | Client lacks coping skills. |

| Dimension 6. Recovery<br>Environment: | Enviornmental/ Support Factors |
|---|---|
|  | ○ 0 - None        ○ 2 - Moderate        ○ 4 - Very Severe |
|  | ○ 1 - Mild        ◉ 3 - Severe |
|  | Severe - Even with clinical structure, coping is difficult with the absence of recovery support. |
| Notes: | Client lacks supportive network and environment. |

## Level of Care

| Level of Care<br>Recommendation (Based<br>upon both ASAM and<br>Clinical Judgement): | Intensive Outpatient (IOP) |
|---|---|
| PPC-II Opioid<br>~~Maintenance~~ Therapy: | ○ Yes<br>◉ No |

## Signatures

| Signature #1: | Melissa Keeney (Certified Addictions Counselor In-Process) - 9/20/2017 10:58 AM |
|---|---|

## Signature History

| Action | Date | Staff |
|---|---|---|
| Document Signed | 9/20/2017 | Melissa Keeney (Certified Addictions Counselor In-Process) |

Freeman, Precias (592280)                    4 of 4                    Date Printed: 9/27/2018 10:14 AM

While not every drug-dependent defendant is a candidate for drug court, and while not every drug court participant will complete their programs, 75% of those who do graduate "will never see another set of handcuffs."[24] In short, drug courts work where other interventions have failed.

### III.   THE CASE FOR DRUG COURT'S IN THE FEDERAL SYSTEM

At its inception, the Bridge Program mainly treated addicted defendants who had committed property crimes that fell under the jurisdiction of federal authorities, for example, theft and receipt of stolen mail, counterfeiting, conspiracy to defraud the United States, and other types of fraud. As the Program experienced success with these participants, it expanded its eligibility criteria to accept non-violent drug offenders who were dealing drugs to support addiction. The Bridge Program not only found that it could effectively treat such offenders, but that in doing so, there was a substantial opportunity to save resources and improve the lives of the participants, their families, and the community.

Our experience with the Bridge Program combined with basic facts about the federal criminal justice system leads us to believe that drug courts are a feasible and sensible alternative to incarceration for some federal defendants. As in the state system, the growth of federal prisons has created a serious financial and logistical problem. Making drug courts available to federal defendants has the potential to ease some of the burden on the Bureau of Prisons (BOP) and produce relative efficiencies beyond those achieved at the state level. Finally, despite claims to the contrary, a significant number of federal defendants are suitable candidates for drug court.

### A.   Growth of Federal Prisons has Created a Financial and Logistical Burden

In 2013, there were 215,900 people serving time in federal prisons,[25] representing nearly a tenfold increase in the number of federal inmates incarcerated in 1980.[26] As a result of this growth,

---

[24] West Huddleston, Interview on C-SPAN, August 6, 2011.
[25] E. ANN CARSON, U.S. DEPT. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2013 2 (2014).

6

addiction through a non-profit he formed with a friend. At his graduation on January 3, 2012, Jaison said that before he walked into this Program he was a "dead man" and that now he has his life back.

A final example is Shaun Dubis, whose story was described in a May 2014 Huffington Post Article that covered Attorney General Holder's visit to the Bridge Program (a copy of the article is attached as Exhibit A). In his early thirties, Shaun had been addicted to heroin for more than half of his life. He had been in and out of drug treatment for over a decade without success and had failed out time and time again. He was quite literally dragged from the edge of death – having been resuscitated after overdosing. The consensus among several of the professionals who work with the Program was that Shaun was the worst heroin addict they had ever seen. His father choked with emotion as he described how he and Shaun's mother lived dreading the knock at the door that would bring them the inevitable news that Shaun was dead.

Instead, Shaun was arrested on federal drug charges and referred to the Bridge Program. With the accountability provided by the Program, Shaun completed a residential drug treatment program, got a job installing custom shutters with his brother, and began to fight for the life he had come so close to losing. When he broke his hand, he continued to work without pain medication so as not to compromise his recovery. He developed into a role model for younger participants in the Program and began to encourage others on the path to sobriety. When he stood before the Court in November of 2014 for his graduation, he was barely recognizable as the man who had been brought in on drug charges more than two years earlier. Never one to waste words, Shaun's message was simple and heartfelt – "thank you, thank you for giving me this chance."

V.    **CONCLUSION**

Although less than four years old, the Bridge Program has already been efficient to significant result. The research conducted on drug courts in the state systems indicates that these

23

Greenville Healthcare System
Department of Surgery – General Surgery
200 Patewood Dr. Suite B260
Greenville, SC 29615

Dr. Joseph A. Camunas, M.D.

Phone: (864) 454-2100

Fax: (864) 454-2101

Patient: Sharika Sanders      Address:                    DOB: ████ 1983    Date: 03/20/15

Rx:          Norco 10/325 mg
sig:         Take 1 tab po q: 6 hours prn pain
Quantity:    120 (one hundred twenty)
Refill:      0 (zero)

NPI#         1750334959
DEA #        BC 0338625

*Not Valid per*
*Dr. Camunas*
*3-28-15*

Dispense as written                          Substitution permitted

RPH Rachel Richman
please
Call  864-382-0408
      DHEC

D.O.B ████ 83 changed to ████ 83

*Black Hair/w Red Hair short*

FREEMAN00236

FREEMAN00238

Create/Review Schedule - 07279

Open in new window

Generate Report

**Recipient Report**

Dispensed From 03/28/2014 to 03/28/2015

2 out of 2 Recipient(s) Selected

SANDERS, SHILOH - -

SANDERS, SHARIKA - DOB: █████ 1983 - 211 Forest Drive

Map Results

| Date Dispensed | Date Prescribed | Quantity Dispensed | Days of Supply | Authorized Refills | NDC | Drug Name | Prescriber | Prescription Number | Dispenser | Dispenser City | Recipient Last Name |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/21/15 | 03/20/15 | 180 | 30 | 0 | 00406012501 | HYDROCODON-ACETAMINOPHN 10-325 | CAMUNAS, JOSEPH A MD | 02236010 | WAL-MART PHARMACY 10-1244 | TAYLORS | SANDE |

*(handwritten notes: "1 of 1", "Sun 22 / pm", "female", "Hospital has this", "Confirmed @ RPh", "RDB U.S. 8-K", "He the nurse of RSS = 12-18 fax")*

**-101-**

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
 2                       SPARTANBURG DIVISION

 3    UNITED STATES OF AMERICA,    )     CR. NO. 7:17-CR-79
                                   )     ANDERSON, SC
 4                                 )     DECEMBER 13, 2018
                                   )
 5          VERSUS                 )
                                   )
 6    PRECIAS K. FREEMAN,          )
                                   )
 7                  DEFENDANT.     )
      _____)
 8
                BEFORE THE HONORABLE TIMOTHY M. CAIN
 9            UNITED STATES DISTRICT COURT JUDGE
                       SENTENCING HEARING
10
      APPEARANCES:
11
      FOR THE GOVERNMENT:      WILLIAM WATKINS, AUSA
12                             UNITED STATES ATTORNEY'S OFFICE
                               55 BEATTIE PLACE
13                             SUITE 700
                               GREENVILLE, SC  29601
14
      FOR THE DEFENDANT:       DONALD L. SMITH, ESQ.
15                             DONALD SMITH LAW OFFICE
                               122 N MAIN STREET
16                             ANDERSON, SC  29621

17    COURT REPORTER:          DEBRA R. BULL, RPR, CRR
                               UNITED STATES COURT REPORTER
18                             315 SOUTH MCDUFFIE STREET
                               ANDERSON, SC  29624
19

20           STENOTYPE/COMPUTER-AIDED TRANSCRIPTION
21                 *** *** *** *** ***

22

23

24

25
```

1          (Whereupon, the hearing commenced at 3:50 p.m.)

2          MR. WATKINS:  That will bring us to 7:17-079

3    United States versus Freeman.  Ms. Freeman is present

4    with her attorney Mr. Smith.

5          THE CLERK:  Raise your right hand,  please.

6            PRECIAS K. FREEMAN, having been first duly

7    sworn, testified as follows:

8          PRECIAS FREEMAN, having been first duly sworn,

9    testified as follows:

10          THE COURT:  Mr. Smith,  are you and your client

11    ready to proceed?

12          MR. SMITH:  Yes,  Your Honor,  we are.

13          THE COURT:  For purposes of this hearing,  I have

14    received and reviewed the following documents,

15    information, and material.   I have considered the

16    information presented at the plea hearing previously

17    held in this case,  as well as the Presentence Report

18    prepared by Probation Officer Stewart, and the updated

19    presentence report at ECF 58.

20            The Defendant has filed a motion to enter BRIDGE

21    Court or BRIDGE program, and there are several

22    objections to the report.   Are there any other

23    documents or materials that were submitted that I did

24    not state on the record or that should be considered by

25    the Court?

```
 1            MR. SMITH:  I do not believe so,  Your Honor.
 2            MR. WATKINS:  No, sir,  Judge.  You got my memo
 3       and my attachments that you mentioned, as well as
 4       Mr. Smith's motions,  unless Probation has anything
 5       additional,  I believe,  you have everything.
 6            THE COURT:   I do have the Government's sentencing
 7       memorandum.
 8             So,  Mr. Smith,  have you had a sufficient
 9       opportunity to review the presentence report and discuss
10       it with your client?
11            MR. SMITH:  Yes, sir,  I believe I have.
12            THE COURT:   Have you explained the report to your
13       client?
14            MR. SMITH:  I have.
15            THE COURT:  Do you believe she understands it?
16            MR. SMITH:  I do.
17                              EXAM
18  BY THE COURT:
19  Q.       Ms. Freeman, have you had a sufficient opportunity
20       to review the report and discuss it with your attorney?
21  A.       Yes, sir.
22  Q.       Do you need any additional time to review the
23       report or discuss it with him?
24  A.       No, sir.
25  Q.       Do you understand the contents of the report?
```

```
 1   A.       I do.
 2   Q.       Now,  I believe you initially were represented by
 3        Ms. Blanchard, and she was relieved because you hired
 4        Mr. Smith,  correct?
 5   A.       Yes, sir.
 6   Q.       Are you completely satisfied with the services of
 7        Mr. Smith?
 8   A.       I am.
 9   Q.       Have you told him everything that you want to tell
10        him?
11   A.       I have.
12   Q.       Has he done everything that you have asked him to
13        do?
14   A.       He has.
15   Q.       Do you authorize and request your attorney to
16        speak on your behalf today?
17   A.       I do.
18            THE COURT:   Okay.  Well,  let's go through the
19        objections.  Objection number 1,  Mr. Smith,  I will be
20        glad to hear from you.
21            MR. SMITH:  May it please the Court,  Your Honor.
22        I believe that objection was, probably in view with the
23        response of the Government, I believe we withdrew that
24        objection.
25            THE COURT:   So,  you are withdrawing objection
```

1      number 1?

2                 MR. SMITH:  Yes, sir.

3   BY THE COURT:

4   Q.       Ms. Freeman,  do you understand that?

5   A.       I don't know which objection it is.

6                 THE COURT:   Well,  let me just read it.  It says:

7                 "The Defendant objects to paragraph

8                 1 of the PSR based on the lack of

9                 specificity regarding the actual

10                times in which the Government claims

11                she committed the alleged crime.

12                Defendant further objects to the

13                Government's failure to identify

14                those who they allege to know in

15                fact and for those of whom they are

16                speculating."

17  A.       Okay.

18  Q.       And the Probation Officer's response was as

19      follows:

20                "Defense counsel should be aware

21                that the Probation Officer cannot

22                change the language in the

23                Indictment filed by the grand jury."

24                So,  Mr. Smith tells me that you are withdrawing

25      that,  I need to know if you agree with that, or if you

1      need more time to talk with him about it, or if you want

2      to go forward on the objection?

3   A.      I agree with that.

4   Q.      So, you are agreeing to withdraw objection number

5      1?

6   A.      Yes.

7          THE COURT:   Okay.  All right.   Objection number

8      2, Mr. Smith.

9          MR. SMITH:  Your Honor,  may it please the Court.

10      As we discussed the objections,  Ms. Freeman and I have

11      discussed the relevance of the objections and with

12      regard to the big picture, and the objections are not

13      going to change,  in essence,  what the charges are,

14      and we believe that the drug court or some of the

15      arguments made in the drug court are what is more

16      pertinent than objections over what might be considered

17      as minimal even if found to be appropriate or the

18      arguments being valid,  we don't think that that takes

19      away from the vast number of pills that the Government

20      has accused her of dispersing or acquiring.

21          THE COURT:   So,  I just want to make sure that I

22      am clear and the record is clear, there were eight

23      objections shown on the Revised Addendum to the

24      Presentence Report filed at ECF 68-1,  are you saying

25      that the Defendant is now withdrawing all of those

```
 1    objections?
 2          MR. SMITH:  Your Honor,  none of those objections
 3    reduce the number that is relevant to this Court.   And
 4    with that in mind,  we don't wish to dwell on those.
 5          THE COURT:   All right.   Listen to my question.
 6    Is the Defendant withdrawing all of her objections to
 7    the Presentence Report set forth on the Addendum to the
 8    Report at ECF 68-1?
 9          MR. SMITH:  Yes, sir.
10  BY THE COURT:
11  Q.      Ms. Freeman,  you heard that,  are you in
12    agreement with that?
13  A.      To withdrawing all objections?
14  Q.      Yes, ma'am.
15  A.      I am not sure.
16          THE COURT:   Okay.   Well,  let's just go through
17    them then:   Objection number 2 is as follows:
18          "Defendant objects to paragraph 6 of
19          the PSR based on the State's failure
20          to produce the test results of the
21          'instant' test USPO Rogers claims
22          she failed.   The Defendant further
23          objects based on the drugs that are
24          alleged to have been in the sample
25          she provided.   The Defendant has
```

1          never denied her use and addiction

2          to opiates, and, in fact, affirmed

3          the agent's query about whether

4          Lortab was her 'drug of choice' but

5          has not used any type of

6          benzodiazepine or Xanax since 2012."

7          So, I need to know if you want to go forward with

8    that objection and have me rule on it or if you want to

9    withdraw it?

10 A.      Can I ask a question?

11 Q.      Well, you can, but you should probably ask your

12    lawyer. And let me just say this, it matters not to

13    me whether you withdraw your objection or not. If you

14    do not withdraw the objection, I will hear from

15    everyone. I believe Ms. Rogers is here, we have case

16    agents here, and I will listen to everything that is

17    presented and give a ruling. That is a decision for you

18    to make in close consultation with your attorney. So,

19    talk to him, and then tell me what you want to do.

20      MR. WATKINS: Judge, just for the record, I have

21    got Ms. Rogers here from Probation as you mentioned; I

22    have a DHEC inspector, Mr. Thomason, who interviewed

23    her along with Rachel Richmond back in October 2016; and

24    I have Adam Roberson with DEA Diversion, the Federal

25    case agent, who interviewed Ms. Freeman as well prior to

```
 1       her absconding.   And to the extent we need testimony,
 2       all of these individuals are ready to go.
 3               THE COURT:    Thank you.
 4               I saw the agents sitting back there,  and I had
 5       assumed they were present for this case because this
 6       case is the only other one on the docket other than the
 7       one we previously heard.
 8  BY THE COURT:
 9  Q.          So,  objection number 2,  Ms. Freeman,  you have
10       had an opportunity to confer with your attorney,  do you
11       want to go forward on that or withdraw it?
12  A.          We can go and withdraw all objections,  that's
13       fine.
14  Q.          Okay.  So you are telling me that you want to
15       withdraw all of the objections to the report after
16       consulting with your attorney?
17  A.          Yes.
18  Q.          And you have made this decision freely and
19       voluntarily?
20  A.          Yes.
21  Q.          Has anyone forced you, or threatened you, or
22       pressured you to make you do this?
23  A.          No.
24  Q.          You have had sufficient time to discuss this with
25       your attorney?
```

```
 1    A.       Yes.

 2    Q.       Do you need any more time to discuss it with him

 3         before we proceed?

 4    A.       No.

 5             THE COURT:  Okay.  Well, the objections are

 6         withdrawn.  I find that the Defendant has decided to

 7         withdraw the objections, and she has made that decision

 8         freely and voluntarily with the advice and assistance of

 9         her attorney.

10             So, in the absence of any objections, I would

11         adopt the factual findings set forth in the Presentence

12         Report for purposes of determining the reasonableness of

13         my sentence.  I will now announce my conclusions as to

14         the appropriate statutory and the advisory sentencing

15         guideline provisions applicable to this case to include

16         the offense level, criminal history category, and

17         calculations as to the appropriate advisory guidelines

18         range.

19             The statutory provisions applicable to this

20         Defendant in this case would provide for a term of

21         incarceration of not more than 20 years, supervised

22         release of not more than 3 years  -- excuse me  -- let

23         me just back up.

24             The statutory provisions would provide for a

25         term of incarceration of not more than 20 years,
```

11

1      supervised release of at least three years,  probation

2      from one to five years,  a fine up to 1 million dollars,

3      and a Special Assessment fee of $100.   With respect to

4      the advisory guideline provisions,  the Defendant

5      admitted to Count 1 of the Indictment, conspiracy to

6      unlawfully possess with intent to distribute Hydrocodone

7      and Oxycodone.  As noted in paragraph 37 of the report,

8      the U.S. Sentencing Commission Guideline for a violation

9      of 21 USC 841(b)(1)(C) was found in Section 2D1.1(c)(3)

10     and calls for a base offense level of 34.

11          The Defendant is responsible for 11,738.4

12     kilograms of marijuana equivalency as noted in paragraph

13     12 of the report.

14          The Defendant received a 2 level reduction (sic)

15     as noted in paragraph 41 of the report as she willfully

16     avoided authorities and violated conditions of her bond

17     pursuant to section 3C1.1 there is a two level increase.

18     That brought the adjusted offense level to 36.

19          The Defendant was not afforded acceptance as

20     noted in paragraph 44, and that brought her total

21     offense level to 36.

22          Her prior criminal record puts her in criminal

23     history category 2.  Under the advisory Sentencing

24     Guidelines she would not be eligible for probation.  And

25     her advisory guideline range would be 210 months to 240

12

1    months imprisonment with three years supervised release.

2    A fine was not calculated in this case, restitution was

3    deemed not applicable, and she would be subject to a

4    $100 Special Assessment fee.

5            Are there any exceptions, objections, or

6    comments as to my conclusions as to the applicable

7    statutory provisions or advisory guideline

8    determinations?

9            MR. WATKINS:  Nothing from the Government Your

10   Honor.

11           MR. SMITH:  Nothing from the defense.

12           PROBATION OFFICER:   No, Your Honor.

13           THE COURT:  Well, Mr. Smith, do you want to go

14   forward now on your motion to enter the BRIDGE Program,

15   or do the parties have some other preference on how to

16   proceed?

17           MR. WATKINS:  Yes, sir.  However you and the

18   defense would like to proceed, the Government has no

19   objection either way.

20           THE COURT:  Well, Mr. Smith, if you want to go

21   forward on the motion, then I can hear from the

22   Government and also on the information the Government

23   wants to present, and then I will come back to you and

24   your client.

25           MR. SMITH:  Yes, sir.  May it please the Court,

 1    Your Honor.

 2         THE COURT:   Yes, sir.

 3         MR. SMITH:   This case is the consummate case for a

 4    drug court BRIDGE program situation.   Ms. Freeman has

 5    had a history of issues with her addiction, and that is

 6    what it comes down to,  but for her addiction to

 7    Opioids, we wouldn't be here today.   The AMA said that

 8    in 1987 that addiction was a disease, and, in fact,

 9    Ms. Freeman has the disease.   She has been a drug addict

10    since roughly 2003 when she was introduced to Opioids.

11         THE DEFENDANT:   2000.

12         MR. SMITH:   2000,  excuse me.   And her life has

13    been trying to satisfy the addiction since that time.

14    She has not stolen from people,  she has created

15    prescriptions,  so it is directly related to her

16    addiction as opposed to someone who steals or robs to

17    support the addiction,  her addiction is the driving

18    force behind everything that she has done from an

19    illegal standpoint.

20         When she was caught in October 2016,  she

21    admitted when the matters were discussed with her at

22    that time,  she again admitted to her involvement in

23    2017 with Ms. Blanchard.   She has never denied her

24    dependency on the Opioids.   And the idea that the State

25    of Florida has recently sued Walgreens and CVS over the

1    proliferation of the drug can be seen with the idea that

2    she submitted a 120-pill prescription and was given 180

3    pills.   Her addictive personality was something that

4    she couldn't do anything about, and once those Opioids

5    were introduced, she was pretty much done.

6        She is not  -- she grew up in a solid family,

7    parents have been married 37 years,  dad is a preacher.

8    She understands what is right and wrong,  but it is not

9    that simple.   Because of that lack of simplicity and

10   the addiction, which as I said in my memorandum,  she is

11   doing 60 to 80 ten milligram pills a day.  When I first

12   heard that,  I thought she would be dead,  but

13   apparently the tolerance that went to build up these

14   medications is real.   Look at the fact that she and her

15   family have nothing,  she certainly didn't do it to

16   enrich herself, there are no cars,  there are no houses,

17   nothing of that sort.   So,  obviously,  the pills were

18   being used and,  unfortunately,  that is what she has.

19       Now, in 2017, right after the proffer,  she or

20   right around the time of the proffer she went to SADAC

21   or the Forrester Center in Spartanburg where they talked

22   to her about certain aspects of treatment.   One of the

23   aspects of treatment is the MAT program,  I believe,

24   and that involves medicinal therapy,  as well.   Well,

25   at that time,  Ms. Freeman was pregnant,  she didn't

15

1    find that out until she went to the doctor for the

2    purpose of the MAT program.   The counselors there did

3    an initial review of her and submitted a report  --

4    submitted something, which in turn tells us what her

5    addictive situation is,  talks about how severe her

6    addiction is,  very severe is the terminology used.

7    Talks about how she is likely to fall back into that

8    program based on her lack of knowledge of how to address

9    the issues she was dealing with.   There is no doubt,

10    that is an independent group saying that she is

11    addicted, and that the addiction was going to get the

12    best of her at that point.

13         Now, that was before the pregnancy test.  So she

14    was basically going to counseling without the assistance

15    of the medicinal therapy that they suggested.

16    Obviously her OB/GYN did not want her to be on Suboxone

17    or methadone while carrying a child.   So, she didn't

18    have that.  So, she went into something that she already

19    knew was going to be difficult without the added weapon

20    of medicinal therapy.

21         She left in September because she was afraid not

22    only of the child being born in jail, but she was of the

23    opinion that the Probation office was against her.   Of

24    course,  her mind has been altered by the course of 15

25    years or 13 to 15 years of the drug use,  18 years of

1    drug use, so she had a paranoid mind-set and,

2    unfortunately, that led her to leave. And as I said

3    she -- right before she left she took a drug test and

4    she passed that, she passed the drug test that she took

5    while she was at SADAC. And hopefully, she wasn't

6    going in the right direction, then, of course, she

7    left, and that changed everything. But that related

8    to the loss of the home, the family, as I said, the

9    struggle with economics, and they were evicted from the

10   apartment, Country Club apartments in Spartanburg, and

11   the stress related to that or related to pregnancy and

12   the baby, too, that the action against her apparently

13   was too great, and she left, unfortunately. However,

14   when she was found in March, she did have two pills,

15   she was found in an extended stay with her family

16   because they didn't have a house yet. So, dealing with

17   the issues relating to the birth of the child, lack of

18   a home, the addiction.

19        Well, she has been incarcerated since March,

20   she hasn't used any drugs, it is the longest time she

21   has had without drugs since 2000. As I said when we

22   were discussing objections, the big picture is nothing

23   is going to change out of those objections the fact that

24   she is an addict and the Opioids have consumed her life.

25   I don't think there is any question that this is in fact

1   a societal problem that the President recognizes,  that

2   all of the governmental entities that are bringing suit

3   against the distributors,  the manufacturers, there is

4   no question of the addictive potential of the

5   medication.   Obviously, she would be the first one to

6   admit she is addicted to them.

7           So, what we are talking about is a woman that

8   suffers from a disease,  17 and a half to 20 years

9   because she is sick.   She didn't want to be sick,  but

10  she is.   As I said,  Your Honor,  no violence,  no

11  stealing,  obviously created things to further her

12  efforts to get a pill.

13          She has five children,  three of which are --

14  16,  9,  4 and 5.   Obviously, if she is around, she can

15  help raise them.   She has the capability of teaching,

16  counseling herself based on the fact that she has done

17  everything related to getting the drugs,  been consumed

18  by them.  And because of that consumption,  she is a

19  great teacher, and when she tells someone that she knows

20  what they are dealing with,  obviously,  she does.

21          Part of the problem,  of course,  unless you

22  have been addicted to drugs or had issues with drugs,

23  you can't understand why would someone who is

24  intelligent,  someone who was raised in a good family

25  can't just say no.   Unfortunately,  it is not that

1    easy.  This Court is aware of my own issues, and,

2    obviously, I went to law school,  had a fairly good

3    understanding of what is right and wrong, and that

4    didn't matter.   And I would suggest that it is the same

5    thing for Ms. Freeman, the counsel and the therapy that

6    she has had to this point has not been sufficient.  The

7    eight months that she has had at this point has allowed

8    her to recognize how great the lack of drugs in her

9    system in her thought process are.   And we think that

10   the BRIDGE program, based on its structure and so forth,

11   would be really perfect aid to her recovery and to

12   making her a prominent member of society.

13          As I mentioned to begin this statement,  drug

14   courts are for the purpose of addressing addiction and

15   not necessarily finding criminal because of the

16   addiction.   She cannot say anything but the fact that

17   she did use prescriptions, create prescriptions to get

18   drugs illegally.   There is no doubt about that.  No

19   doubt about the fact that she left,  and absconded,  and

20   so forth.   But it all comes back to the one thing:  She

21   had prescription issues in 2008 when she got in trouble,

22   2011 when she got in trouble,  everything is related to

23   the acquisition of the Opioids for what she is addicted.

24          And it is a very difficult question when it comes

25   to the addiction versus the gallery,  no doubt she broke

1    the law,  all said and done,  she broke the law because

2    a man named Opioid that has control of her life, and

3    that is exactly why we are here today because the Opioid

4    is not an excuse,  it is a fact.

5         And, Your Honor, we would ask that you have the

6    opportunity to go through the Drug Court, if she fails,

7    well, she failed.   She has not had the proper therapy

8    to this point to fight such a battle that is difficult

9    to win in the first place,  let alone,  try and do it

10   without sufficient therapy or a sufficient plan.   Drug

11   Court takes that into account,  BRIDGE program takes

12   that into account, holds you accountable, and certainly

13   holding her accountable would be the necessary thing to

14   do based on what we just discussed,  because if not,

15   then who knows what she is going to do?  But by giving

16   her the opportunity,  I think she could be a very

17   productive member of society as well as taking care of

18   her children,  and helping in being a drug counseling,

19   which she has already started the process of bringing

20   drug counseling into the jail based on her knowledge,

21   based on her issues and her willingness to share about

22   those issues.

23         But,  Your Honor, we ask just for the

24   opportunity to go through the BRIDGE program because

25   there is no better candidate; the drugs are the only

```
 1         subject of her criminal issues.   And we would ask that
 2         you take that into consideration.
 3              THE COURT:   I will be glad to hear from the
 4         Government.
 5              MR. WATKINS:  Yes, sir,  Your Honor,  may it
 6         please the Court.   Would you like us to just address
 7         the BRIDGE program or the 3553(a) factors generally?
 8              THE COURT:   I would suggest that you address the
 9         motion to enter BRIDGE Court, and then take up the
10         3553(a) factors, and if you have any comments about how
11         that may come into play with the motion, I am glad to
12         hear it.
13              MR. WATKINS:  Yes, sir,  may it please the Court,
14         Your Honor.   Your Honor,  I will tell you on
15         Ms. Freeman and her addiction there are several issues I
16         would like to just bring to the Court's attention.   One
17         is if we had had testimony from Inspector Thomason, he
18         had interviewed Ms. Freeman back originally in October
19         2016, as well as about a year earlier, he had had
20         contact with her.   He tells me, and could fill the
21         Court in later, if needed, that she never indicated to
22         him at those times that she was taking the prescription,
23         she said that she was selling them.   Inspector Roberson
24         would testify similarly,  Your Honor, that the first she
25         told him that she was actually using the medication was
```

21

1    after she had been in Federal custody and had learned

2    about the BRIDGE program; therefore,  my agents

3    certainly have some skepticism about the addiction.

4    However,  to be perfectly candid on the flip side,  when

5    she was  -- after she absconded, when she was arrested

6    in North Carolina,  she was found with two pills of

7    hydrocodone when she went into the jail:  One secreted

8    in a sanitary napkin, and the other frankly secreted in

9    her private parts.  That could be some indicia of an

10   addict who absolutely wanted to have those pills and get

11   a fix while she was in jail.  So,  I just want to bring

12   those two issues to your attention,  Your Honor.

13           Your Honor,  unfortunately,  in this case,  I

14   have a lot of sympathy for the issues that Mr. Smith has

15   brought out,  I thought he did a fine presentation

16   there.  Ms. Freeman has a history of absconding on

17   multiple occasions.  You know,  in spring 2015,  my

18   information is she cut her ankle monitor off when she

19   was in State custody.  In the summer of 2015,  my

20   understanding is is that when the Duncan Police

21   Department was attempting to intervene when she was

22   getting prescriptions filled out a Walgreens in Duncan,

23   that she jumped in a car,  threw her young child in the

24   backseat, and took off in a vehicle.  In August 2015,

25   Ms. Freeman ran from Rachel Richmond,  one of our DHEC

22

1    Inspectors, when they were trying to serve warrants on

2    her at her parent's apartment in Spartanburg on Country

3    Club Road.   They tell me that she initially barricaded

4    herself in the bedroom, and then jumped out of a window

5    after officers entered the house and escaped.

6          Your Honor,  after this escape,  she continued

7    to fill prescriptions.  And then in October 2016,  she

8    was charged by the Simpsonville police with resisting

9    arrest at Walgreens when they got her for passing

10   prescriptions.   And then on October 10,  2016, she was

11   transported to Greenville Memorial Hospital in

12   connection with the arrest and medical issues, and she

13   attempted to escape the hospital and was found one floor

14   below her room and was charged by escape,  and attempt

15   to escape by the Greenville County Sheriff's office.

16   And then obviously in this case,  Judge,  if she entered

17   -- my agents were frankly in shock when the Magistrates

18   gave her a bond because of this history of running,  but

19   she shocked me because she was showing up to Court and

20   doing well.   And then, unfortunately, we have this

21   again, a six-month period after the plea where she

22   absconded to North Carolina and again was arrested up in

23   Shelby.   Because of this continued history of flight,

24   I just ask the Court to factor that in as you consider

25   not only the drug Court request, but any sentence in

1    this case.

2         Your Honor, this is a serious offense.   I think

3    Mr. Smith has made good points about the medical

4    community.   I think I am about the only prosecutor in

5    the last decade here in the Upstate who has successfully

6    prosecuted a physician,  the Dr. Daniel Jebens out of

7    Greer  for his prescribing practices and conspiracy with

8    that, and that is certainly something our office needs

9    to look harder at and make a priority; however,  what

10   she did aside from the doctors is a serious offense,

11   Your Honor.   These are extremely addictive substances.

12   You are putting large numbers of pills out in the

13   public.  I believe her original statement to the DHEC

14   investigators is that she was selling the pills at four

15   dollars a pop,  which was a fairly low price at the time

16   anyway.

17        Your Honor,  it is a serious matter to have

18   these pills out in the public in the volume that she

19   did.  She was essentially working a full-time job doing

20   these prescriptions.   As we point out in the sentencing

21   memo, on some of the best days, she had -- she was able

22   to fill prescriptions in the double digits.   Her

23   statement was that on her bad days she maybe got one

24   prescription filled.   So, this is a large amount of

25   substances being moved.

24

1          Unfortunately,  the State system failed her,

2     Your Honor, you know,  with really slaps on the wrist

3     and not addressing her main issues.  I would have no

4     problem as part of this if she did get some prison time

5     and you recommend the RDAP Program,  drug treatment

6     program there,  Your Honor.   But I will tell you if you

7     look also at the nature and circumstances of this

8     individual, as Mr. Smith quite honestly and properly

9     alluded to,  she does have prior convictions in the

10    State system for obtaining prescriptions by fraud.   My

11    case agent has told me and Adam Roberson --  how long

12    have you been doing  DEA diversion work, Inspector

13    Roberson?

14         THE AGENT:  Twenty years.

15         MR. WATKINS:  Twenty years.  He told me today that

16    she was the most prolific prescription passer that he

17    has investigated in his career, and I have had a lot of

18    cases with him.   So, I highlight all of that to say

19    this is a serious matter to the Government.

20         Your Honor,  I think it certainly inures to her

21    benefit that she wants help, that she wants treatment,

22    that she would like to persuade others from going down

23    the path that she went down.   I think she is sincere

24    about that, and I think those are honorable motives, but

25    I would also ask the Court in considering the BRIDGE

 1    motion as well as any sentence,  Your Honor,  that you

 2    would consider the need to protect the public from any

 3    further crimes, as well as to persuade Ms. Freeman from

 4    engaging in any other criminal conduct as her multiple

 5    flights, and use of physician  DEA numbers, and

 6    identities has shown,  that is a serious matter to the

 7    Government.

 8         Your Honor,  even if you did in the alternative

 9    consider some sort of variance,  if you interpret

10    Mr. Smith's motion as also a BRIDGE Court and perhaps a

11    variance,  Your Honor,  even if you went down two levels

12    on her drug weight,  which there are no objections to,

13    but it results in 210 to 240,  it should be 210 to 262,

14    but the statute caps at 240,  even if you went down two

15    levels which would just assume one prescription being

16    passed a day,  which is an extremely conservative and

17    low estimate, that would still put her at 168 to 210.

18         So,  Judge, that is the Government's

19    presentation.  Your Honor,  again,  if you required any

20    testimony from Inspector Thomason or agent Roberson,  I

21    would be happy to call them, but insofar as there are no

22    objections to the Presentence Report, and you have

23    adopted its factual findings including the offense

24    conduct section, that would be the Government's

25    presentation at this point.

```
1          THE COURT:    I don't require testimony.    I would

2   leave that up to Mr. Smith if he wants some testimony

3   from the agents.    Do you want to hear from the agents?

4          MR. SMITH:   I do not.    May I respond?

5          THE COURT:   Yes,  absolutely.

6          MR. SMITH:   Your Honor,  I would begin this by

7   saying that the Government knows nothing of her alleged

8   distribution other than what she told them.    For the

9   prolific prescriptions,  and so forth, she didn't have

10  any money,  the family didn't have anything special to

11  say that they didn't believe that she was an addict, was

12  disingenuous because they had no idea where all of this

13  medication was going; well, she was using.  She was

14  using a great deal of it, and she was not profiting from

15  it.   She didn't come in rich because of it.

16         There is no -- as I said,  she didn't get caught

17  up in some sting or anything of the sort,  it was her

18  prescribing drugs to herself for her use.    There is no

19  doubt not all of them stayed with her,  no doubt about

20  that.

21         Mr. Watkins talks about the State failing her,

22  well, the State did fail her because she was arrested

23  twice for prescriptions, they didn't address her

24  addiction.    That is what this is all about, her

25  addiction.
```

27

1          THE COURT:    Thank you.

2          Mr. Smith, is there anything else before I hear

3    from your client?

4          MR. SMITH:  No, sir,  I believe I said what I

5    needed to say.

6          THE COURT:    Thank you.

7           Ms. Freeman, you have the separate and

8    independent right to tell me anything you want me to

9    know before I rule on these matters or I decide your

10   sentence,  is there anything you want to say?

11         THE DEFENDANT:   Yes.   I don't -- I did, I wrote

12   a lot of prescriptions,  I did that,  but I did take a

13   lot of them.   I really was taking 60 to 80 a day.

14         THE COURT:   You were consuming 60 to 80 pills a

15   day?

16         THE DEFENDANT:  Yes, sir.  Sixty to 80, 60 to 80,

17   yes, sir,  I was.

18         THE COURT:   Okay,  go ahead.

19         THE DEFENDANT:   And during that time --

20         THE COURT:   Did you say 6 to 8 or 60 to 80?

21         THE DEFENDANT:  Six - no - six zero, sixty, to

22   eight zero, eighty.

23         THE COURT:   Okay.  I just wanted to make sure.

24   Go ahead.

25          THE DEFENDANT:   Okay.  So, during that time it

28

1    was just to keep up that habit, yes, I did have to sell

2    some of those pills, I did have to do that. It is

3    obvious that I didn't get rich off of it because if I

4    got rich off of it, we wouldn't have been getting

5    evicted, I would have owned a house, I don't even own

6    a car, I couldn't even -- I don't have a car. We

7    shared a car, my dad's car.

8           Yes, I have used pills for a long time. In

9    2000, I fell in the shower, broke my tailbone, I was

10    seven months pregnant with my daughter, and my OB/GYN

11    put me on what, at the time, was Lortabs, and I have

12    been hooked ever since then.

13           Yes, I have ran quite a bit. Yes, I have ran,

14    I am not going to deny that, I have, but most of that

15    came from the thought of not being able to get those

16    pills because I have had to go through withdrawals

17    before, and going through withdrawals is like death

18    itself. There is no way to explain it if you have

19    never been through it. So, yeah, everyday I woke up,

20    that was the first thing on my mind was how do I not

21    have to feel like I am about to die.

22           I am not making excuses for what I have done,

23    all I can do is tell you what really happened. And,

24    yeah, I was doing good, and I appreciate Mr. Watkins

25    for when I came before the Court with Mr. Plowden at the

```
 1    time before he retired and requested to be taken off the
 2    ankle monitor, which I thought I did fairly well, it
 3    felt good being clean for like the first time ever.
 4    And I was doing good. I was coming to Court because I
 5    felt like, okay, this is it. Like, I want to prove
 6    that I can do this. And I was doing well, and then we
 7    found out we were getting evicted, found out I was
 8    pregnant, it was a lot of issues at the time. And
 9    then, okay, Ms. Wallace came out and drug tested me.
10    And when she drug tested me, she said I failed for two
11    things, and that just didn't sound right to me. Okay.
12    So, she said she was going to send it off, I said okay
13    fine. She calls me back and tells me, okay, well,
14    the Judge ordered, which I just assumed was you, Judge
15    Cain, but she said the Judge ordered for you to go back
16    on an ankle monitor, I said no problem, I don't have
17    an issue with that. But at the same time, I kept
18    thinking, I still wonder what did I fail for because
19    she never showed me. So, I called Lora Blanchard the
20    time before because Ms. Rogers wanted me to go sign the
21    paperwork at the field office in Spartanburg.
22          THE COURT:   You called Ms. Blanchard?
23          THE DEFENDANT:   I called Ms. Blanchard on the
24    phone. And I told her, Ms. Blanchard, she wants me to
25    sign this paperwork, I don't want to sign anything
```

1    without my lawyer, I don't feel right about it.

2    Ms. Blanchard said, in so many words, well, just be

3    glad that the Judge didn't lock you up, he could have

4    just locked you up, so go sign it. I said, okay. I

5    didn't appreciate the attitude, but I understood what

6    she was saying, I said, okay, I get that. So, I

7    went and signed the paperwork. But when I went, the

8    paperwork was up at the front desk, I didn't get to talk

9    to anybody, so I signed it and asked for a copy of it.

10    Okay. The next thing I know, it was like a week later,

11    I still wasn't actually placed on an ankle monitor, like

12    I wasn't given an actual unit. Okay. I was told to go

13    back to SADAC to start my classes back, The Forrestry

14    Center, that it is called now. I passed my drug test,

15    everything, everything was seeming to be going good.

16        Okay. We had to be out of our apartment by the

17    8th. We packed everything up and left the morning of

18    the 8th. Well, before we left, I called Ms. Rogers

19    and left a voicemail letting her know that she knew we

20    had to be out, but we didn't have anywhere to go. That

21    is the same weekend the hurricane came through. There

22    was no hotels anywhere. The only hotel we could find

23    was in Shelby, which just happened to be the one place I

24    was authorized to go to church once a week. So, I

25    figure out a way, I haven't got in touch with her, what

1  else am I going to do?  I can't just sit around,  I had
2  children,  so we went and stayed at that hotel, and then
3  she called me on Tuesday.  God bless you.
4      THE COURT:    Thank you.
5      THE DEFENDANT:    She called me on that Tuesday
6  asking me where I was at,  I told her I was in North
7  Carolina.   She told me to come back, which I didn't
8  have a problem with, I was coming back.   But then the
9  next call I got was,  we talked to the Judge, and he
10  wants DSS to be here, and I was like for what? Really.
11  Okay.   I respect that decision,  but at the same time I
12  felt like because of a drug test that was said that I
13  failed that I never saw the results to,  which I was end
14  up being for insufficient to be tested,  but because of
15  a failed drug test that said I failed,  I was being
16  punished, and not only was I being punished,  but to
17  think that my children were going to be punished by
18  being taken from me,  in my mind it felt like the world
19  was against me.   Like I had done everything I could to
20  do right and still I was being punished.   And it just
21  seemed like I could not do anything right.   So, I know
22  it seemed like I just ran,  I know it seemed like it
23  might have been like a slap in the face,  but I didn't
24  intend for it to be.   So, I apologize if you feel like
25  I disobeyed your orders or I took your orders lightly,

32

1    I didn't.   All I can do is tell you how I felt and what

2    my mind-set was, so I apologize to the Court, and I

3    apologize to you, Judge Cain,  I apologize to you,

4    Mr. Watkins.

5          I apologize to my family for what I put them

6    through.   I did come from a good home.   I do know

7    right from wrong.   I was raised in church.   I was

8    raised to honor your mother and father and to me honor

9    your mother and father isn't just respect it is in how

10   you live.   And obviously I failed.   I don't want my

11   parents to feel like they failed me,  I failed them.

12   They did everything right,  but I failed them.  I want

13   to apologize to my children for even having to see me in

14   this position.   I don't want them to think by any means

15   I am excusing what I have done, I am not.   I apologize

16   to my husband because I feel like we took those vows and

17   I broke that vow.   I didn't cheat on him with a man,  I

18   like cheat on him with my addiction.

19         I feel so stupid standing here, this is

20   embarrassing,  this is demeaning, this is everything.   I

21   have made a mess of my life, to sum it up.   I have made

22   a mess.   And to sit here and to think that I let

23   something get me to this point, I apologize.   When I

24   got -- I am going to say this, and I am going to end it.

25   When I got to jail here in Anderson  -- thank you -- I

1   went in the cell, and on the cell wall there is a quote

2   from Buddha that says:  "The root of all suffering is

3   attachment."   And I thought about that, and I said,

4   that is so true.   The root of all suffering is

5   attachment, and I attached myself to all of the wrong

6   things.   I attached myself to pills, and to think that

7   because I attached myself to those pills and that

8   addiction that I could spend the rest of my natural life

9   in prison and not get to see my children graduate, and

10  not get to see my children get married.  And to think

11  that my husband can move on and live another life, or

12  that I might not get to sit down and eat Thanksgiving

13  and Christmas with my parents ever again,  I messed up

14  because I attached myself to that.  And now for every

15  day that I live from here on out,  every major decision

16  I make,  I am going to have to think, is that worth

17  suffering for.   If I attach myself to that,  nothing,

18  nothing to me is worth suffering like this for.   And I

19  hate that I attached myself to pills.   If I could go

20  back and change it,  I would.  I really would.   And I

21  apologize.

22       That is all I can say.   I can't do nothing

23  (sic) more.   All I can do is try to prove how sorry I

24  am.   And I do,  I am not even asking you,  I am begging

25  you for another chance.   I am begging you, Judge Cain,

34

1    for another chance because I want to make it right.    I

2    probably was prolific in my prescription writing,  I am

3    not going to lie about that,  but at the same time, my

4    life is a testimony because I know that I shouldn't be

5    alive right now.    I know the  -- I know the

6    consequences of what I have done.    I definitely get it

7    now.    And I think that my life would be a waste if I

8    wasn't given a chance to try to make it right.

9        THE COURT:    Thank you.    Is there anything else

10   on behalf of the Government?

11       MR. WATKINS:  No, sir.

12       THE COURT:    Is there anything else on behalf of

13   the Defendant?

14       MR. SMITH:  Just one thing,  Your Honor.    She has

15   been imprisoned by her medication since 2000.    That will

16   be it.

17       COURT REPORTER:  Say that again.

18       MR. SMITH:  She has been imprisoned by the

19   medication since 2000.

20       THE COURT:    Is there anything else from

21   Probation?

22       PROBATION OFFICER:    No, sir.

23       THE COURT:    This Court is mandated to calculate

24   an appropriate guidelines range,  which I believe has

25   been done, and then look at the traditional departures

1    or variances that might be applicable in view of all of

2    the facts and circumstances in the case.

3         In fashioning the sentence and considering the

4    requests presented to the Court, the Court has

5    specifically reviewed and considered all of the Section

6    3553(a) factors.  And in addition to the information

7    presented at the plea hearing and as set forth in the

8    presentence report and provided today, I would cite the

9    following relevant 3553(a) factors that would serve as

10   the basis for the sentence I will impose.

11        I have considered the nature and circumstances

12   of the offense.  The Defendant over a significant

13   period of time engaged in a pattern and course of

14   conduct to violate the law by forging and filling

15   fraudulent prescriptions for Hydrocodone.  She did this

16   at pharmacies across Upstate South Carolina including

17   Greenville, Lyman, Greer, Taylors, and Simpsonville.

18   And significant quantities of these pills were obtained

19   by fraud by the Defendant.

20        I have also considered the history and

21   characteristics of the Defendant.  Her prior criminal

22   history is more fully set forth in the report, but

23   includes a conviction in 2011 for obtaining prescription

24   drugs by fraud.  In June of 2012, she was convicted of

25   obtaining prescription by fraud and possession of a

36

1    controlled substance.   She also had a conviction in

2    2011 for misrepresenting identification to police.

3          The Defendant was born on December 2nd,  1982.

4    In 2014 she married Antonio Borders in North Carolina.

5    She has two children from this marriage.   She also has

6    three children from previous relationships.

7          She is in good health.   She reported to the

8    report writer that she has been taking the prescriptions

9    Lexapro and Seroquel for depression as prescribed by the

10   medical staff at the Detention Center since December of

11   2016.   Are you still taking those medications,  ma'am?

12        THE DEFENDANT:  No, sir.

13        THE COURT:  All right.   So you are not on any

14   medication today?

15        THE DEFENDANT:  Well,  I am on blood pressure

16   medication.

17        THE COURT:  You are taking blood pressure

18   medication.   Does that in any way affect your ability

19   to understand what is happening here today?

20        THE DEFENDANT:  No.

21        THE COURT:  The defendant does have a prior

22   history of drug use including marijuana and Lortab.

23        She is -- I don't believe has ever had any real

24   substance abuse treatment, but I think as a part of her

25   Pretrial Services she was placed in intensive outpatient

37

1  program; is that right, Ms. Rogers?

2       PROBATION OFFICER:   Yes,  Your Honor, in the

3  beginning, she was on a -- for the MAT -- but in the

4  beginning, yes.

5       THE COURT:   Say that last part again.

6       PROBATION OFFICER:   She was in IOP until she was

7  considered for the MAT program that Mr. Smith alluded

8  to, the medicinal alternative treatment when she was

9  pregnant.  Her OB/GYN would not sign off on that, so

10 then she just scheduled to go back.

11      THE COURT:   Okay.

12      The Defendant graduated from high school in May

13 of 2000 and she indicated that she had attended ECPI

14 University in Greenville.

15      Her employment history includes working with

16 Personnel Solutions, Incorporated, at Adidas in

17 Spartanburg from May 11,  2017 until May 15,  2017, and

18 she was employed for six to seven months at the place

19 called Carolina Center in Greer,  South Carolina.

20      I have also considered the need for any sentence

21 imposed to reflect the seriousness of the offense.   The

22 filling of fraudulent prescriptions,  particularly

23 Opioids, and the distribution of these drugs is a

24 serious problem in South Carolina and the entire nation.

25 The Defendant was no doubt a major supplier of these

1    drugs for sale on the street.  The devastating effects

2    of these drugs on individuals and families from all

3    walks of life and on our healthcare system, educational

4    system, the economy, and criminal justice system is

5    immeasurable.

6        I have also considered the need for any sentence

7    imposed to promote respect for the law and the

8    Defendant's prior criminal conduct.  And her conduct in

9    this matter over a period of time reflects some lack of

10   respect for the law.

11       I have also considered the need for any sentence

12   imposed to provide just punishment to promote adequate

13   deterrence to future criminal conduct and to protect the

14   public from further crimes of the Defendant.

15       Thus far, the Defendant's involvement with the

16   criminal justice system has not deterred her in engaging

17   in criminal conduct, and it is hoped that the sentence

18   imposed today will impact her in some positive way so as

19   to promote respect for the law and deter her from

20   engaging in criminal conduct in the future.

21       So, if there is nothing further, with respect to

22   the motion to allow the Defendant to enter into what is

23   known as the BRIDGE program, let me say this:  The

24   BRIDGE program was started by one of our judges a few

25   years ago, and it has been implemented in the various

```
 1       divisions of the District.   It is a type of diversion
 2       program,  as I understand it, whereby certain defendants
 3       who have minimal or no criminal record who have an
 4       addiction to drugs or alcohol are admitted to what is an
 5       intensive Court-supervised program.   Admission to the
 6       program is at the discretion of the Judge assigned to
 7       the case.   And I have referred several folks to the
 8       Drug Court program and placed some people on probation
 9       with a special condition that probation being that they
10       enter and successfully complete the BRIDGE Court or Drug
11       Court program.   Some people successfully complete it,
12       and  some people do not.   I really don't know what the
13       recidivism rate is for folks who graduate six months
14       out,  or a year out,  or 18 months out, but in any
15       event, based upon my individualized assessment of the
16       3553(a) factors as I have cited,  and as applied to this
17       case, I find that the motion to enter the BRIDGE Court
18       program should be denied.  To the extent that the
19       Defendant seeks a downward variance below the applicable
20       advisory guideline range,  that motion is also denied
21       based,  again,  on my assessment of the 3553(a) factors
22       as applied to the facts of this case and this Defendant.
23            Such that having calculated and considered the
24       advisory Sentencing Guidelines and having also
25       considered the relevant statutory sentencing factors
```

40

```
 1    contained in 18, United States Code, Section 3553(a),
 2    it is the judgment of the Court that the Defendant,
 3    Precias K. Freeman, is hereby committed to the custody
 4    of the Bureau of Prisons to be imprisoned for a term of
 5    210 months.   It appears the Defendant does not have the
 6    ability to pay a fine; therefore,  the fine is waived.
 7    The Defendant shall pay the mandatory 100 dollar Special
 8    Assessment fee.
 9           Upon release from imprisonment,  the Defendant
10    shall be placed on supervised release for a term of
11    three years.   Within 72 hours of release from custody
12    of the Bureau of Prisons,  the Defendant shall report in
13    person to the probation office in the District to which
14    the Defendant is released.
15           While on supervised release,  the Defendant
16    shall comply with the mandatory and standard conditions
17    of supervision outlined in 18 USC Section 3583(d).  The
18    Defendant shall also comply with the following special
19    condition for the reasons set forth in the presentence
20    report, which has previously been adopted by the Court
21    as the findings of fact for purposes of sentencing:  The
22    Defendant shall submit to random drug testing as
23    administered by the U.S. Probation Officer.   I will
24    include a request in my Judgment Order that the
25    Defendant be allowed to participate in any drug
```

41

1    treatment program available, including the RDAP Program,

2    which is the Residential Drug Treatment Program offered

3    through the Bureau of Prisons.

4          I will also state that I believe that I have

5    calculated the advisory guidelines range properly and

6    correctly addressed the points raised by the parties.

7    If, however, it is later determined that I have not,

8    I will state for the record that based upon the facts

9    and circumstances of this case, I would have imposed

10    this same sentence as an alternate variant sentence in

11    light of all of the 18 USC Section 3553(a) factors,

12    including the nature and circumstances of the offense,

13    the history and characteristics of the Defendant, the

14    need to promote respect for the law, provide adequate

15    deterrence to future criminal conduct, protect the

16    public from further crimes of the Defendant, and provide

17    for just punishment and in light of the totality of the

18    circumstances present in this case.

19          Ms. Freeman, I also find that this sentence is

20    sufficient but not greater than necessary to achieve the

21    purposes of sentencing.

22          Ms. Freeman, if you wanted to appeal your

23    conviction or sentence, you would have 14 days from the

24    date of entry of the written Judgment Order in this case

25    to file your Notice of Appeal. If you could not afford

42

1    the filing fee, it would be waived and filed for you

2    without cost by you.   And if you wanted a lawyer to

3    represent you in any such appeal of your conviction or

4    sentence and could not afford a lawyer,  you could ask

5    that one be appointed for you without cost to you,  and

6    one would be appointed without cost to you; do you

7    understand all of that?

8              THE DEFENDANT:  I think so.

9              THE COURT:  Ma'am?

10             THE DEFENDANT:  I think so.

11             THE COURT:  Well,  let me go over it again to make

12    sure.   If you wanted to appeal your conviction or

13    sentence, you would have 14 days from the date of entry

14    of the written Judgment Order in your case, that will

15    probably be today or tomorrow when the Judgment Order is

16    entered.   If you could not afford to pay the filing fee

17    for your Notice of Appeal in writing to the clerk,  it

18    would be waived, and you would not have to pay a filing

19    fee.   If you wanted to appeal your conviction and/or

20    sentence,  and you wanted a lawyer, but could not afford

21    one,  you could ask that one be appointed for you

22    without charge; do you understand that?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Are there any substantive, or

25    procedural errors, or omissions to be brought to the

1    attention of the Court, or anything else concerning

2    sentencing in this case?

3            MR. WATKINS:  No, sir.

4            THE COURT:   Anything else,  Mr. Smith?

5            MR. SMITH:  No, sir.

6            THE COURT:   Anything from probation?

7            PROBATION OFFICER:   No, sir.

8            THE COURT:   Good luck to you.   We will take a

9    short recess and then finish the next case.

10       (Whereupon, at 4:57, the hearing concluded.)

11            *** END OF REQUESTED TRANSCRIPT ***

12       * * * * * * * * * * * * * * * * * * * * * * * * *

13                CERTIFICATE OF REPORTER

14       I certify that the foregoing is a correct

15   transcript from my stenographic notes in the

16   above-entitled matter.

17

18

19

20

21    S/Debra R. Bull, RPR, CRR   April 24, 2019
                                  Date
22

23

24

25

AO 245B (SCDC Rev.02/18) Judgment in a Criminal Case Sheet 1

# UNITED STATES DISTRICT COURT
## District of South Carolina

UNITED STATES OF AMERICA

vs.

<u>Precias K Freeman</u>

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 7:17cr00079 (1)

USM Number: 32077-171

Donald Smith
Defendant's Attorney

**THE DEFENDANT:**

■ pleaded guilty to count(s) __1__ .

☐ pleaded nolo contendere to count(s) _____which was accepted by the court.

☐ was found guilty on count(s) __after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:846 | Please see indictment | 2/14/17 | 1 |

The defendant is sentenced as provided in pages 2 through <u>6</u> of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)_____.

☐ <u>Count(s)</u> ☐ are dismissed on the motion of the United States.

☐ Forfeiture provision is hereby dismissed on motion of the United States Attorney.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of any material changes in economic circumstances.

December 13, 2018
Date of Imposition of Judgment

S/ Timothy M Cain
Signature of Judge

Honorable Timothy M Cain, USDJ
Name and Title of Judge

Dcember 13, 2018
Date

AO 245B (SCDC Rev. 02/18) Judgment in a Criminal Case
Sheet 2 - Imprisonment

Page 2

DEFENDANT: Precias K Freeman
CASE NUMBER: 7:17cr00079

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of TWO HUNDRED AND TEN (210) MONTHS.

■    The court makes the following recommendations to the Bureau of Prisons:
1.    It is recommended that the defendant participate in any substance abuse treatment including the Residential Drug Abuse Program available and be allowed to enroll while incarcerated.

■    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:
☐ at _____ ☐ a.m. ☐ p.m. on _____.
☐ as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
☐ before 2 p.m. on _____.
☐ as notified by the United States Marshal.
☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this Judgment as follows:

Defendant delivered on _____ to _____

at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

7:17-cr-00079-TMC    Date Filed 12/13/18    Entry Number 72    Page 3 of 6

AO 245B (SCDC Rev. 02/18) Judgment in a Criminal Case

Sheet 3 - Supervised Release                                                                                      Page 3

DEFENDANT: Precias K Freeman
CASE NUMBER: 7:17cr00079

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of THREE (3) YEARS.
The defendant shall submit to random drug testing as administered by the U.S. Probation Officer.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ■ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. §20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program of domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (SCDC Rev. 02/18) Judgment in a Criminal Case
Sheet 3A- Supervised Release                                                                          Page 4

DEFENDANT: Precias K Freeman
CASE NUMBER: 7:17cr00079

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.    You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.    After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.    You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.    You must answer truthfully the questions asked by your probation officer.
5.    You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.    You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.    You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.    You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.    If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B (SCDC Rev. 02/18) Judgment in a Criminal Case
Sheet 5 - Criminal Monetary Penalties

Page 5

DEFENDANT: Precias K Freeman
CASE NUMBER: 7:17cr00079

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | **$ 100.00** | | **$ N/A** | **$ N/A** |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case(AO245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

☐   Restitution amount ordered pursuant to plea agreement   **$_____**

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. §3612(f).  All of the payment options on Sheet 5 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. §3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:
    ☐   The interest requirement is waived for the ☐ fine ☐ restitution.
    ☐   The interest requirement for the ☐ fine ☐ restitution is modified as follows:

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (SCDC Rev. 02/18) Judgment in a Criminal Case
 Sheet 6 - Schedule of Payments
                                  Page 6

DEFENDANT: Precias K Freeman
CASE NUMBER: 7:17cr00079

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A    ■    Lump sum payment of $ 100.00 special assessment due immediately, balance due

   ☐ not later than _____, or

   ☐ in accordance with ☐ C, ☐ D, or ☐ E, or ☐ F below: or

B    ☐    Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C    ☐    Payment in equal _____(weekly, monthly, quarterly) installments of $_____over a period of _____

   (*e.g., months or years*), to commence _____ (*e.g., 30 or 60 days*) after the date of this judgment; or

D    ☐    Payment in equal monthly (*e.g., weekly, monthly, quarterly*) installments of_____, to commence_____ (*e.g., 30 or 60 days*) after release from imprisonment to a term of supervision; or in an amount o be adjusted throughout the defendant's supervision, based on his ability to pay.

E    ☐    Payment during the term of supervised release will commence within (*e.g., 30 or 60 days*) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☐    Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

  Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.



☐    The defendant shall pay the cost of prosecution.
☐    The defendant shall pay the following court cost(s):
☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

As directed in the Preliminary Order of Forfeiture, filed_____and the said order is incorporated herein as part of this judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# UNITED STATES DISTRICT COURT

for the
District of South Carolina

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | C.A. No.: 7:17-CR-79 |
| | ) | |
| v. | ) | |
| | ) | |
| PRECIAS K. FREEMAN | ) | |
| _____ | ) | |

**DEFENDANT'S PETITION FOR REHEARING; OR, IN THE ALTERNATIVE, MOTION FOR RECONSIDERATION**

**COMES NOW,** pursuant to Federal Rule of Civil Procedure Rule 59(e), Defendant Precias K. Freeman who brings this Petition for Rehearing; or, in the alternative, Motion for Reconsideration, based on the following:

## INTRODUCTION

The Presentence Investigation Report provided by the United States Probation Office states that the correct offense level for Precias K. Freeman was a level 36, a criminal history level of II, thus qualifying Precias K. Freeman for a sentencing guideline range of 210 to 240 months. The Defendant, by and through counsel, respectfully disagreed with the calculations of the drugs based on the failure to provide but a mere pittance of evidence regarding the acquisition of opioids.

Defendant further contended that Probation Agent Rogers had manufactured a failed drug test. Defendant provided the Court with information that illustrated Rogers stories regarding the alleged positive drug test differed. She alleged Defendant had failed for opioids and benzos. However, when she had spoken to the Forrester Center, she indicated to them that Defendant had tested positive for opioids alone. Of course, Defendant's contention would have failed had the specimen Rogers forwarded to the testing facility not been mysteriously "leaking". The testing facility would not test the tainted sample. Rogers did not attempt to take another

sample upon learning of her unfortunate failure to close the container in which the sample was sent. In addition, Agent Rogers had provided information that the Freeman family had left the State of South Carolina when she attempted to make contact with her on September 7, 2017.

"Your client's assertions about a drug test that the probation officer admits could not be confirmed by the lab (due to leakage during shipping), and any other statements disputed by the defendant would be a credibility determination that would be determined by the court, should you wish to pursue." This response by the Court's staff was an ominous statement which Defendant found to be an indication of the likelihood that she would get unbiased review of the facts. Based on the Court's sentencing hearing, Defendant had reason to be concerned about the Court's analysis of the objections previously made by her.

At the sentencing hearing, Defendant chose to bypass a confrontational hearing with the government, given its inability to prosecute for several years. Agent versus Defendant in a matter of credibility. Based on Defendant's penchant for eluding law enforcement on occasions in the past, the playing field was slanted against her. The United States' bitterness due to this fact was thoroughly addressed by counsel. However, Defendant was well aware of a bias that may exist; and, she specifically provided the Court with objective evidence of her objections.

Due to Defendant's inability to come see her the previous day, Agent Rogers made a surprise visit to the apartment at which the Freeman family was staying. She requested Defendant provide a urine specimen. Upon testing the specimen, Agent Rogers told her that she had tested positive for opioids (by implication-she asked if Lortab was Ms. Freeman's drug of choice, to which she acknowledged); and, tested positive for a second drug, *which the agent refused to offer.* The Agent then allegedly placed the specimen in the container used, and thoroughly and completely fastened the lid, for transport of same.

Later that afternoon, Agent Rogers contacted the Forrester Center to alert them of her findings.

> Client P O  Bryanna Rogers called to report client submitted UDS positive for opiates. According to Ms. Rogers, client reported she had taken 1 Lortab. Ms. Rogers requested client file be kept open until the judge determines  whether  or not she will return to treatment services or attend jail time followed by potential inpatient care due to pregnancy.

(Exhibit 1).

Agent Rogers stated that Defendant admitted to taking 1 Lortab.  Defendant referred to her drug of choice as "Norco", *not Lortab.*  In addition, if she had admitted to ingesting the "Lortab", what would be the purpose of denying another drug's use?  Agent Rogers should have had her sign a statement admitting use of the Lortab.  She did not.  Once Agent Rogers learned of the fact that her collection and packaging of the urine specimen failed, she could have immediately performed another collection.  She did not.  There would be **_no way_** for the Defendant, or anyone else for that matter, to prove anything.  The idea of getting beyond a reasonable doubt, or even a preponderance of evidence, was not met; in particular, with the absolute failure of the government to do anything substantiating the allegations.

The government has sought to lock up Defendant; and, throw away the key for some time.  Upon relieving prior counsel, the government sought, and found, two more points to add to her offense level to bring it to 36.  The base level of 34 is speculative at best.  The government could not prove much of what was calculated.  It was incumbent upon them to prove their case.  In actuality, Defendant pled guilty and gave them everything they knew.  Interestingly, despite the fact that Defendant not only pled guilty, but allegedly gave the information necessary to come to the conclusion that she was worthy of a base level of 34, they had the audacity to say that she "has not clearly demonstrated acceptance of responsibility for the offense".  Defendant

[Type here]                    [Type here]                    [Type here]

is not sure what more she could have done regarding her recognition of her fault, and the manner in which she performed the illegal activity.

The government had several ways in which to illustrate the failed drug test in September of 2017, was valid. They did nothing. They are simply relying on the Court's belief in the entity which is very simply an arm of the court. While it is understood integrity is associated with the probation office, the fact remains that human beings maintain the office; and, therefore, are capable of mistakes. In the matter at hand, a criminal case, the government should not benefit from its own lack of due diligence.

Most important of the Government's failures is that pertaining to the pill count, which in turn became her base level for purposes of sentencing. The government's offering as it relates to the evidence supporting Defendant's base level offense was negligible. This understatement can only be seen in this matter with the actual numbers.

The following chart was created to illustrate what evidence the government provided. It is difficult to comprehend the dearth of evidence regarding the acquisition of illegal drugs, when there has been a couple of years in which to assemble the evidence. The United States speaks of all of the facts and circumstances discussed by Freeman. It did little or nothing to confirm what most assuredly was taken out of context or embellished. It did not even attempt to provide the Court with this abundance of evidence. Questions of whether the evidence exists; or, whether the government used due diligence in attempting to prove its case, are raised. According to the government's calculations, Defendant would have filled 2,184 prescriptions. The following is what was offered in discovery.

**October 2014/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 10/8/2014=1 | 10/16/2014=1 |

| | |
|---|---|
| 10/10/2014=1 | 10/18/2014=1 |
| 10/14/2014-1 | 10/20/2014=1 |
| 10/15/2014=2 | 10/30/2014=1 |
| 10/20/2014=1 | |
| 10/22/2014=1 | |
| 10/30/2014=2 | |

Total dropped off for the month of October 2014 was 9 prescriptions of 120 pills each which equals 1,080 pills.

Total picked up from pharmacy for the month of October 2014 was 4 prescriptions.

Of the 31 days in October, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,9,11,12,13,17,19,21,23,24,25,26,27,28 & 29

*21 days of no evidence of activity*

**November 2014/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 11/4/2014=1 | 11/7/2014=2 |
| 11/7/2014=1 | 11/23/2014=1 |
| 11/20/2014=2 | 11/25/2014=1 |
| 11/25/2014=4 | |

Total dropped off for the month of November 2014 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of November 2014 was 4 prescriptions.

Of the 30 days in November, no prescriptions were presented or picked up on the following dates:

1,2,3,5,6,8,9,10,11,12,13,14,15,16,17,18,19,21,22,24,26,27,28,29 & 30

*26 days of no evidence of activity*

**December 2014/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 12/1/2014=5 | 12/1/2014=1 |
| 12/4/2014=2 | 12/18/2014=1 |

[Type here]                    [Type here]                    [Type here]

12/17/2014=1                     12/19/2014=1

12/30/2014=14

Total dropped off for the month of December 2014 was 22 prescriptions of 120 pills each which equals 2,640 pills.

Total picked up from pharmacy for the month of December 2014 was 3 prescriptions

Of the 31 days in December, no prescriptions were presented or picked up on the following dates:

2,3,5,6,7,8,9,10,11,12,13,14,15,16,20,21,22,23,24,25,26,27,28,29,31

***25 days where there is no evidence of activity***

## 2015

### January 2015/31 days

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 1/26/2015=2 | 1/2/2015=1 |
| 1/28/2015=1 | 1/4/2015=1 |
| 1/29/2015=4 | 1/10/2015=1 |
| | 1/11/2015=1 |
| | 1/15/2015=1 |
| | 1/16/2015=1 |
| | 1/17/2015=1 |
| | 1/18/2015=1 |
| | 1/21/2015=3 |
| | 1/23/2015=1 |
| | 1/27/2015=1 |
| | 1/28/2015=1 |

Total dropped off for the month of January 2015 was 7 prescriptions of 120 pills each which equals 840 pills.

Total picked up from pharmacy for the month of January 2015 was 14 prescriptions

Of the 31 days in January, no prescriptions were presented or picked up on the following dates:

1,3,5,6,7,8,9,12,13,14,19,20,22,24,25,30 & 31

*17 days where there is no evidence of activity*

**February 2015/28 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 2/17/2015=2 | 2/3/2015=1 |
| 2/24/2015=2 | 2/4/2015=1 |
| 2/27/2015=4 | 2/24/2015=2 |
| | 2/25/2015=1 |
| | 2/28/2015=3 |

Total dropped off for the month of February 2015 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of February 2015 was 8 prescriptions

Of the 28 days in February, no prescriptions were presented or picked up on the following dates:

1,2,5,6,7,8,9,10,11,12,13,14,15,16,18,19,20,21,22,23 & 26

*21 days where there is no evidence of activity*

**March 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 3/3/2015=2 | 3/7/2015=1 |
| 3/10/2015=1 | 3/9/2015=1 |
| 3/11/2015=2 | 3/15/2015=2 |
| 3/20/2015=3 | 3/21/2015=2 |
| 3/23/2015=2 | 3/24/2015=1 |
| 3/30/2015=2 | 3/26/2015=1 |
| | 3/31/2015=2 |

Total dropped off for the month of March 2015 was 12 prescriptions 10 were for 120 each and 2 were for 60 each which equals 1,320 pills.

Total picked up from pharmacy for the month of March 2015 was 10 prescriptions

Of the 31 days in March, no prescriptions were presented or picked up on the following dates:

1,2,4,5,6,8,12,13,14,16,17,18,19,22,25,27,28 & 29

*18 days where there is no evidence of activity*

[Type here]                [Type here]                [Type here]
**-157-**

**April 2015/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 4/1/2015=1 | 4/3/2015=1 |
| 4/4/2015=1 | 4/5/2015=2 |
| 4/6/2015=3 | 4/6/2015=2 |
| 4/10/2015=2 | 4/8/2015=1 |
| 4/13/2015=1 | 4/10/2015=1 |
| 4/22/2015=2 | 4/12/2015=1 |
| | 4/18/2015=1 |

Total dropped off for the month of April 2015 was 10 prescriptions of 120 pills each which equals 1,200 pills.

Total picked up from pharmacy for the month of April 2015 was 9 prescriptions

Of the 30 days in April, no prescriptions were presented or picked up on the following dates:

2,7,9,11,14,15,16,17,19,20,21,23,24,25,26,27,28,29 & 30

***19 days where there is no evidence of activity***

**May 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 5/14/2015=1 | |

Of the 31 days in May, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

***30 days where there is no evidence of activity***

**June 2015/30 days**

***30 days where there is no evidence of activity***

**July 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 7/21/2015=1 | 7/22/2015=1 |
| 7/31/2015=3 | 7/31/2015=1 |

[Type here]                    [Type here]                    [Type here]

Total dropped off for the month of July 2015 was 4 prescriptions of 120 pills each which equals 480 pills.

Total picked up from pharmacy for the month of July 2015 was 2 prescriptions

Of the 31 days in July, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,23,24,25,26,27,28,29 & 30

***28 days where there is no evidence of activity***

**August 2015/31 days**

**Dropped off at Pharmacy**                **Picked up at Pharmacy**

8/14/2015=1

Total dropped off for the month of August 2015 was 1 prescription of 120 pills each which equals 120 pills.

Total picked up from pharmacy for the month of August 2015 was 0 prescriptions

Of the 31 days in August, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

***30 days where there is no evidence of activity***

**September 2015/30 days**

***30 days where there is no evidence of activity***

**October 2015/31 days**

***31 days where there is no evidence of activity***

**November 2015/30 days**

**Dropped off at Pharmacy**                **Picked up at Pharmacy**

11/11/2015=2                               11/11/2015=2

11/13/2015=2

Total dropped off for the month of November 2015 was 4 prescriptions of 120 pills each which equals 480 pills.

Total picked up from pharmacy for the month of November 2015 was 2 prescriptions

Of the 30 days in November, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,12,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29 & 30

***29 days where there is no evidence of activity***

## December 2015/31 days

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

12/16/15=1

Total dropped off for the month of December 2015 was 1 prescription of 120 pills each which equals 120 pills.

Total picked up from pharmacy for the month of December 2015 was 0 prescriptions

Of the 31 days in December, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

***30 days where there is no evidence of activity***

## 2016

## January 2016/31 days

***31 days where there is no evidence of activity***

## February 2016/28 days

***28 days where there is no evidence of activity***

## March 2016/31 days

***31 days where there is no evidence of activity***

## April 2016/30 days

***30 days where there is no evidence of activity***

## May 2016/31 days

***31 days where there is no evidence of activity***

## June 2016/30 days

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

6/17/2016=2                                    6/22/2016=1

[Type here]                    [Type here]                    [Type here]

Total dropped off for the month of June 2016 was 2 prescriptions of 120 pills each which equals 240 pills.

Total picked up from pharmacy for the month of June 2016 was 1 prescription

Of the 30 days in June, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,18,19,20,21,23,24,25,26,27,28,29,30 & 31

*29 days where there is no evidence of activity*

**July 2016/31 days**

*31 days where there is no evidence of activity*

**August 2016/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 8/1/2016=3 | 8/3/2016=1 |
| 8/23/2016=4 | 8/5/2016=1 |
| 8/31/2016=1 | |

Total dropped off for the month of August 2016 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of August 2016 was 2 prescriptions

Of the 31 days in August, no prescriptions were presented or picked up on the following dates:

2,4,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,24,25,26,27,28,29 & 30

*26 days where there is no evidence of activity*

**September 2016/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 9/1/2016=1 | |
| 9/13/2016=2 | |

Total dropped off for the month of September 2016 was 3 prescriptions of 120 pills each which equals 360 pills.

Total picked up from pharmacy for the month of September 2016 was 0 prescriptions

Of the 30 days in September, no prescriptions were presented or picked up on the following dates:

2,3,4,5,6,7,8,9,10,11,12,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29 & 30

*28 days where there is no evidence of activity*

[Type here]                    [Type here]                    [Type here]

*650 of the 730 days where there is no activity*

Defendant further objected to this paragraph because the calculated weight of the hydrocodone or Norco that the Government is alleging Defendant had illegally obtained is 1,752,000 mg. or 1,752 grams. When converted to the marijuana equivalent, pursuant to USSG § 2D1.1(D), the total weight would be 11,738,400 grams or 11,728.4 kilograms. Pursuant to USSG § 2D1.1(c)(3) this makes Defendant's base offense level of 34. Based on the data provided by the Government, Defendant obtained 10,260 pills at 10mg/pill, which equates to 102,600 mg or 102.6 grams, which when multiplied by 6,700 grams of marijuana, equals 687,420 grams or 6,874.2 kilograms. Since this is less than 10,000 kilograms, that reduces her base offense level of 32.

As mentioned previously, Defendant decided to forgo the arguments relating to her ongoing objections. That decision was based on what appeared to be the quintessential case for the Bridge Program. The undersigned was alerted that Agent Shannon Webber was the Court's right-hand man as it related to the Bridge Program. (Exhibit 1). Correspondence was forwarded to him in attempts to recommend Ms. Freeman to the program which clearly had those like her in mind.

Defendant filed a motion in an effort to be considered for the Bridge Program. The motion set out her undeniable addiction, the third-party identification of everything associated with her addiction, statements by Judge Hendricks justifying the program for Defendant. (Docket No. 70.3 and 4). Counsel was of the belief that pursuant to the Bridge Program mantra, the Court would send the matter to the aforementioned Mr. Webber for the purpose of reviewing Defendant's qualifications. However, the Court did not offer that courtesy.

The motion regarding the Bridge Program was very clear in its intent. The undersigned spoke to the Court's assistant on December 5th. The conversation related to what the

undersigned had filed; and, whether the filing of the day prior failed in any manner.   Counsel was assured that any error would be relayed.  No signification came from the Court.  Based on the fact that Mr. Webber did not contact counsel, it was believed that the Court would make a finding on December 13th that, at the very least, Mr. Webber should see if Ms. Freeman qualified for the program.  Instead, the Court went immediately into sentencing.

Ms. Freeman discussed at length her difficulties with Norcos.  She really didn't need to list them.  Her legal trouble with prescriptions has been a constant point of contention for the last fifteen (15) years.  When she was hospitalized when she was caught in October of 2016, she had a high sensitivity of opiate in her positive urine test.  (Exhibit 2).  When she was admitted to the Forrester Center, the independent counselors found that in every category she was at the most vulnerable of people facing addiction.  (Exhibit 3).

It was seemingly undeniable Defendant has a severe addiction.  Regardless of how clear and unequivocal the addiction, the government said that they were unaware of same.  It is their contention that Defendant only spoke of selling drugs when they discussed them with her.  It should be noted the interview of which they speak occurred at the Hillcrest Hospital (see Exhibit 2).  In that interview, she was high.  Did that stop the agents from pressing on until she had a clear head?  They certainly did not.  They had her in a vulnerable state; and, they took advantage.

This Court asks defendants on every occasion they speak whether they are under the influence of any mind-altering substance.  How much would you wager the agents failed to do so?  More importantly, do you think they recorded the interview, so it would be memorialized for situations such as this?  Of course, not.  They appreciate when it's a question of credibility.  They never lose those "50/50 balls".  Then again, they aren't 50/50 jump balls.  They are 100/00 certainties.

[Type here]                         [Type here]                         [Type here]
-163-

This Court held a sentencing hearing in this matter on Thursday, December 13, 2018.  At that time counsel for Defendant withdrew her objections to the Presentencing Report offered by the Government.  Defendant believed that this Court had reviewed her Motion

This Court did not review Ms. Freeman's plea for the Bridge Program.  This fact was apparent when the Court had to clarify whether she was claiming to take 6 to 8 "Lortabs" per day, or 60 to 80.   Since this was part of the justification for the Bridge Program request, it was clearly denoted in her brief.

ARGUMENT

The Court heard enough to find that Defendant has never been able to get the necessary treatment.  It appears the Court is unable to get past the fact addiction is not something anyone can turn on; or, turn off.  The Court spoke the words regarding the "reasons" it had to support the 17 and 1/2 year sentence that was about to be handed down.  Ironically, those reasons are the same used at every sentencing:  Defendant has introduced a great hardship on society, opioids have taken people's lives, filled our jails, taxed our depleted medical resources, etc.  **That is exactly why she was there to be sentenced by the Court.**  The Court summarily dismissed the facts; as Defendant has been summarily dismissed in this matter.  She deserves to spend 20% of her life in prison-***because she is sick.***

This Court previously was put to task regarding another individual who thought he was deserving of the Bridge Program.  In the *United States v. Larecius Mattison*, 16-4656 (4th Cir. 2017), the Defendant also alleged the Court failed to give proper weight to his request for the Bridge Program:

Mattison also contends that the district court did not fully and accurately address

his request to be placed in a state drug court known as the Bridge Program, under which the defendant participates in a period of drug treatment prior to sentencing. Whether to approve an applicant's admission into the program depends upon a variety of factors, including a verified history of current substance abuse or addiction, the nature of the current charge, the defendant's criminal history, and his dangerousness to the community.

The Court was affirmed by the appellate tribunal based on the reasons offered:

> The district court gave several reasons for denying Mattison's request for placement in the Bridge Program. Among other things, the court noted that there was evidence of drug use but not drug addiction and that the present offense was serious and involved possession of a firearm. This explanation sufficiently addressed Mattison's request for placement in the program.

Precias Freeman is a drug addict. She has independent proof of this fact. The Court recognized this fact when opining that she has not had the necessary treatment to combat her illness. She never had a weapon. She didn't steal. She did not intentionally hurt anyone. All of her criminal history is ***directly related to her addiction.*** The spoke of how Precias has hurt the community, and society at large, with her distribution of opioids. However, the Court then dismissed the request for the Bridge Program and sentenced her to the 210 months necessary to get rid of her disease. This sentence is the definition of arbitrary and capricious.

This Court did not give any reasons for the denial. This Court didn't even ask Agent Webber to look into whether she as a verifiable candidate. Similarly, Agent Rogers didn't have anything to support the fact that Defendant failed a drug test, let alone for two substances.

## CONCLUSION

Precias Freeman didn't grow up wanting to be a drug addict. This Court acknowledged that she had a problem. The Court's solution to this problem was to sentence her to 17 and ½ years in prison. The Court abused its discretion in this matter; and,

Defendant pleads for reconsideration of the findings in the hearing held on December 13, 2018.

s/**_Donald L. Smith_**
Donald L. Smith, (Fed Id.#06626)
Attorney for Defendant Precias Freeman
122 N. Main Street
Anderson SC 29621
Telephone:  (864) 642-9284
Facsimile:   (864) 642-9285
attorneydonaldsmith@gmail.com

Anderson, South Carolina
December 24, 2018

# UNITED STATES DISTRICT COURT

for the

District of South Carolina

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | C.A. No.:  7:17-CR-79 |
| | ) | |
| v. | ) | |
| | ) | |
| PRECIAS K. FREEMAN | ) | |
| _____ | ) | |

## DEFENDANT'S PETITION FOR REHEARING; OR, IN THE ALTERNATIVE, AMENDED MOTION FOR RECONSIDERATION

**COMES NOW,** pursuant to Federal Rule of Civil Procedure Rule 59(e), Defendant

Precias K. Freeman who brings this Petition for Rehearing; or, in the alternative, Motion for

Reconsideration, based on the following:

### INTRODUCTION

The Presentence Investigation Report provided by the United States Probation Office

states that the correct offense level for Precias K. Freeman was a level 36, a criminal history

level of II, thus qualifying Precias K. Freeman for a sentencing guideline range of 210 to 240

months. The Defendant, by and through counsel, respectfully disagreed with the calculations of

the drugs based on the failure to provide but a mere pittance of evidence regarding the

acquisition of opioids.

Defendant further contended that Probation Agent Rogers had manufactured a failed

drug test.  Defendant provided the Court with information that illustrated Rogers stories

regarding the alleged positive drug test differed.  She alleged Defendant had failed for opioids

and benzos.  However, when she had spoken to the Forrester Center, she indicated to them that

Defendant had tested positive for opioids alone.  Of course, Defendant's contention would have

failed had the specimen Rogers forwarded to the testing facility not been mysteriously "leaking".

The testing facility would not test the tainted sample.  Rogers did not attempt to take another

sample upon learning of her unfortunate failure to close the container in which the sample was sent. In addition, Agent Rogers had provided information that the Freeman family had left the State of South Carolina when she attempted to make contact with her on September 7, 2017.

"Your client's assertions about a drug test that the probation officer admits could not be confirmed by the lab (due to leakage during shipping), and any other statements disputed by the defendant would be a credibility determination that would be determined by the court, should you wish to pursue." This response by the Court's staff was an ominous statement which Defendant found to be an indication of the likelihood that she would get unbiased review of the facts. Based on the Court's sentencing hearing, Defendant had reason to be concerned about the Court's analysis of the objections previously made by her.

At the sentencing hearing, Defendant chose to bypass a confrontational hearing with the government, given its inability to prosecute for several years. Agent versus Defendant in a matter of credibility. Based on Defendant's penchant for eluding law enforcement on occasions in the past, the playing field was slanted against her. The United States' bitterness due to this fact was thoroughly addressed by counsel. However, Defendant was well aware of a bias that may exist; and, she specifically provided the Court with objective evidence of her objections.

Due to Defendant's inability to come see her the previous day, Agent Rogers made a surprise visit to the apartment at which the Freeman family was staying. She requested Defendant provide a urine specimen. Upon testing the specimen, Agent Rogers told her that she had tested positive for opioids (by implication-she asked if Lortab was Ms. Freeman's drug of choice, to which she acknowledged); and, tested positive for a second drug, ***which the agent refused to offer.*** The Agent then allegedly placed the specimen in the container used, and thoroughly and completely fastened the lid, for transport of same.

Later that afternoon, Agent Rogers contacted the Forrester Center to alert them of her findings.

> Client P O Bryanna Rogers called to report client submitted UDS positive for opiates. According to Ms. Rogers, client reported she had taken 1 Lortab. Ms. Rogers requested client file be kept open until the judge determines whether or not she will return to treatment services or attend jail time followed by potential inpatient care due to pregnancy.

(Exhibit 1).

Agent Rogers stated that Defendant admitted to taking 1 Lortab. Defendant referred to her drug of choice as "Norco", *not Lortab.* In addition, if she had admitted to ingesting the "Lortab", what would be the purpose of denying another drug's use? Agent Rogers should have had her sign a statement admitting use of the Lortab. She did not. Once Agent Rogers learned of the fact that her collection and packaging of the urine specimen failed, she could have immediately performed another collection. She did not. There would be ***no way*** for the Defendant, or anyone else for that matter, to prove anything. The idea of getting beyond a reasonable doubt, or even a preponderance of evidence, was not met; in particular, with the absolute failure of the government to do anything substantiating the allegations.

The government has sought to lock up Defendant; and, throw away the key for some time. Upon relieving prior counsel, the government sought, and found, two more points to add to her offense level to bring it to 36. The base level of 34 is speculative at best. The government could not prove much of what was calculated. It was incumbent upon them to prove their case. In actuality, Defendant pled guilty and gave them everything they knew. Interestingly, despite the fact that Defendant not only pled guilty, but allegedly gave the information necessary to come to the conclusion that she was worthy of a base level of 34, they had the audacity to say that she "has not clearly demonstrated acceptance of responsibility for the offense". Defendant

is not sure what more she could have done regarding her recognition of her fault, and the manner in which she performed the illegal activity.

The government had several ways in which to illustrate the failed drug test in September of 2017, was valid. They did nothing. They are relying on the Court's belief in the entity which is an arm of the court. While it is understood integrity is associated with the probation office, the fact remains that human beings maintain the office; and, therefore, are capable of mistakes. In the matter at hand, a criminal case, the government should not benefit from its own lack of due diligence.

Most important of the Government's failures is that pertaining to the pill count, which in turn became her base level for purposes of sentencing. The government's offering as it relates to the evidence supporting Defendant's base level offense was negligible. This understatement can only be seen in this matter with the actual numbers.

The following chart was created to illustrate what evidence the government provided. It is difficult to comprehend the dearth of evidence regarding the acquisition of illegal drugs, when there has been a couple of years in which to assemble the evidence. The United States speaks of all of the facts and circumstances discussed by Freeman. It did little or nothing to confirm what most assuredly was taken out of context or embellished. It did not even attempt to provide the Court with this abundance of evidence. Questions of whether the evidence exists; or, whether the government used due diligence in attempting to prove its case, are raised. According to the government's calculations, Defendant would have filled 2,184 prescriptions. The following is what was offered in discovery.

**October 2014/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
| --- | --- |
| 10/8/2014=1 | 10/16/2014=1 |

| | |
|---|---|
| 10/10/2014=1 | 10/18/2014=1 |
| 10/14/2014-1 | 10/20/2014=1 |
| 10/15/2014=2 | 10/30/2014=1 |
| 10/20/2014=1 | |
| 10/22/2014=1 | |
| 10/30/2014=2 | |

Total dropped off for the month of October 2014 was 9 prescriptions of 120 pills each which equals 1,080 pills.

Total picked up from pharmacy for the month of October 2014 was 4 prescriptions.

Of the 31 days in October, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,9,11,12,13,17,19,21,23,24,25,26,27,28 & 29

***21 days of no evidence of activity***

**November 2014/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 11/4/2014=1 | 11/7/2014=2 |
| 11/7/2014=1 | 11/23/2014=1 |
| 11/20/2014=2 | 11/25/2014=1 |
| 11/25/2014=4 | |

Total dropped off for the month of November 2014 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of November 2014 was 4 prescriptions.

Of the 30 days in November, no prescriptions were presented or picked up on the following dates:

1,2,3,5,6,8,9,10,11,12,13,14,15,16,17,18,19,21,22,24,26,27,28,29 & 30

***26 days of no evidence of activity***

**December 2014/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 12/1/2014=5 | 12/1/2014=1 |
| 12/4/2014=2 | 12/18/2014=1 |

12/17/2014=1                           12/19/2014=1

12/30/2014=14

Total dropped off for the month of December 2014 was 22 prescriptions of 120 pills each which equals 2,640 pills.

Total picked up from pharmacy for the month of December 2014 was 3 prescriptions

Of the 31 days in December, no prescriptions were presented or picked up on the following dates:

2,3,5,6,7,8,9,10,11,12,13,14,15,16,20,21,22,23,24,25,26,27,28,29,31

***25 days where there is no evidence of activity***

**2015**

**January 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 1/26/2015=2 | 1/2/2015=1 |
| 1/28/2015=1 | 1/4/2015=1 |
| 1/29/2015=4 | 1/10/2015=1 |
|  | 1/11/2015=1 |
|  | 1/15/2015=1 |
|  | 1/16/2015=1 |
|  | 1/17/2015=1 |
|  | 1/18/2015=1 |
|  | 1/21/2015=3 |
|  | 1/23/2015=1 |
|  | 1/27/2015=1 |
|  | 1/28/2015=1 |

Total dropped off for the month of January 2015 was 7 prescriptions of 120 pills each which equals 840 pills.

Total picked up from pharmacy for the month of January 2015 was 14 prescriptions

Of the 31 days in January, no prescriptions were presented or picked up on the following dates:

1,3,5,6,7,8,9,12,13,14,19,20,22,24,25,30 & 31

*17 days where there is no evidence of activity*

**February 2015/28 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 2/17/2015=2 | 2/3/2015=1 |
| 2/24/2015=2 | 2/4/2015=1 |
| 2/27/2015=4 | 2/24/2015=2 |
| | 2/25/2015=1 |
| | 2/28/2015=3 |

Total dropped off for the month of February 2015 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of February 2015 was 8 prescriptions

Of the 28 days in February, no prescriptions were presented or picked up on the following dates:

1,2,5,6,7,8,9,10,11,12,13,14,15,16,18,19,20,21,22,23 & 26

*21 days where there is no evidence of activity*

**March 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 3/3/2015=2 | 3/7/2015=1 |
| 3/10/2015=1 | 3/9/2015=1 |
| 3/11/2015=2 | 3/15/2015=2 |
| 3/20/2015=3 | 3/21/2015=2 |
| 3/23/2015=2 | 3/24/2015=1 |
| 3/30/2015=2 | 3/26/2015=1 |
| | 3/31/2015=2 |

Total dropped off for the month of March 2015 was 12 prescriptions 10 were for 120 each and 2 were for 60 each which equals 1,320 pills.

Total picked up from pharmacy for the month of March 2015 was 10 prescriptions

Of the 31 days in March, no prescriptions were presented or picked up on the following dates:

1,2,4,5,6,8,12,13,14,16,17,18,19,22,25,27,28 & 29

*18 days where there is no evidence of activity*

**April 2015/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 4/1/2015=1 | 4/3/2015=1 |
| 4/4/2015=1 | 4/5/2015=2 |
| 4/6/2015=3 | 4/6/2015=2 |
| 4/10/2015=2 | 4/8/2015=1 |
| 4/13/2015=1 | 4/10/2015=1 |
| 4/22/2015=2 | 4/12/2015=1 |
| | 4/18/2015=1 |

Total dropped off for the month of April 2015 was 10 prescriptions of 120 pills each which equals 1,200 pills.

Total picked up from pharmacy for the month of April 2015 was 9 prescriptions

Of the 30 days in April, no prescriptions were presented or picked up on the following dates:

2,7,9,11,14,15,16,17,19,20,21,23,24,25,26,27,28,29 & 30

*19 days where there is no evidence of activity*

**May 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 5/14/2015=1 | |

Of the 31 days in May, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

*30 days where there is no evidence of activity*

**June 2015/30 days**

*30 days where there is no evidence of activity*

**July 2015/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 7/21/2015=1 | 7/22/2015=1 |
| 7/31/2015=3 | 7/31/2015=1 |

Total dropped off for the month of July 2015 was 4 prescriptions of 120 pills each which equals 480 pills.

Total picked up from pharmacy for the month of July 2015 was 2 prescriptions

Of the 31 days in July, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,23,24,25,26,27,28,29 & 30

*28 days where there is no evidence of activity*

**August 2015/31 days**

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

8/14/2015=1

Total dropped off for the month of August 2015 was 1 prescription of 120 pills each which equals 120 pills.

Total picked up from pharmacy for the month of August 2015 was 0 prescriptions

Of the 31 days in August, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

*30 days where there is no evidence of activity*

**September 2015/30 days**

*30 days where there is no evidence of activity*

**October 2015/31 days**

*31 days where there is no evidence of activity*

**November 2015/30 days**

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

11/11/2015=2                                   11/11/2015=2

11/13/2015=2

Total dropped off for the month of November 2015 was 4 prescriptions of 120 pills each which equals 480 pills.

Total picked up from pharmacy for the month of November 2015 was 2 prescriptions

Of the 30 days in November, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,12,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29 & 30

*29 days where there is no evidence of activity*

**December 2015/31 days**

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

12/16/15=1

Total dropped off for the month of December 2015 was 1 prescription of 120 pills each which equals 120 pills.

Total picked up from pharmacy for the month of December 2015 was 0 prescriptions

Of the 31 days in December, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,17,18,19,20,21,22,23,24,25,26,27,28,29,30 & 31

*30 days where there is no evidence of activity*

**2016**

**January 2016/31 days**

*31 days where there is no evidence of activity*

**February 2016/28 days**

*28 days where there is no evidence of activity*

**March 2016/31 days**

*31 days where there is no evidence of activity*

**April 2016/30 days**

*30 days where there is no evidence of activity*

**May 2016/31 days**

*31 days where there is no evidence of activity*

**June 2016/30 days**

**Dropped off at Pharmacy**                    **Picked up at Pharmacy**

6/17/2016=2                                    6/22/2016=1

Total dropped off for the month of June 2016 was 2 prescriptions of 120 pills each which equals 240 pills.

Total picked up from pharmacy for the month of June 2016 was 1 prescription

Of the 30 days in June, no prescriptions were presented or picked up on the following dates:

1,2,3,4,5,6,7,8,9,10,11,12,13,14,15,16,18,19,20,21,23,24,25,26,27,28,29,30 & 31

*29 days where there is no evidence of activity*

**July 2016/31 days**

***31 days where there is no evidence of activity***

**August 2016/31 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 8/1/2016=3 | 8/3/2016=1 |
| 8/23/2016=4 | 8/5/2016=1 |
| 8/31/2016=1 | |

Total dropped off for the month of August 2016 was 8 prescriptions of 120 pills each which equals 960 pills.

Total picked up from pharmacy for the month of August 2016 was 2 prescriptions

Of the 31 days in August, no prescriptions were presented or picked up on the following dates:

2,4,6,7,8,9,10,11,12,13,14,15,16,17,18,19,20,21,22,24,25,26,27,28,29 & 30

***26 days where there is no evidence of activity***

**September 2016/30 days**

| **Dropped off at Pharmacy** | **Picked up at Pharmacy** |
|---|---|
| 9/1/2016=1 | |
| 9/13/2016=2 | |

Total dropped off for the month of September 2016 was 3 prescriptions of 120 pills each which equals 360 pills.

Total picked up from pharmacy for the month of September 2016 was 0 prescriptions

Of the 30 days in September, no prescriptions were presented or picked up on the following dates:

2,3,4,5,6,7,8,9,10,11,12,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29 & 30

***28 days where there is no evidence of activity***

***650 of the 730 days where there is no activity***

Defendant further objected to this paragraph because the calculated weight of the

hydrocodone or Norco that the Government is alleging Defendant had illegally obtained is

1,752,000 mg. or 1,752 grams. When converted to the marijuana equivalent, pursuant to USSG

§ 2D1.1(D), the total weight would be 11,738,400 grams or 11,728.4 kilograms. Pursuant to

USSG § 2D1.1(c)(3) this makes Defendant's base offense level of 34.  Based on the data provided by the Government, Defendant obtained 10,260 pills at 10mg/pill, which equates to 102,600 mg or 102.6 grams, which when multiplied by 6,700 grams of marijuana, equals 687,420 grams or 6,874.2 kilograms.  Since this is less than 10,000 kilograms, that reduces her base offense level of 32.

As mentioned previously, Defendant decided to forgo the arguments relating to her ongoing objections.  That decision was based on what appeared to be the quintessential case for the Bridge Program.  The undersigned was alerted that Agent Shannon Webber was the Court's right-hand man as it related to the Bridge Program.  (Exhibit 2).  Correspondence was forwarded to him in attempts to recommend Ms. Freeman to the program which clearly had those like her in mind.

Defendant filed a motion in an effort to be considered for the Bridge Program.  The motion set out her undeniable addiction, the third-party identification of everything associated with her addiction, statements by Judge Hendricks justifying the program for Defendant.  (Exhibit 3-Docket No. 70.3 and 4).  Counsel was of the belief that pursuant to the Bridge Program objective, the Court would send the matter to the aforementioned Mr. Webber for the purpose of reviewing Defendant's qualifications.  However, the Court did not offer that courtesy.

The motion regarding the Bridge Program was very clear in its intent.  The undersigned spoke to the Court's assistant on December 5th.  The conversation related to what the undersigned had filed; and, whether the filing of the day prior failed in any manner.   Counsel was assured that any error would be relayed.  No signification came from the Court.  Based on the fact that Mr. Webber did not contact counsel, it was believed that the Court would make a finding to direct Mr. Webber to review Ms. Freeman's case, and her as an individual, to see if

she qualified for the program.  Instead, the Court went immediately into sentencing.

Ms. Freeman discussed at length her difficulties with Norcos.  She really didn't need to list them.  Her legal trouble with prescriptions has been a constant point of contention for the last fifteen (15) years.  When she was hospitalized when she was caught in October of 2016, she had a high sensitivity of opiate in her positive urine test.  (Exhibit 4).  When she was admitted to the Forrester Center, the independent counselors found that in every category she was at the most vulnerable of people facing addiction.  (Exhibit 5).

It was seemingly undeniable Defendant has a severe addiction.  Regardless of how clear and unequivocal the addiction appeared, the government said that they were unaware of same.  The Government claims that Defendant only spoke of selling drugs when they discussed them with her.  It is the objective of the government to show that Defendant's addiction came later as a means of escaping her potential sentence.  It should be noted the interview which formed the basis of her failure to admit addiction, as well as the pill count that was later extrapolated therefrom, occurred at the Hillcrest Hospital (see Exhibit 4).  In that interview, she was high.  Did agents stop the interview until such time as Defendant was not under the influence?  They certainly did not.  They had her in a vulnerable state; and, they took advantage.

This Court asks defendants on every occasion they speak whether they are under the influence of any mind-altering substance.  The agents did not ask whether she was under the influence.  They did not wait forty-eight (48) hours until Defendant had been incarcerated, and therefore drug free, before speaking to her.   More importantly, they did not memorialize the interview by recording it.  With no objective proof of what was said, it is a matter of credibility.  They never lose those "50/50 balls".  Then again, they aren't 50/50 jump balls.  They are 100/00 certainties.

This Court held a sentencing hearing in this matter on Thursday, December 13, 2018. At that time, counsel for Defendant withdrew her objections to the Presentencing Report offered by the Government. Defendant believed that this Court had reviewed her Motion

This Court did not review Ms. Freeman's plea for the Bridge Program. This fact was apparent when the Court had to clarify whether she was claiming to take 6 to 8 "Lortabs" per day, or 60 to 80. Since this was part of the justification for the Bridge Program request, it was clearly denoted in her brief.

### ARGUMENT

The Court heard enough to find that Defendant has never been able to get the necessary treatment. It appears the Court is unable to get past the fact addiction is not something anyone can turn on; or, turn off. The Court spoke the words regarding the "reasons" it had to support the seventeen and a half-year sentence that was about to be handed down. Ironically, those reasons are the same used at every sentencing: Defendant has introduced a great hardship on society, opioids have taken people's lives, filled our jails, taxed our depleted medical resources, etc. **That is exactly why she was there to be sentenced by the Court.** The Court summarily dismissed the facts relating to her addiction; as the Government has done throughout this process. The disregard for her addiction equates to the belief that she deserves to spend 20% of her life in prison-*because she is sick.*

This Court previously was put to task regarding another individual who thought he was deserving of the Bridge Program. In the *United States v. Larecius Mattison*, 16-4656 (4th Cir. 2017), the Defendant also alleged the Court failed to give proper weight to his request for the Bridge Program:

Mattison also contends that the district court did not fully and accurately address

his request to be placed in a state drug court known as the Bridge Program, under which the defendant participates in a period of drug treatment prior to sentencing. Whether to approve an applicant's admission into the program depends upon a variety of factors, including a verified history of current substance abuse or addiction, the nature of the current charge, the defendant's criminal history, and his dangerousness to the community.

The Court was affirmed by the appellate tribunal based on the reasons offered:

The district court gave several reasons for denying Mattison's request for placement in the Bridge Program. Among other things, the court noted that there was evidence of drug use but not drug addiction and that the present offense was serious and involved possession of a firearm. This explanation sufficiently addressed Mattison's request for placement in the program.

Precias Freeman is a drug addict. She has independent proof of this fact. The Court recognized this fact when opining that she has not had the necessary treatment to combat her illness. She never had a weapon. She didn't steal. She did not intentionally hurt anyone. All of her criminal history is *__directly related to her addiction.__* The Court spoke of how Precias has hurt the community, and society at large, with her distribution of opioids. However, the Court then dismissed the request for the Bridge Program and sentenced her to the 210 months necessary to get rid of her disease. This sentence is the definition of arbitrary and capricious.

This Court did not give any reasons for the denial. This Court didn't even ask Agent Webber to look into whether she was a verifiable candidate. Similarly, Agent Rogers didn't have anything to support the fact that Defendant failed a drug test, let alone for two substances.

## CONCLUSION

Precias Freeman didn't grow up wanting to be a drug addict. This Court acknowledged that she had a problem. The Court's solution to this problem was to sentence her to 17 and ½ years in prison. The Court abused its discretion in this matter; and,

16

Defendant pleads for reconsideration of the findings in the hearing held on December 13, 2018.

s/**_Donald L. Smith_**_____

Donald L. Smith, (Fed Id.#06626)
Attorney for Defendant Precias Freeman
122 N. Main Street
Anderson SC 29621
Telephone:  (864) 642-9284
Facsimile:   (864) 642-9285
attorneydonaldsmith@gmail.com

Anderson, South Carolina
December 26, 2018

Spartanburg Alcohol and Drug Abuse
Commission - CSN Free Text

## Session Information

| | |
|---|---|
| Client: | Freeman, Precias (592280) 9/2/1982 |
| Staff: | Keeney, Melissa (546494) |
| Service Date/Time: | 8/23/2017 5:30 PM - 5:40 PM |
| Client Program: | Intensive Outpatient (IOP) |
| Activity: | Non-Billable Case Management (CM-NC) |
| | Not Paid by Primary Payer |
| Procedure Code: | 00000 |
| Units: | 1.0 |
| Organization: | Spartanburg Alcohol and Drug Abuse Commission |
| Service Location: | 57 - Non-residential Substance Abuse Treatment Facility |

## CSN Free Text v2

| | |
|---|---|
| Clinical Service Note: | Client PO Bryann Rogers called to report client submitted UDS positive for opiates. According to Ms. Rogers, client reported she had taken 1 Lortab. Ms. Rogers requested client file be kept open until the judge determines whether or not she will return to treatment services or attend jail time followed by potential inpatient care due to pregnancy. Case was staffed with Lisa Caldwell-Salters who confirmed Ms. Rogers request. |
| Was client's family member/social support involved in this session? | ○ Yes ◉ No |

## Signatures

| | |
|---|---|
| Signature #1: | Melissa Keeney (Certified Addictions Counselor In-Process) - 8/24/2017 10:53 AM |

## Signature History

| Action | Date | Staff |
|---|---|---|
| Document Signed | 8/24/2017 | Melissa Keeney (Certified Addictions Counselor In-Process) |

**Don Smith <attorneydonaldsmith@gmail.com>**     Tue, Sep 18, 3:58 PM

to
Shannon_webber

Mr. Webber:

My name is Don Smith. I am the current counsel for the defendant in the above-referenced defendant, Ms. Freeman. I was given your name by a couple of people regarding your influence in requests for drug. In fact, Margaret Chamberlain, Esquire, said that without your involvement, it would be futile. Thus, I broach the topic with you, this afternoon. Our objections to the PSR are due on Thursday.

I am not completely sure of the parameters of drug court. However, it is my belief that the goal is to get addicts treatment, while lessening some of the burden on the prison system. With that in mind, I believe Precias Freeman is the epitome of the candidate for drug court. All of her criminal history is directly related to her addiction. I honestly don't honestly believe that I have ever encountered such an overwhelming addiction. At the height of her usage, she was using 60 to 80 Norcos per day. She was crush 6 at a time.

Her addiction controlled her and her life. She comes from a devout Christian family. Her father is a reverend. Her parents have been married for forever. Her addiction began in about 2000 with an injury. She was working for a doctor who enabled her to get prescriptions filled as she saw fit. Her addiction created a monster. She became an expert at getting pills.

On the same token, the pharmacies did absolutely nothing to curtail it. She had prescriptions filled three times at the same pharmacy on the same day, once. She had a prescription filled for 120 pills, and received 180 in return. Her addiction, seemingly, is like those of so many Americans. The outcry regarding opioids is for this very reason. I would greatly appreciate your thoughts. More importantly, I would like to pursue drug court on her behalf.

She has made a number of enemies in her opioid induced past. But, that was a different person. Putting her in jail for 20 years for an addiction is harsh. A cancer victim doesn't get jailed at all. Thank you for taking the time to read my email.

Sincerely,
Don Smith

*Donald L. Smith*
**Attorney Office of Donald Smith**
**122 N. Main St.**
**Anderson SC 29621**
**Telephone:  (864) 642-9284**
**Facsimile:   (864) 642-9285**
**attorneydonaldsmith@gmail.com**

Reply    Forward



 **Don Smith <attorneydonaldsmith@gmail.com>**    Mon, Dec 3, 1:35 PM

to
Shannon_webber

Mr. Webber:

I previously broached the topic of the Bridge Program, and my client Precias Freeman.  I will file a Motion for the Bridge Program.  I would ask that you point me in the right direction as to what the Court looks for in giving applicants the opportunity.  Thank you.

Sincerely,

Don Smith

While not every drug-dependent defendant is a candidate for drug court, and while not every drug court participant will complete their programs, 75% of those who do graduate "will never see another set of handcuffs."[24] In short, drug courts work where other interventions have failed.

### III.     THE CASE FOR DRUG COURT'S IN THE FEDERAL SYSTEM

At its inception, the Bridge Program mainly treated addicted defendants who had committed property crimes that fell under the jurisdiction of federal authorities, for example, theft and receipt of stolen mail, counterfeiting, conspiracy to defraud the United States, and other types of fraud. As the Program experienced success with these participants, it expanded its eligibility criteria to accept non-violent drug offenders who were dealing drugs to support addiction. The Bridge Program not only found that it could effectively treat such offenders, but that in doing so, there was a substantial opportunity to save resources and improve the lives of the participants, their families, and the community.

Our experience with the Bridge Program combined with basic facts about the federal criminal justice system leads us to believe that drug courts are a feasible and sensible alternative to incarceration for some federal defendants. As in the state system, the growth of federal prisons has created a serious financial and logistical problem. Making drug courts available to federal defendants has the potential to ease some of the burden on the Bureau of Prisons (BOP) and produce relative efficiencies beyond those achieved at the state level. Finally, despite claims to the contrary, a significant number of federal defendants are suitable candidates for drug court.

### A. Growth of Federal Prisons has Created a Financial and Logistical Burden

In 2013, there were 215,900 people serving time in federal prisons,[25] representing nearly a tenfold increase in the number of federal inmates incarcerated in 1980.[26] As a result of this growth,

---

[24] West Huddleston, Interview on C-SPAN , August 6, 2011.
[25] E. ANN N CARSON, U.S. D EPT. OF J USTI CE, B UR.EAU OFJ USTICE STAT IS11C.S, P RISONERS IN 20132 (2014).

addiction through a non-profit he formed with a friend. At his graduation on January 3, 2012, Jaison said that before he walked in to this Program he was a "dead man" and that now he has his life back.

A final example is Shaun Dubis, whose story was described in a May 2014 Huffington Post Article that covered Attorney General Holder's visit to the Bridge Program (a copy of the article is attached as Exhibit A). In his early thirties, Shaun had been addicted to heroin for more than half of his life. He had been in and out of drug treatment for over a decade without success and had failed out time and time again. He was quite literally dragged from the edge of death - having been resuscitated after overdosing. The consensus among several of the professionals who work with the Program was that Shaun was the worst heroin addict they had ever seen. His father choked with emotion as he described how he and Shaun's mother lived dreading the knock at the door that would bring them the inevitable news that Shaun was dead.

Instead, Shaun was arrested on federal drug charges and referred to the Bridge Program. With the accountability provided by the Program, Shaun completed a residential drug treatment program, got a job installing custom shutters with his brother, and began to fight for the life he had come so close to losing. When he broke his hand, he continued to work without pain medication so as not to compromise his recovery. He developed into a role model for younger participants in the Program and began to encourage others on the path to sobriety. When he stood before the Court in November of 2014 for his graduation, he was barely recognizable as the man who had been brought in on drug charges more than two years earlier. Never one to waste words, Shaun's message was simple and heartfelt - " thank you, thank you for giving me this chance."

## V.    CONCLUSION

Although less than four years old, the Bridge Program has already been efficient to significant result. The research conducted on drug courts in the state systems indicates that these

23

Pulmonary/Chest: Effort normal and breath sounds normal.
Abdominal: Soft. Bowel sounds are normal.
Musculoskeletal: Normal range of motion.
Neurological: She is alert and oriented to person, place, and time.
Skin: Skin is warm and dry.
Psychiatric: She has a normal mood and affect. Her behavior is normal. Judgment and thought content normal.
Nursing note and vitals reviewed.

**ED Course**
**ECG 12 Lead**
Date/Time: **10/3/2016 12:55 AM**
Performed by: **RAMSAY, MICHAEL PATRICK**
Authorized by: **RAMSAY, MICHAEL PATRICK**

ECG reviewed by ED Physician in the absence of a cardiologist: **no**
Previous ECG:
 Previous ECG: **Unavailable**
Interpretation:
 Interpretation: **abnormal**
Rate:
 ECG rate: **99**
 ECG rate assessment: **normal**
Comments:
  **Heart rate 99, QTC 441, left atrial abnormality, nonspecific ST-T wave changes.**

**MDM**
Number of Diagnoses or Management Options
Chest pain, unspecified type: new and requires workup

Amount and/or Complexity of Data Reviewed
Clinical lab tests: ordered and reviewed
Tests in the radiology section of CPT®: ordered and reviewed
Decide to obtain previous medical records or to obtain history from someone other than the patient: yes
Review and summarize past medical records: yes
Risk of Complications, Morbidity, and/or Mortality
Presenting problems: moderate
Diagnostic procedures: moderate
Management options: moderate
Patient Progress
Patient progress: stable

Labs Reviewed
URINE DRUG SCREEN MEDICAL WITHOUT CONFIRMATION - Abnormal; Notable for the following:
  Opiate Scrn, Urine (High Sensitivity)          Positive (*)
  All other components within normal limits
  *Narrative:*
  *Results are for medical purposes only.*
BASIC METABOLIC PANEL (BMP)(BMET) - Abnormal; Notable for the following:
  Potassium                                      2.9 (*)

Printed by BATSON, FRANCES [31031] at 9/18/2018 4:10:46 PM

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

Priority #: | 3

## TEDS/NOMS Verification

**Client Program:** Programs marked with (*) are not yet active. They will become active once the Client is admitted.
Intensive Outpatient (IOP) (04/20/2017 - 09/20/2017)

**Days Waiting to Enter Treatment:** 7

**Record Type:** Discharge

**Education:** 2 Years of College/University

**Employment Status:** Unemployed

**Living Status:** Adult or Independent Youth Living Independently

**Arrests in 30 days prior (to A/T/D):** ◉ Unknown

**Non-DUI Arrests in 30 days prior (to A/T/D):** ◉ Unknown

**DUI Arrests in 30 days prior (to A/T/D):** ◉ Unknown

## Quality of Life Survey
(Optional Participation)

**Did the client leave before quality of life questions could be completed?** ◉ Yes  ○ No

## Client DSM Diagnosis as of 9/20/2017 10:44 AM

| | |
|---|---|
| Client: | Freeman, Precias (592280) 9/2/1982 |
| Effective Date/Time: | 9/20/2017 10:44 AM |
| External Diagnosis: | No |
| Diagnosed By: | Keeney, Melissa (546494) |
| Comments: | |

## Diagnosis

| DSM-5 Severity/Specifier | ICD-10 | Comments |
|---|---|---|
| F11.20 - Severe opioid use disorder | F11.20 - Opioid dependence, uncomplicated | Federal Probation for Conspiracy to Possess with Intent to Distribute and Distribute Hydrocodone and Oxycodone, Schedule II Controlled Substances (October 2014 and indicted February 12th, 2017). CI said that she requested to come for AOD tx due to px with opiate use with last use was last week (Norcos 10mg-1 pill/others) with report of heavier use in the past year. |
| F12.10 - Mild cannabis use disorder | F12.10 - Cannabis abuse, uncomplicated | CI reported last use was 2 1/2 weeks ago which she usually smokes 5-6 hits off a joint on weekends. |
| F32.9 - Unspecified Depressive Disorder | F32.9 - Major depressive disorder, single episode, unspecified | Dx by Dr. Martin (psychiatrist) while in jail which he prescribed her Lexapro and Seroquel in December 2016 which she took until February 2017 (cl took herself off of it) which cl said that it was making her blood pressure go up. CI denied any |

Freeman, Precias (592280)                    2 of 4                    Date Printed: 9/27/2018 10:14 AM

-189-

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

| F41.9 - Unspecified Anxiety Disorder | | counseling hx. |
|---|---|---|
| | F41.9 - Anxiety disorder, unspecified | Per cl report. |

The Diagnoses above display in priority order.

## Psychosocial and Contextual Factors

| ICD-10 Code - Description | Comments |
|---|---|
| Z65.8 - Other Problem Related to Psychosocial Circumstances | Taking care of her parents, px with kids (i.e. teenage daughter) |
| Z59.9 - Unspecified Housing or Economic Problem | Financial stress |
| Z65.3 - Problems Related to Other Legal Circumstances | Legal px involving Federal Probation with Conspiracy (possession with intent to distribute opiates) |

## Diagnostic Formulation

See psychoactive substance use hx.

### ASAM PTC-Third ed.

**Dimension 1. Intoxication/WD:** Intoxication/Withdrawal or Potential Signs or Symptoms
- ○ 0 - None　　　○ 2 - Moderate　　　○ 4 - Very Severe
- ○ 1 - Mild　　　　◉ 3 - Severe

Severe - Severe intoxication or WD risk, but manageable.

**Notes:** Client hx of AOD use and self-report of continued use poses high risk for intoxication and withdrawal.

**Dimension 2. Medical Issues:** Biomedical Symptoms or their Complications to Tx
- ○ 0 - None　　　○ 2 - Moderate　　　○ 4 - Very Severe
- ○ 1 - Mild　　　　◉ 3 - Severe

Severe - Severe but stable medical problems or inability to cope with them.

**Notes:** Lupus (dx with 2003) and residuals from fall in 2000 involving her tail bone. Cl takes Prednisone when having flare-ups with Lupus but not on any meds now and does not have a physician (hers was on North Carolina). Cl does not have a physician in SC. Client is pregnant and reported continued AOD use. Client stated she is due to give birth 01/01/18.

**Dimension 3. Emotional/ Behavioral:** Emotional, Behavioral, or Cognitive functioning
- ○ 0 - None　　　○ 2 - Moderate　　　◉ 4 - Very Severe
- ○ 1 - Mild　　　　○ 3 - Severe

Very Severe - Severe mental, cognitive or behavioral impairment in need of confinement.

**Notes:** Cl has px coping with stressors/anxiety/depressive sx w/o AOD such as px with setting boundaries with others and having to take care of her parents along with legal charges. Client reported she and her family are being evicted from their home. Client stated she does not want to go to a shelter. Client reported prior homeless episode when she, her husband and two children lived in their SUV. Client stated that was a "fun" time.

**Dimension 4. Tx Acceptance:** Treatment Readiness
- ○ 0 - None　　　○ 1 - Mild　　　○ 2 - Moderate

| Freeman, Precias (592280) | 3 of 4 | Date Printed: 9/27/2018 10:14 AM |
|---|---|---|

**-190-**

Spartanburg Alcohol and Drug Abuse
Commission - Transfer/Discharge
Request

|  | ○ 3 - Severe | ● 4 - Very Severe |
|---|---|---|

Very Severe - Knows little about addiction, and not willing to explore.

**Notes:** Client stated if she does not attend treatment she will be arrested.
Client has not returned to services. Client has not responded to attempts for
reconnection with services.
Client appeared ambivalent regarding negative impact of AOD on her life, her
unborn child, her family and her need for positive change.

**Dimension 5. Relapse/
Ongoing Use Potential:** Skills to manage symptoms of disease

| ○ 0 - None | | ○ 2 - Moderate | | ○ 4 - Very Severe |
|---|---|---|---|---|
| ○ 1 - Mild | | ● 3 - Severe | | |

Severe - Little understanding or coping skills for managing substance abuse
symptoms.

**Notes:** Client lacks coping skills.

**Dimension 6. Recovery
Environment:** Environmental/ Support Factors

| ○ 0 - None | | ○ 2 - Moderate | | ○ 4 - Very Severe |
|---|---|---|---|---|
| ○ 1 - Mild | | ● 3 - Severe | | |

Severe - Even with clinical structure, coping is difficult with the absence of
recovery support.

**Notes:** Client lacks supportive network and environment.

## Level of Care

**Level of Care
Recommendation (Based
upon both ASAM and
Clinical Judgement):** Intensive Outpatient (IOP)

**PPC-II Opioid
~~Maintenance~~ Therapy:** ○ Yes
● No

## Signatures

**Signature #1:** Melissa Keeney (Certified Addictions Counselor In-
Process) - 9/20/2017 10:58 AM

### Signature History

| Action | Date | Staff |
|---|---|---|
| Document Signed | 9/20/2017 | Melissa Keeney (Certified Addictions Counselor In-Process) |

Freeman, Precias (592280)    4 of 4    Date Printed: 9/27/2018 10:14 AM

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. <u>7:17-CR-079</u> |
| | ) | |
| vs. | ) | |
| | ) | <u>GOVERNMENT'S RESPONSE TO</u> |
| PRECIAS K. FREEMAN | ) | <u>MOTION FOR RECONSIDERATION</u> |

The United States, pursuant to the directive of the Court, files the following response to the Motion to Reconsider.

**BACKGROUND**

On December 18, 2018, this Court held a sentencing hearing for Freeman. Prior to the hearing, Freeman filed eight objections to the Pre-Sentence Report ("PSR") and a comprehensive motion asking for admission to Bridge Court. (ECF No. 70) In light of the objections, the Government had Probation Officer Bryana Rogers, DEA Agent Adam Roberson, and DHEC Inspector Coy Tomlinson available to testify.

At the beginning of the sentencing hearing, Freeman and her counsel decided to withdraw all objections and to request admission to Bridge Court and/or a variant sentence.[1] The Court heard from defense counsel, the Government, and indicated on the record that it had reviewed all of the parties' filings. The Court denied the Motion for Bridge Court and sentenced Freeman to 210 months in the Bureau of Prisons, which was the low-end of her Guideline range. The Court recognized that Freeman had a drug problem and also recommended that the BOP consider her for the Residential Drug Abuse Program. (ECF No. 72, at 2)

---

[1] Freeman is not happy with the result of the sentencing proceeding; however, the decision to withdraw the many baseless objections and to proceed with a focus on Freeman and mitigating individual characteristics was inherently reasonable and sound strategy.

On December 24, 2018, Freeman filed a Motion to Reconsider. (ECF No. 76)

## LEGAL ARGUMENT

### I.     Agent Rogers and the drug test

Freeman alleges that Agent Rogers "manufactured a failed drug test" and that she "didn't have anything to support the fact that Defendant failed a drug test, let alone for two substances." (ECF No. 76, at 1 & 15)  The Government is at a loss to understand why Freeman insists on vilifying Agent Rogers regarding the drug test.  Freeman was not violated on her bond because of the drug test (an instant sample) and there is no doubt that the sample spilled on the way to the lab for confirmation.

The fact that Freeman tested positive seems to the Government to support Freeman's position at sentencing that she is a drug addict and is in need of drug rehabilitation.  Moreover, because Freeman raised this matter in her objections, the Government had Agent Rogers available to testify at the sentencing hearing, but Freeman chose not to ask her any questions. The fact that Freeman did not address at sentencing the allegations of "manufacturing evidence" shows that they lack merit and are frivolous.

### II.     Impartiality of the tribunal

Freeman quotes from an October 23, 2018 email from Deputy Clerk Pam Brissey to defense counsel regarding the drug test mentioned in the previous section. (ECF 76, at 2) In an effort to aid Attorney Smith, Ms. Brissey stated, inter alia, "Your client's assertions about a drug test that the probation officer admits could not be confirmed by the lab (due to leakage during shipping), and any other statements disputed by the defendant would be a credibility determination that would be determined by the court, should you wish to pursue."  This is accurate information.  Yet, Freeman now says that this email "was an ominous statement which

Defendant found to be an indication of the likelihood that she would get an unbiased review of the facts." Id. Freeman then states: "Based on the Court's sentencing hearing, Defendant had reason to be concerned about the Court's analysis of the objections previously made by her." Id.

It appears that Freeman is alleging that this Court and its staff have shown a bias against her and thus deprived her of a fair hearing. Cannon 3(C)(1) of the Code of Judicial Conduct provides: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned."

To the extent that Freeman is claiming that this Court is not impartial, no reasonable person would find fault inasmuch as this Court's staff conveyed accurate information to Freeman and this Court's denial of Freeman's Motion for Bridge Court was entered after a full and fair opportunity to be heard. There is no basis for disqualification or a claim of bias.

### III.    The drug weight

Freeman argues that on drug weight "[t]he government could not prove much of what was calculated." (ECF No. 76, at 3) This is the same argument Freeman raised in her objections to the PSR and chose not to pursue at sentencing. The Government simply incorporates by reference Sections IV-VI of its initial sentencing memorandum. (ECF No. 65).

### IV.    Bridge Program

In asking for reconsideration, Freeman argues that the "Court summarily dismissed facts relating to her addiction." (ECF No. 76, at 14) The Government disagrees. This Court took notice of the addiction and recommended Freeman for the Residential Drug Abuse Program in the BOP. The Court examined the § 3553(a) factors and explained the reasons for sentencing Freeman at the low-end of the Guidelines.

**CONCLUSION**

Freeman's Motion to Reconsider makes bald allegations of a general conspiracy among the Probation Office, Clerk's Office, the U.S. Attorney's Office, and the Court.    Freeman overlooks that she is the most prolific prescription forger that DEA has dealt with in the upstate of South Carolina, she absconded prior to sentencing and incurred additional charges, and that the findings of the PSR on drug weight and other matters were accepted on the record without objection from the defense.  Freeman is faced with a lengthy sentence, but she is the architect of the events leading to this sad result.

Respectfully submitted,

SHERRI A. LYDON
UNITED STATES ATTORNEY

BY:    s/ William J. Watkins, Jr.
WILLIAM J. WATKINS, JR.
Assistant U.S. Attorney
Federal I.D. No: 7863
Greenville, SC 29601
(864) 282-2100

# UNITED STATES DISTRICT COURT
for the
District of South Carolina

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | C.A. No.: 7:17-CR-79 |
| | ) | |
| v. | ) | |
| | ) | |
| PRECIAS K. FREEMAN | ) | |
| _____ | ) | |

## DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO HER MOTION FOR RECONSIDERATION

**COMES NOW,** Defendant, Precias K. Freeman, who brings this reply to the Government's Response to her Motion for Reconsideration:

## BACKGROUND

The Presentence Investigation Report provided by the United States Probation Office states that the correct offense level for Precias K. Freeman was a level 36, a criminal history level of II, thus qualifying Precias K. Freeman for a sentencing guideline range of 210 to 240 months. Defendant sought admission to the Bridge Program based on her extreme addiction to opiates. Said addiction had been confirmed by the program to which she was directed by the government. All of her encounters with criminal courts have been related to her ongoing quest to feed said addiction.

The Court recognized that Freeman had a drug problem and also recommended that the BOP consider her for the Residential Drug Abuse Program. The Court learned of the addiction which consisted of the ingestion of 60 to 80, 10 mg Lortabs per day during her sentencing. Based on the ADA's belief that drug addiction is a disease, Ms. Freeman suffers from a significant disease. Because Defendant suffers from a disease, she was sentenced to 210 months of incarceration.

## I. DRUG TEST

Counsel for the government takes issue with the vilification of Agent Rogers. However, the government has not offered any response other than how ridiculous Defendant is for questioning the agent. The Government doesn't provide a satisfactory reason for why the agent failed to do anything to substantiate her claims. Other than the agent's statement, there is no evidence that supports her assertions.

In fact, the Government goes as far as to say that even if the drug test results were manufactured, the test had no bearing on her violation and subsequent sentencing. Opposing counsel stated, "Freeman was not violated because of the drug test." (ECF 79, at 2). He was merely following the statement he made in his Response to Objections. "Ms. Freeman was not violated for the drug test..." (Sentencing Memorandum-Response to Objections, p, 3, section II).

Agent Rogers requested that the Court issue a warrant for Defendant's arrest by stating the following: "The defendant left the district of South Carolina without permission from the U.S. Probation Officer. She traveled to North Carolina and failed to provide the probation officer with her change of address. **The defendant also tested positive for the use of opiates and benzodiazepines on August 23, 2017**."

There was no qualification to the statement regarding the testing results. There was no mention of an admission. There was no mention of the testing sample being contaminated; and, as a result, no test was performed. Based on the agent's assertion, the Court issued a warrant for her arrest. The Government said, "the Court modified the defendant's bond to be placed back on location monitoring with GPS due to the positive drug test…" (Revised PSR, p. 4, No. 6). The government's own submission states that she was violated in part because of the failed drug test.

## II. IMPARTIALITY OF THE TRIBUNAL

The Government seeks to create a storm with the assumption that Defendant was seeking recusal by the Court. Counsel for the Government sums up Freeman's perception that she is being single out by the Government, *not the Court*. "Freeman overlooks that she is the most prolific prescription forger that DEA has dealt with in the upstate of South Carolina…" (ECF

No. 79, at 4).  The Government was embarrassed by Defendant.  Despite the fact that she was a lone operative, the plethora of agents who were involved, could not catch her.  Her *perception* was the Government would stop at nothing to bury her.  This perception was realized when the Government raised her sentencing points from 34 to 36, after she changed counsel.

At no time, did Defendant request or imply that the Court should step aside.  The concern was that the Court did not recognize the severity of her addiction, whether as seen by her testimony or the Forrester Center diagnoses.  Defendant simply does not understand how the Court could acknowledge her addiction; states the destruction that opiates have had on society; and, refuse to allow Shannon Webber to review if the Bridge Program would benefit Ms. Freeman *and* the Government.

### IV.  BRIDGE PROGRAM

As previously mentioned, Defendant's only criminal issues are related to her drug addiction.  They are *directly* related.  She did rob, steal, etc., for the purpose of supporting her habit.  She simply used her ingenuity combined with her addiction to create ways in which to get around the government to satisfy her thirst.  She was seemingly the ideal candidate for the Bridge Program.  However, the Court found that she is simply an individual worthy of spending 20% of her life incarcerated due to a disease.

### CONCLUSION

President Trump signed into law the First Step Act on December 21, 2018.  The Act is a criminal justice reform bill attempting to adjust sentencing laws and penalties that do not fit crimes.  The Act mandates treatment for opiate abuse.  Its purpose is to "prepare inmates to successfully rejoin society and enact commonsense sentencing reforms to make our justice system fairer for all Americans."  (White House, U.S. Legal News World).  Defendant respectfully prays for the opportunity to be a subject case in the government's push to have this inmate rejoin society with a commonsense sentence.

4

s/**_Donald L. Smith_**
Donald L. Smith, (Fed Id.#06626)
Attorney for Defendant Precias Freeman
122 N. Main Street
Anderson SC 29621
Telephone:  (864) 642-9284
Facsimile:  (864) 642-9285
attorneydonaldsmith@gmail.com

Anderson, South Carolina
January 14, 2019

| | | |
|---|---|---|
| 01/30/2019 | 81 | TEXT ORDER denying 76 Motion for Reconsideration as to Precias K Freeman (1): Defendant filed a motion for rehearing or, in the alternative, an amended motion for reconsideration of this courts sentence and judgment order of December 13, 2018. (ECF No. 76). The Government filed a response. (ECF No. 79). Defendant filed a Reply. (ECF No. 80).Defendant pleaded guilty to violations of 21 U.S.C. 841(a)(1), (b)(1)(C) and 846. (ECF No. 32). A sentencing hearing was held on December 13, 2018. At the hearing, Defendant withdrew her objections to the Presentence Report. Defendant was sentenced to 210 months imprisonment to be followed by three years of supervised release. (ECF No. 72).Defendants motion essentially attempts to rehash arguments contained in the objections to the Presentence Report, all of which were withdrawn, or to reargue her motion to enter a drug court program. (ECF No. 70). Defendants motion states it is filed pursuant to Federal Rule of Civil Procedure 59(e). However, Rule 59(e) does not apply to criminal proceedings. United States v. McKelvey, 34 Fed. Appx 959, 959 (4th Cir. 2002). The courts authority to modify a sentence is extremely narrow. A district court is only authorized to modify or reduce a sentence after imposition where (1) the Bureau of Prisons moves for a reduction, (2) the Sentencing Commission amends the applicable Guidelines range, or (3) another statute (including Rule 35 of the Federal Rules of Criminal Procedure) expressly permits the court to do so. United States v. Blackshear, 450 Fed. Appx 241, 242 (4th Cir. 2011) (citing 18 U.S.C. § 3582(c) (Section 3582)). Neither the first nor third condition is present here. Therefore, the only relevant issue is whether modification is allowed by statute or Rule 35. Under Rule 35, there are also only three possible situations allowing the court to modify a sentence: (a) upon remand after appeal; (b) upon motion of the Government; and (c) within fourteen days after sentencing if there was an arithmetical, technical, or other clear error. See Fed.R.Crim.P. 35(a)-(c). As there has not been a remand after an appeal, the Government has not filed any motion for a sentence reduction, and there is no arithmetical, technical or other clear error in the judgment, Rule 35 does not provide Defendant any relief. It appears that Defendant simply would like a re-do of her sentencing. However, the court finds that it lacks authority to modify Defendants sentence.Assuming the court did have the authority to alter or amend the sentence, it would not do so. The court carefully considered the Defendants motion for entry into the Bridge Program and determined, based upon the facts and circumstances presented, as well as an analysis of the factors set forth in 18 U.S.C. §3553, that the motion should be denied. The Defendant has a troubling criminal record. She was a prolific dealer of hydrocodone and oxycodone through forging and filling fraudulent prescriptions over an extended period, filling up to 21 such prescriptions per day. (ECF No. 68, 10). The Defendant received a low end advisory guideline sentence, with a recommendation, based on her assertions that she had a drug problem, that she be allowed to participate in any drug treatment programs available within the Bureau of Prisons. The court remains of the opinion that |

the sentenced imposed is reasonable given the facts and circumstances of the case and sufficient but not greater than necessary to achieve the purposes of sentencing.Finally, in her Reply, Defendant makes a vague reference to the First Step Act and requests an opportunity to be a subject case under the Act without identifying any specific provisions which would entitle her to relief. (ECF No. 80). Unlike filings filed by pro se parties, the court is not required to liberally construe motions filed by a party who is represented by counsel. Aikens v. Ingram, 652 F.3d 496, 504 (4th Cir. 2011). Nor are courts required to conjure up questions never squarely presented to them. Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1274, 1278). Based on the foregoing, Defendants motion (ECF No. 76) is DENIED.This order shall be without prejudice to the Defendants right to pursue, by proper petition or motion in accordance with applicable law, any relief to which she may be entitled under the First Step Act of 2018, Pub. L. No. 115-391, § 404, 132 Stat.___(2018). Ordered by Honorable Timothy M Cain on 1/30/19.(pbri, ) (Entered: 01/30/2019)

**FORM 1. Notice of Appeal to the United States Court of Appeals for the Federal Circuit from a
Judgment or Order of a UNITED STATES DISTRICT COURT**

Form 1
Rev. 03/16

RECEIVED
USDC CLERK. GREENVILLE. SC

2019 FEB 12  AM 9: 59

## United States District Court

### for the

_Spartanburg_ _____     **District of** _South Carolina_ _____

_United States of America_ Plaintiff,

v.                     Case No. _7:17CR79_ _____

_Precias Freeman_ , Defendant.

## NOTICE OF APPEAL

Notice is hereby given that _Precias Freeman_ _____

(name all parties * taking the appeal) in the above named case hereby appeal to the United States

Court of Appeals for the Federal Circuit _4th Circuit of South Carolina_ _____

(from the final judgment) ((from an order) (describe the order)) entered in this action on _12/13/18_ ___

_Precias Freeman_ _____

(Signature of appellant or attorney)

_2/12/19_

_____

(Address of appellant or attorney and e-mail address)

_request Court Appointed Attorney_

*See Fed. R. App. P. 3(c) for permissible ways of identifying appellants.

Precins Freeman
101 Justice Pl
Shelby, NC 28150
Cleveland County Jail